Receipt # 001730

ORIGINAL

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
APR 11 2006
U.S. COURT OF FEDERAL CLAIMS

THE PEOPLE OF BIKINI, BY AND THROUGH THE KILI/BIKINI/EJIT LOCAL GOVERNMENT COUNCIL,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 06-288 L

# COMPLAINT

Plaintiffs the people of Bikini Atoll, by the through the Kili/Bikini/Ejit Local Government Council, allege as follows:

## NATURE OF THE ACTION

1. On March 7, 1946, the U.S. Navy moved the people of Bikini in the Marshall Islands off their atoll in order to use it as a testing ground for nuclear bombs. The U.S. government moved the people of Bikini five times in four decades, even carelessly back to their own radioactive atoll until the islanders themselves had to sue the United States to be moved off. For 40 years, the Bikinians were wards of the United States, which had pledged to the United Nations to care for them and "protect [them] against the loss of their land and resources." Thanks in large part to the testing program at Bikini Atoll, the United States fought the Soviet Union to a nuclear testing stalemate and eventually won

the Cold War, but it has never discharged its fiduciary obligations to the nuclear nomads of Bikini. Instead, defendant has walked away from those obligations. In a Compact of Free Association with the Marshall Islands, defendant "accepte[d] responsibility for compensation owing to" the people of Bikini and established a Nuclear Claims Tribunal, an alternative dispute resolution procedure specifically to render "final determination upon all claims past, present and future," of the citizens of the Marshall Islands arising out of the nuclear testing program. The people of Bikini litigated their claims before the Tribunal for over seven years, and on March 5, 2001, received an award of $563,315,500. However, due to woefully inadequate funding provided by the United States – only $45.75 million – the Tribunal was able to pay the Bikinians only $2,279,000, or less than one-half of one percent of their award. By this action, the people of Bikini seek compensation under the Fifth Amendment to the U.S. Constitution for the taking of their property damage claims resulting from defendant's failure and refusal to adequately fund the March 5, 2001 order of the Nuclear Claims Tribunal. Alternatively, the people of Bikini seek damages for defendant's breaches of its fiduciary duty to provide just and adequate compensation for the taking of their lands in consideration for their agreement to move off Bikini Atoll and for breaches of the implied duties and covenants integral to that agreement, the Compact of Free Association agreement, and a related subsidiary agreement.

## JURISDICTION

2. This court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a) (1) and the Fifth Amendment of the United States Constitution.

PARTIES

3. Plaintiffs, the people of Bikini, the class for which this complaint is filed, are citizens of Bikini Atoll in the Marshall Islands. All plaintiffs are either: (a) members of the Bikini community in 1946, under control of the United States by military occupation, when they were evacuated prior to "Operation Crossroads," the first American atomic bomb tests at Bikini; (b) direct descendants of such members; or (c) other persons who by traditional law and custom are recognized by the people of Bikini as members of their community. All plaintiffs and class members possess land rights on Bikini Atoll.

4. The people of Bikini are governed locally by the Kili/Bikini/Ejit Local Government Council ("Council"), a recognized political subdivision within the Republic of the Marshall Islands. Members of the Council are voted into office by the people of Bikini in accordance with the Council's Constitution. The Council consists of a mayor (who is elected by the people of Bikini); treasurer, assistant treasurer, clerk, and assistant clerk (who are appointed by the mayor); and 18 Council members, 15 of whom are elected by the people of Bikini and the three of whom are traditional, non-elected leaders (called "alaps" in Marshallese) from each of the three clans of Bikinians. In addition, the people of Bikini are represented by a senator in the Marshall Islands parliament, which is called the Nitijela.

5. Plaintiff Eldon Note, the mayor of the Council, is a citizen of Bikini Atoll and the Marshall Islands.

6. Plaintiffs Banjo Joel, Jason Aitap, Hinton Johnson, Jaja Joe, Mishimore Jamore, Typhoon Jamore, Glann Lewis, Biem Lewis, Bujen Lewis, Urantha Jibas, Wilson Note, Ketruth Juda, Simon Jamore, Quincy Calep, Uraki Jibas, Jendrik Leviticus,

Nijima Jamore, and Kathaejar Jibas are Council members. All are citizens of Bikini Atoll and the Marshall Islands.

7. The following plaintiffs are Council officers: Andy Bill (treasurer), Marsh Note (assistant treasurer), Ajji Lewis (clerk), and Scare Laiso (assistant clerk). All are citizens of Bikini Atoll and the Marshall Islands.

8. Plaintiff Tomaki Juda is the senator for the people of Bikini.

9. The named plaintiffs sue on their own behalf and on behalf of the class they represent.

10. Defendant United States of America took and controlled access to Bikini Atoll for most of the last six decades and has assumed fiduciary responsibilities to the people of Bikini.

## CLASS ACTION ALLEGATIONS

11. This complaint is filed on behalf of the named plaintiffs and all the people of Bikini. This class consists of all living persons who were members of the Bikini community at the time of the 1946 evacuation of Bikini Atoll, all living direct descendants of those people who were evacuated, and all other persons who by traditional law and custom are recognized by the people of Bikini as members of their community. As used herein, "plaintiffs" refers to the named plaintiffs and the class they represent.

12. The members of the class on whose behalf this complaint is brought are so numerous that their joinder is impracticable. There are currently more than 3,650 members of the Bikini community.

13. This complaint involves common questions of law and fact, and the claims of the named plaintiffs are typical of the claims of the class. The named plaintiffs will

adequately and fairly protect the interests of the class, and they are represented by legal counsel experienced in class action litigation.

14. The actions of the defendant in the conduct of the U.S. nuclear testing program and negotiation of the Compact of Free Association have generally affected the entire class, thus making final relief appropriate with respect to the class as a whole. The common questions of law and fact involved in this action thus predominate over individual questions, if any. Class action treatment is the superior method for fair and efficient adjudication of this controversy because it permits numerous persons to prosecute their common claims jointly in a single forum and thus avoids unnecessary duplication. A class action provides an efficient, manageable method to adjudicate fairly the rights and obligations of the named plaintiffs and class members.

## STATEMENT OF FACTS

### A. Geography of Bikini: A Land-Centered Culture

15. Bikini Atoll is one of 29 atolls and five islands comprising the Marshall Islands, located approximately 2,200 miles southwest of Hawaii just north of the equator. Bikini Atoll's 26 islands, of which Bikini Island is the largest, have a combined land area of 2.32 square miles and enclose a lagoon of approximately 245 square miles. The Marshall Islands, together with two other archipelagoes, the Carolines and the Marianas, comprise Micronesia, a group of approximately 2,100 islands and atolls dispersed throughout the central Pacific in an ocean area approximately the size of the continental United States. A map of Micronesia is attached hereto as Exhibit A.

16. As the northernmost atoll in the Marshall Island's western chain, Bikini is relatively distant and isolated from other atolls. Before 1946, the Bikinians maintained

no regular contact with other communities and were among the last Marshallese people affected by foreign influences. As a result, the people developed an extremely well integrated society bound together by close ties of kinship, association and tradition.

17. The Bikinians developed a strong attachment to their homeland. Under traditional Marshallese law and custom, each Bikinian was—and still is—born with land rights in the islands of Bikini Atoll. Each individual is identified with the land that is his birthright, and ties to the land are especially strong. These land rights are intended to provide security to the members of the community. Because land in the Marshall Islands is so scarce, the Marshallese do not regard land as a commodity that can be sold to non-Marshallese people. "Land is regarded as sacred, . . . and as far as may be ascertained, has never been sold or given away to outsiders except through fear of physical or moral sanction being applied." Tobin, Land Tenure in the Marshall Islands (1958) at 4.

18. Prior to their evacuation from Bikini Atoll in 1946, the Bikinians were economically self-sufficient, relying almost exclusively upon Bikini's land and lagoon for their material needs.

B. Early History and Political Background

19. Formerly under Spanish and German rule, Micronesia was seized by Japan during World War I and thereafter became a League of Nations Mandate administered by Japan until 1944, when U.S. forces seized control of the islands from the Japanese in some of the bloodiest battles of World War II.

20. On January 30, 1944, the day U.S. forces first landed in the Marshall Islands, Admiral Chester W. Nimitz, Military Governor of the Marshall Islands, issued Proclamation No. 1, pursuant to which the United States assumed all legal powers of

government throughout the Marshall Islands. The proclamation provided, in part: "Your existing personal and property rights will be respected and your existing laws and customs remain in force and effect, except to the extent that it is necessary for me in the exercise of my powers and duties to change them." Proclamation No. 1 became effective as to Bikini Atoll on March 29, 1944, when U.S. military forces occupied and controlled the atoll. From 1944 until July 18, 1947 – covering the period of the 1946 evacuation of the Bikini people and the first U.S. atomic bomb tests – Bikini Atoll, like the rest of the Marshall Islands, was occupied military territory under United States' control.

C. United States' Evacuations of the Inhabitants of Bikini Atoll for the U.S. Nuclear Testing Program

21. On January 10, 1946, President Harry Truman approved the use of Bikini Atoll for three nuclear tests, code-named "Operation Crossroads." One month later, on Sunday, February 10, 1946, the American military governor of the Marshall Islands, U.S. Navy Commodore Ben Wyatt, flew by seaplane to Bikini to speak to the people and their leader, Juda, at the conclusion of the Bikinians' church services. Official Navy records reported that Wyatt told the Bikinians "of the bomb that men in America had made and of the destruction it had wrought upon the enemy" and that the Americans "are trying to learn how to use it for the good of mankind and to end all world wars." He then asked: "Would Juda and his people be willing to sacrifice their island[s] for the welfare of all men?" The Bikinians were told that they would be allowed to return to their atoll in a matter of months when the United States no longer needed it for Operation Crossroads.

22. The Bikinians did not wish to leave their atoll. But, in view of the United States' defeat of Japan and Commodore Wyatt's description of the nuclear weapons, they believed themselves powerless to resist the United States decision.

The Bikinians were accustomed to taking military orders, having been under the control of Japanese soldiers during Word War II. To remain on Bikini and insist that the United States find an alternative site for its nuclear testing was not a realistic option, and they thus agreed to leave their atoll on the understanding that the United States would provide for them while they were away from their homeland and would protect them against the loss of their lands.

23. On March 7, 1946, the U.S. Navy moved the 167 inhabitants of Bikini off their atoll. It first moved them to Rongerik Atoll, 125 miles east of Bikini, leaving them with a few weeks' supply of food and water. Within two months, the Bikinians experienced severe food shortages and asked the Navy for permission to return home. Their request was denied.

24. A U.S. physician sent to examine the Bikinians reported in July 1947 that "they were visibly suffering from malnutrition," and an anthropologist sent by the U.S. government in February 1948 found that starvation conditions existed on Rongerik.

25. Following newspaper disclosure of the dire conditions on Rongerik, the U.S. Navy moved the Bikinians to Kwajalein Atoll in March 1948 and then moved them again six months later, this time to Kili Island, about 400 miles southeast of Bikini Atoll.

26. Kili is an island, not an atoll, with a landmass only one-sixth the area of Bikini Atoll. The lagoon-centered fishing skills that had sustained the people of Bikini on their atoll for generations were of no use on Kili, which has neither a lagoon nor a protected anchorage. For six months out of the year, access to the island by boat is extremely hazardous and fishing is nearly impossible.

27. Numerous severe food shortages occurred on Kili. The situation in 1952 was so severe that the United States air dropped food to the island. The 1958 and 1960 food shortages resulted from a devastating 1957 typhoon that killed much of the vegetation.

28. Of the approximately 3,650 Bikinians living today, approximately 1,100 reside on Kili. Conditions on Kili have remained adverse since 1948. Health care is deficient, housing is sub-standard, and the Bikinians have little cash producing activity, and the local economy remains severely depressed.

D. <u>The U.S. Atomic and Hydrogen Bomb Testing on Bikini Atoll</u>

29. Between June 1946 and July 1958, the United States exploded 23 atomic and hydrogen bombs at Bikini Atoll. The majority of the nuclear devices were detonated on barges anchored in Bikini lagoon or on the atoll's reef. Two tests were air drops directly on the land, and two nuclear devices were detonated underwater in or near the lagoon.

30. The nuclear tests caused severe, extensive, and long-lasting destruction to Bikini Atoll. The 1954 "Bravo" hydrogen bomb shot – the largest nuclear weapon ever detonated by the United States and at least 750 times more powerful than the atomic bomb dropped on Hiroshima – created a fireball four miles wide, vaporized three islands and portions of others, left a one-mile, 200-foot deep hole in the atoll's reef, and moved concrete buildings 24 miles across the lagoon.

31. The cost to develop and test U.S. nuclear weapons in the Marshall Islands exceeded $150 billion (in 2006 dollars). A 1953 report from the Atomic Energy Commission ("AEC") to Congress on these costs explained: "Each of the tests involved a major expenditure of money, manpower, scientific effort and time. Nevertheless, in accelerating the rate of weapons development, they saved far more than their cost." The

AEC also noted "that tests should be held overseas until it could be established more definitely that continental detonations would not endanger the public health and safety."

32. In 1958, President Dwight D. Eisenhower declared a moratorium on U.S. atmospheric nuclear testing, ending the nuclear testing program in the Marshall Islands.

33. Based on the findings of a blue-ribbon AEC panel, President Lyndon B. Johnson announced on August 12, 1968, that a return to Bikini would "not offer a significant threat to [the Bikinians'] health and safety," and the next year the United States began moving Bikinians back to Bikini Atoll, which had been completely decimated by the nuclear tests.

34. However, limited radiological measurement in the early 1970's led U.S. scientists to urge the Bikinians to limit their intake of locally grown foods, such as coconuts, breadfruit, and pandanus. Concerned about their safety, the Bikinians brought suit in 1975 seeking to compel defendant to conduct a comprehensive radiological survey of Bikini Atoll. In their complaint, the Bikinians stated: "For us to make an intelligent decision to resettle Bikini Atoll, they must be able to weigh our desire to return against the radiological risks of returning. We have not been provided with that information." The People of Bikini v. Seamans, et al., Civ. No. 75-0348 (D. Ha.). They dismissed the lawsuit after defendant agreed to conduct a thorough radiological survey of Bikini Atoll.

35. Before this survey could be conducted, a team of U.S. physicians examining the Bikinians in April 1978 described what they called an "incredible" one-year 75% increase in their body burdens of radioactive cesium-137, leading the physicians to conclude that the Bikinians had likely ingested the largest amounts of radiation of any known population.

36. Later investigations revealed that the AEC findings relied on by President Johnson in 1968 contained an egregious typographic error that assumed that people living on Bikini would consume one spoonful of liquid per day, numbers that were off by a factor of nearly 100. "We just plain goofed," the author of the report admitted.

37. In August 1978, the United States evacuated the people from Bikini Atoll for the fifth time, sending some to Ejit Island in Majuro Atoll and others back to Kili Island.

38. Numerous radiological surveys of Bikini conducted since late 1978 have concluded that the atoll was – and still is – not safe for human habitation. The Bikinians are barred from returning to their homeland, have not lived together as a community for 37 years, and remain scattered throughout the Marshall Islands, the United States, and other areas of the Pacific.

E. U.S. Political Control over Micronesia

39. On July 18, 1947, the Marshall Islands, together with the rest of Micronesia, were brought into the United Nations ("U.N.") trusteeship system, with the United States as administering authority, pursuant to the terms of a Trusteeship Agreement for the Former Japanese Mandated Islands, 61 Stat. 3301, T.I.A.S. No. 1665 (1947). In order to preserve U.S. control of the area, Micronesia, now also called the Trust Territory of the Pacific Islands, was designated a "strategic trust," the only one in the U.N. system. In addition, the United States as administering authority reported to the U.N. Security Council, where it had veto power.

40. The Trusteeship Agreement granted the United States "full powers of administration, legislation, and jurisdiction" over the Trust Territory and the right to fortify the islands and close off parts of them for security purposes. At the same time, it

required the United States to promote the economic, social, and educational advancement of the inhabitants; to promote their political advancement toward self-government or independence, taking into consideration their "freely expressed wishes;" to protect their health; and to protect them "against the loss of their land and resources."

41. Defendant expanded on this last pledge in 1947, stating that it was "the policy of the United States that ... [Trust Territory] owners of private property required for public use shall be properly compensated for the loss of property taken," and that if a fair agreement compensating the property owner by award of title to other land could not be reached, "cash compensation from the date of seizure is in order."

42. A U.S. representative assured the U.N. Security Council in 1947 that

> [m]y Government feels that it has a duty towards the peoples of the trust territory to govern them with no less consideration than it would govern any part of its sovereign territory. It feels that the laws, customs and institutions of the United States form a basis for the administration of the trust territory compatible with the spirit of the Charter. For administrative, legislative and jurisdictional convenience in carrying out its duty towards the peoples of the trust territory, the United States intends to treat the trust territory as if it were an integral part of the United States.

43. In a November 20, 1947 memorandum to President Truman, AEC Chairman David Lilienthal stated that "[i]n order to insure that the United States meets fully its international obligations under the Charter of the United Nations and in connection with the Trusteeship Agreement entered into between the United States and the Security Council respecting the Trust Territory of the Pacific . . . [local inhabitants] will be accorded all rights which are the normal constitutional rights of citizens under the Constitution . . . ."

44. U.S. executive authority over the Trust Territory of the Pacific Islands was vested in a U.S. High Commissioner, appointed by the President with the advice and

consent of the Senate, and who, beginning in 1951, served under the supervision and direction of the Secretary of the Interior. The first proclamation issued by a High Commissioner, on July 18, 1947, announced that he exercised "all powers of government and jurisdiction . . . and final administrative responsibility" over the Trust Territory and its inhabitants. Any local laws inconsistent with the Trusteeship Agreement, Interior Department Orders or Executive Orders, or any directive of the High Commissioner, would be null and void.

45. Under the United Nations Trusteeship Agreement, the People of Bikini and the other inhabitants of the Marshall Islands became citizens of the Trust Territory of the Pacific Islands with passports reflecting this status. They remained citizens of the Trust Territory until 1990, when the Trusteeship terminated.

46. U.S. policy towards the Trust Territory for the first several decades of the trusteeship was one of benign neglect. The United States spent tens of billions of dollars on the nuclear testing program in the Marshall Islands and $28 million to build a Central Intelligence Agency ("CIA") complex in the Northern Mariana Islands, but the annual budget for the entire Trust Territory only averaged about $5 million.

47. In 1960, the U.N. General Assembly issued a "Colonialism Declaration" calling for "[i]mmediate steps to be taken in trust . . . territories . . . to transfer all powers to the peoples of those territories . . . in order to enable them to enjoy complete freedom and independence." A U.N. Visiting Mission report on Micronesia in 1962 was sharply critical of all aspects of American administration: inadequate education and economic development, almost non-existent health care, failure to compensate for lands that were taken, and especially the failure to move the Micronesians toward self-government.

48. A 1963 report ordered by President John F. Kennedy to examine conditions in Micronesia confirmed the views of the U.N. Visiting Mission and warned that the United States probably had "only five to seven years before United Nations' pressures compel the holding of a plebiscite leading to the termination of the trusteeship" and therefore that "the primary United States objective is to get the people of Micronesia to vote for permanent affiliation with the United States in such a plebiscite." In calling for a U.S. strategy to bring Micronesia "into line with an eventual permanent association," the report recommended various actions to insure a favorable vote in the plebiscite . . . ."

49. In 1964, the Interior Department created a Trust Territory governmental entity called the Congress of Micronesia, but the High Commissioner retained the right to veto all laws passed by the Congress and to enact "urgent" laws not passed by it.

50. During the entire trusteeship period, defendant maintained strict control over the Trust Territory. The Trust Territory Government could not communicate directly with foreign governments and international bodies, and the High Commissioner maintained control over budget, accounting, and other relations with U.S. government agencies. Even after the Marshall Islands formed its own constitutional government in 1979, the High Commissioner continued to maintain authority over all laws and eight categories of administrative functions, including budget, accounting, and all relations with United States government agencies and foreign governments. Indeed, as late as December 1982, defendant prevented the Marshall Islands Government from signing the Law of the Sea Treaty. "We've got the trust, and they've got the territory," is how one Marshallese senator summed up the first 40 years of U.S. control over the Trust Territory.

F. Future Political Status Negotiations

51. In 1969, discussions commenced between Micronesian officials and defendant concerning the future political status of the Trust Territory.

52. During the course of these talks, Bob Woodward of the Washington Post reported that the CIA had regularly conducted electronic surveillance on Micronesian negotiators to obtain intelligence on their negotiating positions in the political status talks. In a December 14, 1976 editorial, the Washington Post asked: "Why should the United States . . . be bugging a dependent ward that had been formally delivered into its care by the United Nations?" Senate hearings in 1977 confirmed that Secretary of State Henry Kissinger had ordered these actions, which included the bugging as well as placing a spy on the Micronesian negotiating team.

53. By 1978, Micronesia had fragmented politically into four separate political entities – the Northern Mariana Islands, the Federated States of Micronesia, Palau and the Marshall Islands. The Northern Marianas achieved commonwealth status, while the other three entities opted for "free association," a political relationship recognized by the U.N. General Assembly as a middle ground between full integration and independence. Under this status, embodied in a Compact of Free Association ("Compact"), the three governments obtain financial assistance from the United States and are permitted some degree of self-government and the limited ability to conduct their own foreign affairs except insofar as the United States determines them to be incompatible with U.S. defense responsibilities. The United States also has the right to maintain its military base in the Marshall Islands and to foreclose access to Micronesia by the military of any third country.

54. In 1978, the Under Secretary of the U.S. Department of the Interior, James Joseph, voiced his concern that the Compact would permit the United States to walk away from its obligations to the people of Bikini. He urged the U.S. ambassador negotiating the Compact that "the United States should make clear that it will regard itself as having a continuing responsibility, for the indefinite future, for nuclear damage in the Marshalls." Citing a "dismal record of miscalculation" and the fact that "the United States egregiously misguessed in 1968 with respect to Bikini," the Under Secretary argued that

> [W]e should not today assume that we can responsibly know now or predict for the future the fate of the damaged Marshallese . . . or their land. If that is so, then we believe that the United States should continue to remain responsible, and should treat the damage problem on an ad hoc basis, obtaining legislation and appropriations to meet such needs as arise, when they arise. I recognize that this is untidy, but so is the problem of nuclear damage.

55. The United States, as administering authority of the Trust Territory, vetoed plans for a 1982 plebiscite to determine the future political status of the Marshall Islands because independence was going to be on the ballot along with free association and continuation of the U.N. trusteeship. The United States insisted that the option of independence be removed from the ballot. "This means that when we are allowed to vote, the only choice will be between two different forms of colonial administration," said the Republic of the Marshall Islands ("RMI") foreign minister in response to the veto.

56. Although the RMI government initialed the Compact in 1980, it did not become effective until 1986. During this period, the RMI, as its Chief Secretary testified before the U.S. Congress, was "critically confronted with a serious financial crisis" and on the verge of bankruptcy. The RMI's infrastructure had deteriorated badly, due in large

part to earlier U.S. neglect. Based on U.S. assurances that the Compact would go into effect in 1981, the RMI Government borrowed against Compact funding to initiate a major capital improvement program, but this only led to further economic dependence on the United States and thus weakened the RMI Government's bargaining position on the Compact and any possible nuclear claims settlement.

57. The RMI and U.S. governments signed the final version of the Compact on June 25, 1983.

58. Voters in the Marshall Islands approved the Compact in a September 7, 1983 plebiscite. The people of Bikini voted nearly 80% against the Compact.

59. The U.S. Congress passed the Compact of Free Association Act in December 1985, and President Ronald Reagan signed it into law on January 14, 1986. Pub. L. No. 99-239, 48 U.S.C. § 1681. The Act contains both the Compact, as voted upon by the Marshall Islanders, as well as extensive new provisions in three additional titles.

60. The U.N. Security Council terminated the Trusteeship Agreement on December 22, 1990 and admitted the RMI to the United Nations on August 9, 1991.

61. The close association and control by defendant envisioned by the Compact has played out in many ways. The Marshall Islands continues to utilize U.S. zip codes (96960 and 96970) and used domestic U.S. postage governed mail service to and from the United States until January 8, 2006. Marshallese citizens serve in all branches of the U.S. armed forces and they are not required to obtain a visa to enter the United States. And, in keeping with its foreign policy powers, the United States prevented the RMI government from signing the South Pacific Nuclear Free Zone Treaty.

G. The Compact of Free Association

62. Section 177(a) of the Compact states that the defendant "accepts the responsibility for compensation owing to citizens of the Marshall Islands . . . for loss or damage to property and person of the citizens of the Marshall Islands . . . resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946, and August 18, 1958." Section 177(b) states that defendant and the RMI government shall "set forth in a separate agreement provisions for the just and adequate settlement of all such claims which have arisen in regard to the Marshall Islands and its citizens and which have not as yet been compensated or which in the future may arise. . . . "

63. The separate agreement referred to in Section 177(b) of the Compact, entitled "Agreement Between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact of Free Association" ("Section 177 Agreement"), had been signed on June 25, 1983. A copy of the Section 177 Agreement is attached hereto as Exhibit B.

64. As stated in its preamble, the Section 177 Agreement was signed "[i]n recognition of . . . the expressed desire of the Government of the Marshall Islands to create and maintain, in perpetuity, a means to address past, present and future consequences of the [U.S.] Nuclear Testing Program, including the resolution of resultant claims. . . ."

65. The Section 177 Agreement established a $150 million trust fund, the income from which was earmarked for nuclear-affected atolls and for other programs related to the legacy of the nuclear testing program. Article IV established a Nuclear Claims

Tribunal ("Tribunal") with "jurisdiction to render final determination upon all claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program. . . ." The Section 177 Agreement provided that $45.75 million of income from the trust fund was to be made available to the Tribunal over a 15-year period to pay out awards, and after 15 years, at least 75% of the income earned by the trust fund was to be made available to the Tribunal "for disbursement in payment of monetary awards made by the Claims Tribunal in subsequent years."

66. By its own admission, the defendant made no effort to calculate the magnitude of the damages and injuries inflicted upon the Marshall Islanders in deciding the amount of the payments under the Section 177 Agreement. Asked by the House Interior Committee for "documents which reflect the calculations" the Administration made "to determine how much should be paid to each group of claimants," the Administration responded that "no [such] documents exist."

67. In conjunction with the establishment of the Nuclear Claims Tribunal, Article X of the Section 177 Agreement, entitled "Espousal," states: "This Agreement constitutes the full settlement of all claims, past and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program and which are against the United States, its agents, employees, contractors and citizens and nationals. . . ." In addition, Article XII of the Section 177 Agreement, entitled "United States Courts," provides that claims described in Article X "shall be terminated" and that "[n]o court of the United States

shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed."

68. Article VI, Section 1 of the Section 177 Agreement provides: "The Government of the United States reaffirms its commitment to provide funds for the resettlement of Bikini Atoll by the people of Bikini at a time which cannot now be determined."

69. The people of Bikini were not parties either to the negotiations on the Compact or the Section 177 Agreement.

70. Defendant engaged in self-dealing in "negotiating" the Section 177 Agreement.

H. Prior Federal Court Proceedings

71. On March 16, 1981, the people of Bikini filed suit in the United States Court of Claims seeking compensation under the Fifth Amendment of the U.S. Constitution for the taking of their lands and damages for breaches of fiduciary duties owed by the United States. Juda et al. v. United States, No. 172-81 L (March 16, 1981). On October 5, 1984, the Court denied the United States' motion to dismiss, holding that (1) the Bikinians' Fifth Amendment taking claims were not barred by the statute of limitations; (2) Tucker Act jurisdiction existed over the claim of a contract implied-in-fact imposing fiduciary obligations on the United States; (3) the Bikinians' implied-in-fact contract claims were not barred by the sovereign act defense; (4) no specific contract precluded the implied contract claims; and (5) the Fifth Amendment's just compensation clause is applicable to the Marshall Islanders. Juda v. United States, 6 Cl.Ct. 441 (1984).

72. Following enactment of the Compact, the Court subsequently held that the Compact implicitly amended the Tucker Act so as to withdraw the consent of the United States to be sued on takings and breach of contract claims arising from the nuclear testing program. The Court further held that plaintiffs' claims questioning the constitutionality of the procedures set up in the Section 177 Agreement were premature, because the Agreement provided an alternative method of compensation – the Tribunal: "[T]he settlement procedure, as effectuated through the Section 177 Agreement, provides a 'reasonable' and 'certain' means for obtaining compensation. Whether the settlement provides 'adequate' compensation cannot be determined at this time." Juda v. United States, 13 Cl.Ct. 667, 689 (1987).

73. On appeal, the U.S. Court of Appeals for the Federal Circuit affirmed the reasoning underlying this decision:

> The [Compact] and the section 177 Agreement, provide, in perpetuity, a means to address past, present and future consequences, including the resolution of individual claims, arising from the United States nuclear testing program in the Marshall Islands. . . . [W]e are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate.

People of Enewetak v. United States, 864 F.2d 134, 136 (1988).

74. The Bikinians dismissed their appeal of the Juda decision (see paragraph 72, above), following the enactment of legislation that appropriated funds for the resettlement of Bikini. People of Bikini, et al. v. United States, 859 F.2d 1482 (Fed.Cir.1988).

75. In 1984, plaintiffs brought suit in U.S. District Court in Hawaii seeking to compel defendant to conduct a radiological cleanup of Bikini Atoll, restore it to its former safe condition, and resettle the Bikinians. The People of Bikini v. United States of America, et al., Civ. No. 84-0425 (D. Ha. 1984). The litigation was settled in a

Memorandum of Agreement, dated March 13, 1985, which states: "The United States views with favor the rehabilitation and resettlement of Bikini Atoll by the people of Bikini and pledges to the people of Bikini to use its best efforts to facilitate the steps necessary to achieve these objectives."

I. Proceedings before the Nuclear Claims Tribunal

76. In 1993, the people of Bikini filed a class action claim in the Nuclear Claims Tribunal, seeking damages for (a) the loss of use of Bikini Atoll, (b) restoration costs for a radiological cleanup of the atoll, and (c) consequential damages and hardships suffered by the people of Bikini. In the Matter of the People of Bikini, Claimants for Compensation, NCT No. 23-04134.

77. The people of Bikini litigated their claims before the Tribunal for over seven years, and on March 5, 2001, the Tribunal issued a Memorandum of Decision and Order awarding plaintiffs $563,315,500 for property and consequential damages, after deducting $194,725,000 for compensation and restoration costs already received by plaintiffs from defendant. This deduction was required by Article IV, Section 2 of the Section 177 Agreement, which provides that "in making any award, the Claims Tribunal shall take into account the validity of the claim, any prior compensation made as a result of such claim and such other factors as it may deem appropriate." A copy of the Tribunal's Memorandum of Decision and Order is attached as Exhibit C.

78. The $563,315,500 awarded by the Tribunal was broken down into three categories: (1) $278,000,000 was designated for past and future loss of use of Bikini Atoll; (2) $251,500,000 was designated for restoration costs for a radiological cleanup of

the atoll; and (3) $33,814,500 was designated "for the hardships suffered by the People of Bikini as a result of their relocation attendant to their loss of use."

79. As the U.S. State Department has noted, the Tribunal "considered [radiological cleanup] strategies estimated to cost from $217 million to $1.4 billion for Bikini," but only awarded an amount in the lower range of those estimates – $251.5 million – selecting the same cleanup method recommended by the U.S. Department of Energy's contractor, Lawrence Livermore National Laboratory.

80. On February 1, 2002, the Tribunal issued an initial payment on the Bikini award in the amount of 0.25% of the Tribunal's award. "It is clear that the Nuclear Claims Fund is insufficient to make more than a token payment on the award," the Tribunal noted in its Order. "Nonetheless, the Claimants deserve a payment that will acknowledge the loss and damage from the Nuclear Testing Program which they have suffered and give some meaning to the Tribunal's award." The Tribunal acknowledged that the 0.25 percent award "is less than requested by claimants, in light of the resources available to the Tribunal, the potential of future land awards and uncertainty regarding the future of the Tribunal, the level of payment is an amount the Tribunal regards as prudent considering the totality of circumstances."

81. On February 20, 2002, the Tribunal issued an Order calculating that 0.25% of its award to the people of Bikini amounted to $1,491,809.43, and it ordered that this "initial payment" be made to plaintiffs.

82. Pursuant to decisions in earlier cases and the fact that statutory interest on judgments in Marshall Islands court is 9%, the Tribunal established a post-judgment interest rate of 7% per annum for the loss of use and restoration of land. By December

16, 2002, interest had accrued on the award, bringing the amount due as of that date to $629,896,320. On February 4, 2003, the Tribunal issued another Order for payment. Noting that the Nuclear Claims Fund balance stood at approximately $12 million and that the Tribunal faced additional class action claims and "[l]egislative and administrative action [that] could add significantly to the demands on the [Nuclear Claims] Fund," the Tribunal limited its second payment on the Bikini award to 0.125% of the updated total, amounting to $787,370.40, noting that "[i]n light of the current fiscal constraints, it behooves the Tribunal to be conservative in its payment determination."

83. As of December 31, 2005, the Tribunal had awarded $88,291,750 in compensation for radiogenic medical conditions to 1,958 Marshall Islanders. Because of these awards and Congress' overall inadequate funding of the Tribunal, it has been able to pay only 0.375%—less than one-half of one percent—of its award to plaintiffs.

84. After deducting the two small payments made in 2002 and 2003, interest earned on the loss of use and restoration portions of the Bikini award increased the total award from $563,315,500 in March 2001 to $724,560,902 as of today.

85. As of December 31, 2005, the value of the remaining funds available to the Tribunal for its own administrative operations and awards payments was $1,856,998.20.

J. <u>The Thornburgh Report</u>

86. In response to U.S. government concerns that the Nuclear Claims Tribunal was not operating with adequate transparency, the RMI Government in 2002 retained former U.S. Attorney General Richard Thornburgh to undertake an independent examination and assessment of the processes used by the Tribunal.

87. In his January 2003 report ("Thornburgh Report"), Mr. Thornburgh found that the Tribunal fulfilled the basic functions for which it was created in a reasonable, fair and orderly manner, and with adequate independence. He concluded that property damage claims before the Tribunal had been asserted through class action vehicles similar to those used in the United States courts, with litigation "characterized by the kind of legal briefing, expert reports, and motion practice that would be found in many U.S. court proceedings."

88. The Thornburgh Report concluded: "[I]t is our judgment that the $150 million trust fund initially established in 1986 is manifestly inadequate to fairly compensate the inhabitants of the Marshall Islands for the damages they suffered as a result of the dozens of U.S. nuclear tests that took place in their homeland."

K. Changed Circumstances Petition

89. Article IX of the Section 177 Agreement, entitled "Changed Circumstances," provides: "If loss or damage to property and person of the citizens of the Marshal Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, and such injuries were not and could not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate, the Government of the Marshall Islands may request that the Government of the United States provide for such injuries by submitting such a request to the Congress . . . for its consideration." The RMI government filed such a petition on September 11, 2000, and specifically requested Congress to authorize and appropriate additional funds to cover unpaid Tribunal property claims, but Congress never acted on it. On January 24, 2005, the U.S. State Department

advised Congress that the "facts [in the petition] regarding loss and damage to property do not support a funding request under the "changed circumstances" provision of the Section 177 Agreement."

L. Compact of Free Association Amendments Act of 2003

90. Facing expiration of the 15-year term of the Compact of Free Association, the U.S. and RMI governments entered into negotiations that resulted in the Compact of Free Association Amendments Act of 2003, P.L. 108-188 ("amended Compact").

91. The amended Compact is silent on the question of additional funding to the Tribunal because defendant refused to negotiate the issue. By letter dated March 27, 2002 to the RMI government, the U.S. Compact negotiator stated: "We cannot . . . address requests for any additional assistance related to the Nuclear Testing Program since this issue is on a separate track. It is now before Congress via the [RMI Government's] request submitted under the changed circumstances provision" of the Section 177 Agreement.

COUNT I

Fifth Amendment Taking of Plaintiffs' Claims for Public Use

92. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 91.

93. Defendant's failure and refusal to satisfy the awards issued by the Nuclear Claims Tribunal on March 5, 2001 constitutes a taking of plaintiffs' claims for public use for which plaintiffs are entitled to just compensation under the Takings Clause of the Fifth Amendment to the United States Constitution.

94. Plaintiffs request just compensation for such taking in the amount of at least $561,036,320 (which represents the Tribunal's original award of $563,315,500 less the two payments totaling $2,279,180), plus interest as required by law.

COUNT II

Breach of Fiduciary Duties Created by Contract Implied-in-Fact

95. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 94.

96. When defendant moved the people of Bikini off their atoll on March 7, 1946, it assumed fiduciary responsibilities for the people. The Bikinians recognized and relied upon these fiduciary obligations by agreeing to place themselves in defendant's care. The circumstances of their evacuation and removal from Bikini Atoll created a contract implied in fact between the Bikinians and defendant obligating defendant as a fiduciary to protect the health, well-being, economic condition and lands of the Bikini people.

97. On various occasions, defendant has recognized and expressed its obligations as trustee to the Bikini people. See, for example, Proclamation No. 1 of Admiral Nimitz (paragraph 20, above; Proclamation No. 1 of the High Commissioner (paragraph 44, above); the U.N. Trusteeship Agreement (paragraph 40, above); and 1947 policy statements by defendant (paragraphs 41, 42 and 43, above).

98. In a "Statement Of Understanding On The Part Of The Government Of The United States And The Government Of The Trust Territory Of The Pacific Islands Concerning Their Move Of The People Of Bikini Island, August, 1978," defendant declared that "[t]he Government of the United States considers itself generally responsible for the well being of the Bikini people and their descendants . . . ."

99. The existence of defendant's fiduciary obligations does not depend upon the Trusteeship Agreement, which was consummated in July 1947, more than a year after defendant assumed fiduciary responsibilities for the Bikini people.

100. This cause of action is for damages for breaches of fiduciary obligations imposed on defendant in 1946 by a contract implied in fact between defendant and plaintiffs.

101. Defendant has breached its fiduciary obligations to plaintiffs by declining and refusing to provide the Nuclear Claims Tribunal with funds sufficient to satisfy the Tribunal's Memorandum of Decision and Order dated March 5, 2001 awarding plaintiffs $563,315,500 for past and future loss of use of Bikini Atoll, restoration costs for a radiological cleanup of the atoll, and hardships.

102. The above described breaches of fiduciary duty by defendant have damaged plaintiffs in the amount of at least $561,036,320, plus interest as required by law.

COUNT III

Breach of Implied Duties and Covenants of the Implied in Fact Contract

103. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 102.

104. Implicit in the implied in fact contract alleged in Paragraph 100, above, is defendant's duty to cooperate with plaintiffs in achieving the objectives and benefits of that implied in fact contract, the defendant's duty not to interfere with plaintiffs' efforts to achieve those objectives and benefits, and the defendant's covenant of good faith and fair dealing with respect to plaintiffs' benefits and expectations under the implied in fact contract.

105. Defendant breached each of the implied duties and covenants referenced in paragraph 104, above, by (a) failing or refusing to seek additional funds for the Nuclear Claims Tribunal sufficient to satisfy the Tribunal's Memorandum of Decision and Order dated March 5, 2001; (b) interfering with plaintiffs' efforts to request or secure additional funds for the Tribunal sufficient to satisfy the Tribunal's Memorandum of Decision and Order dated March 5, 2001; and (c) failing to act in a reasonable manner regarding the lack of sufficient funds.

106. As a result of the breaches identified in paragraph 105, above, plaintiffs were damaged in the amount of at least $561,036,320, plus interest as required by law.

COUNT IV

Third-Party Beneficiary Breaches of Implied Duties and Covenants

107. Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 106.

108. Plaintiffs are intended direct third-party beneficiaries of the Compact and the Section 177 Agreement, (collectively, the "Compact Agreements") between the defendant and the RMI government. Implicit in the Compact Agreements is defendant's duty to cooperate with plaintiffs in achieving the objectives and benefits of the Compact Agreements, defendant's duty not to interfere with plaintiffs' efforts to achieve those objectives and benefits, and defendant's covenant of good faith and fair dealing with respect to plaintiffs' benefits and expectations under the Compact Agreements.

109. Defendant breached each of the implied duties and covenants referenced in paragraph 108 above by (a) refusing or failing to seek additional funds for the Nuclear Claims Tribunal sufficient to satisfy the Tribunal's Memorandum of Decision and Order

dated March 5, 2001; (b) interfering with plaintiffs' efforts to request or secure additional funds for the Tribunal sufficient to satisfy the Tribunal's Memorandum of Decision and Order dated March 5, 2001; and (c) failing to act in a reasonable manner regarding the lack of sufficient funds.

110. The breaches identified in paragraph 109 above damaged plaintiffs in the amount of at least $561,036,320, plus interest as required by law.

PRAYER FOR RELIEF

WHEREFORE, named plaintiff and their class pray:

1. That this Court enter an order establishing this action as a class action and allowing named plaintiffs to represent the class described above.

2. That this Court enter an order awarding plaintiffs and their class just compensation for the taking of their Nuclear Claims Tribunal claims in violation of the Fifth Amendment to the United States Constitution in the amount of at least $561,036,320 for past and future loss of use of Bikini Atoll, restoration costs for a radiological cleanup of the atoll, and hardships for property and consequential damages, plus interest as required by law.

3. That this Court enter an order awarding plaintiffs and their class damages against defendant for defendant's breaches of fiduciary duty created by a contract implied-in-fact in the amount of at least $561,036,320 for past and future loss of use of Bikini Atoll, restoration costs for a radiological cleanup of the atoll, and hardships for property and consequential damages, plus interest as required by law.

4. That this Court enter an order awarding plaintiffs and their class damages against defendant for defendant's breaches of the implied duties and covenants under a

contract implied in fact in the amount of at least $561,036,320 for past and future loss of use of Bikini Atoll, restoration costs for a radiological cleanup of the atoll, and hardships for property and consequential damages, plus interest as required by law.

5. That this Court enter an order awarding plaintiffs and their class, as third party beneficiaries, damages against defendant for defendant's breaches of implied duties and covenants contained in the Compact Agreements in the amount of at least $561,036,320 for past and future loss of use of Bikini Atoll, restoration costs for a radiological cleanup of the atoll, and hardships for property and consequential damages, plus interest as required by law.

6. That this Court grant such other and further relief as it may deem just and equitable.

Respectfully submitted,

Jonathan M. Weisgall

Jonathan M. Weisgall, Chartered
Counsel of Record
1200 New Hampshire Avenue, N.W., Suite 300
Washington, D.C. 20036-6812
tel: (202) 828-1378
fax: (202) 828-1380
Attorney for Plaintiffs

April 11, 2006

Of Counsel:

Robert K. Huffman
Miller & Chevalier Chartered
655 15th St., N.W.
Washington, DC 20005
tel: (202) 626-5824
fax: (202) 626-0858

Elizabeth Langer
Law Offices of Elizabeth Langer
3712 Ingomar Street, N.W.
Washington, D.C. 20015
tel: (202) 244-0456
fax: (202) 244-0456