estimates and would have resulted in the conclusion that it was unsafe to live on Bikini and consume locally produced food.

77. The 1967 AEC report also reviewed a 1964 study of ground water on Bikini and concluded:

> Well water could be used safely by the natives upon their return to Bikini. In summary it appears that radioactivity in drinking water may be ignored from a radiological safety standpoint.

78. In 1968, an AEC Ad Hoc committee reviewed the results of the AEC's 1967 survey and declared that Bikini was "once again safe for human habitation." This committee's report concluded: "The exposures to radiation that would result from the repatriation of the Bikini people do not offer a significant threat to their health and safety."

I. Bikini Resettlement And Survey Dispute

79. Relying on the conclusions of the AEC Ad Hoc committee, President Johnson announced on August 12, 1968, that "the major islands of [Bikini Atoll] are now safe for human habitation" and that the Bikinians could return to their atoll. This announcement, made in a letter to the Secretary of Defense, also ordered commencement of a federal program to resettle and rehabilitate Bikini.

80. In February 1969, the U.S. Department of Defense ("DOD") and the AEC commenced a cleanup of debris and equipment on Bikini Atoll. The AEC contemporaneously announced that "there is virtually no radiation left, and we can find no discernible effect on either plant or animal life."

81. In June 1969, eight Bikinians returned to Bikini to assist in the resettlement project. Six months later, an additional 23 workers moved from Kili to Bikini Atoll. The Department of the Interior ("DOI") began construction of 40 homes, and more Bikinians were moved from Kili to Bikini in the early 1970's.

82. In June 1971, the AEC stated that well water samples had been taken periodically from several locations on Bikini Island over a period of time and that, "from a radiological viewpoint, the water is safe to drink."

83. In 1972, defendant conducted a thorough radiological survey of Enewetak Atoll, the site of 42 U.S. nuclear tests, using the best technological equipment then available. This equipment was more sophisticated and sensitive than that used to survey Bikini in the 1960's. The AEC released a three-volume radiological survey of Enewetak Atoll in 1973.

84. In November 1974, the AEC presented DOI with recent radiological findings on Bikini and stated that a sophisticated "follow-on" radiological survey was desirable. Upon receipt of this information, DOI halted construction and resettlement activities on Bikini.

85. On March 7, 1975, DOI Secretary Morton wrote DOD Secretary Schlesinger stating that the Energy Research and Development Administration ("ERDA"), which had recently assumed all AEC functions regarding Bikini, was prepared to conduct a thorough radiological survey of Bikini Atoll in April if DOD could provide the necessary financial and logistic support.

86. While Secretary Morton's March 7, 1975 letter stated that ERDA was prepared to begin a radiological survey in April, DOD did not respond to it until the end of May 1975. DOD then wrote that it could conduct a survey "at reimbursable cost of $609,000," but stated that "we are unable to provide the requested support at this time."

87. On June 19, 1975, the Assistant Secretary of Interior wrote ERDA and DOD again requesting a thorough radiological survey. He declared that neither DOI nor ERDA could provide funds to reimburse DOD, and stated that he was therefore

> deeply concerned that a quality radiological survey such as that performed on Enewetak, whose people will not be coming back for some time, cannot be made available in a timely fashion for the Bikinians whose return is imminent.
>
> . . . [O]ur commitments to insure the safe return of the Bikinians . . . make it imperative that they in their environment be attended to with the best testing equipment available.
>
> It appears that none of the involved Departments has budgeted adequately for this needed and highly warranted effort in order to meet our statutory and moral commitments to the people of this area . . . .

88. Meanwhile, in response to the Bikinians' desire to locate some homes in Bikini Island's interior, a limited ground radiological survey of the island was conducted in June 1975. While this survey was not performed with the best available equipment, it found the island's interior too radioactive for housing and some wells too radioactive for drinking purposes. It also showed that breadfruit and pandanus, two staples in the Bikinians' diet, contained unacceptably high levels of radiation.

89. At an August 12, 1975 meeting in Livermore, California, ERDA officials distributed two reports, which concluded that the Bikinians would receive external gamma radiation in excess of federally prescribed limits if the Bikini resettlement program proceeded as previously planned. The reports also recommended that groundwater on Bikini Island be used only for agricultural purposes.

90. On October 10, 1975, the Bikinians brought suit in United States District Court in Hawaii, seeking to compel the United States to conduct a comprehensive radiological survey of Bikini Atoll. The People of Bikini v. Seamans, et al., Civ. 75-0348 (D. Ha). In the complaint, the Bikinians said: "For us to make an intelligent decision to resettle Bikini Atoll, we must be able to weigh our desire to return against the radiological risks of returning. We have not been provided with that information. . . ."

91. Settlement discussions followed, but the various U.S. Government agencies involved -- ERDA, DOD, DOI and the Department of Energy ("DOE"), which assumed ERDA's functions in 1977 -- continued to disagree until 1978 as to which agency would pay for the survey.

92. A copy of the Memorandum Agreement settling the litigation in The People of Bikini v. Seamans is attached as Exhibit C and is incorporated by reference. This Agreement provided, inter alia, that a radiation survey of Bikini Atoll, "using the latest and most effective technology," would be completed by December 31, 1978 (Paragraph 8), and that "all major

[Bikini resettlement] project documents, including documents relating to radiation exposure, shall be translated or summarized in the Marshallese language to the maximum feasible extent . . . ." (Paragraph 6). This requirement was included because only a few Bikinians speak or read English.

93. A thorough radiological survey of Bikini was conducted in late 1978. This survey essentially employed equipment that was available as early as 1972 and used to survey Enewetak Atoll. The final results of the Bikini Atoll survey still have not been published, but a preliminary report, dated May 15, 1979, indicated that Bikini Atoll was not safe for habitation.

J. Second Removal From Bikini

94. Before the radiological survey was conducted, tests in 1977 had shown that the level of radioactive strontium-90 in Bikini Island well water exceeded acceptable U.S. standards. Coconuts were also found to have high radiation levels, and the people living on Bikini Island were told to eat only one coconut per day, well below their normal intake of five to ten.

95. In April 1978, a medical team arrived on Bikini to test the islanders again. The people living on Bikini, who still did not understand the risks they were exposed to, offered coconuts, the most radioactive crop on the island, to arriving scientists as a sign of friendship. Examinations showed an "incredible" one-year 75% increase in body burdens of radioactive cesium-137, causing U.S. scientists to conclude that the people

likely had ingested the largest amounts of radiation of any known population. Other examinations showed unacceptably high body burdens of radioactive strontium and plutonium.

96. In August 1978, as a result of these findings, defendant once again moved the people from Bikini. Some of the Bikinians were relocated to Ejit Island in Majuro Atoll. Others were moved back to Kili. No one has been allowed to reside at Bikini Atoll since that time.

K. Recent U.S. Statements On Conditions At Bikini Atoll

97. Although defendant has made conflicting statements, the official U.S. position is that the Bikinians cannot safely return to Bikini Island for 30 to 60 years, and to Eneu Island (the second largest in the atoll) for 20 to 25 years.

98. On July 1, 1979, DOI wrote to the Bikini leaders stating:

> All of us here deeply regret that Eneu Island cannot be used for residence for at least another 20-25 years, since we understand the deep feelings of the people of Bikini and their hopes, that even though Bikini Island is not useable now, Eneu Island possibly might have been. This is not now possible.

Copies of these letters are attached as Exhibit D and incorporated by reference.

99. On July 1, 1979, DOI also sent a report on Bikini to the U.S. Congress that contained, inter alia, defendant's final assessment of the radiological safety of Bikini and Eneu Islands:

> By mid-March 1979, the first results of the aerial radiological survey [of Bikini Atoll] . . . became available.

> [T]he Department of the Interior [has drawn] the conclusion that the new data reaffirmed that Bikini Island could not be used by the people of Bikini for at least the next 30 years, and possibly the next 60 years. . . . [T]here was no question that the island of Eneu must be placed off limits as a place of residence for the Bikini people for at least another 20-25 years.

Progress Report to Congress on Bikini Resettlement Efforts As Required By P.L. 95-348 (Section 2(c)) at 2.

100. Despite defendant's agreement (see paragraph 92, supra) to translate or summarize in Marshallese all major documents relating to Bikini resettlement, defendant has never informed the Bikinians in Marshallese that Bikini Island cannot be resettled for 30 to 60 years and that the Eneu Island is off-limits for 20 to 25 years.

101. The only document that meets the terms of Paragraph 6 of the Memorandum Agreement (see paragraph 92, supra) is an English-Marshallese booklet entitled Melelen Radiation Ilo Ailin Bikini (The Meaning of Radiation at Bikini Atoll), which was prepared by DOE and distributed at a two-day dose assessment meeting meeting on Kili in October 1980. The Bikinians requested the meeting to obtain information from the U.S. Government regarding the radiological safety of Bikini Atoll. The meeting was attended by seven DOE officials and scientists and three DOI officials.

102. The DOE booklet fails to state that defendant had already determined that Bikini Island cannot be resettled for 30 to 60 years and that Eneu Island is off-limits for 20 to 25 years.

103. Rather, the impression given the Bikinians was that Eneu was once again safe for habitation. One DOE scientist stated unequivocally that he would not hesitate to live on Eneu with his family.

104. At the meeting, a Bikinian leader asked DOE officials what had occurred to change the assessment in DOE's July 1, 1979 letters to the Bikinian leaders that Eneu could not be resettled for 20 to 25 years (see paragraph 98, supra). The DOE officials replied that they were not aware of this conclusion. Upon information and belief, several DOE officials present at the dose assessment meeting were fully aware of the conclusion found in those letters.

105. The DOE booklet attempted to justify the 1968 decision to allow the return to Bikini by stating (pp. 28-29):

> 1. The information available at that time was insufficient regarding the amount of radioactive atoms that would go from the soil up into the fruits of plants like coconuts.
>
> 2. The information at that time was insufficient regarding the amount of each kind of food people eat. For example, people ate more from the coconut tree than the amount scientists thought they would.

The booklet failed to state that defendant in 1967 grossly and carelessly miscalculated the Bikinians' diet by assuming an average daily per person intake of only 9 grams of coconut meat and milk. See paragraphs 70-76, supra.

## L. Documents And Related Actions Concerning The Legal Status Of Bikini Atoll

106. The taking, occupancy, and use by defendant of Bikini in 1946 was not legitimized by any contemporaneous written agreement between defendant and the people of Bikini.

107. On April 27, 1951, the Trust Territory Government, defendant's agent, and certain Bikini alabs (family heads) signed a purported "Release of Rights To Bikini Atoll" and a purported "Deed," copies of which are attached as Exhibits E and F, respectively, and incorporated by reference. These documents purported to convey Kili and three islets in Jaluit Atoll to the Bikinians in exchange for Bikini Atoll. Of the approximately thirteen Bikinian alabs, only a few signed both documents, despite pressure from U.S. officials, and a lawful exchange was not concluded. The alabs were not represented by counsel.

108. On November 22, 1956, the Trust Territory Government and the Bikini alabs, who were not represented by counsel, entered into a purported agreement entitled "Agreement In Principle Regarding Use Of Bikini Atoll." A copy of this document is attached as Exhibit G and incorporated by reference. This document, which referred to the Bikinians as the "owners" of Bikini Atoll, allowed defendant to continue to "occupy and use" Bikini Atoll, and further provided that:

> The Government of the Trust Territory of the Pacific Islands and/or the Government of the United States of America shall possess the full use right to Bikini Atoll until such time as it determines it will no longer be necessary to occupy and use the said Atoll.

109. In exchange for the grant of use rights in Biniki Atoll, the Bikinians received "full use rights" in Kili and four small parts of Jaluit Atoll, $25,000 in cash and a $300,000 trust fund administered by the High Commissioner. The purported 1956 agreement demonstrates that defendant did not consider that the purported 1951 exchange of islands was valid.

110. Defendant also induced the alabs who signed the 1956 document to agree that "any future claims by Bikinians based on the use of Bikini by the Governments of the United States or the Trust Territory, or on the moving of Bikini people from Bikini Atoll to Kili Island, shall be against them and not against the Government." (Emphasis added.)

111. Two weeks before the 1956 agreement was signed, the High Commissioner visited Kili and stated that, if the Bikinians accepted the agreement, he would promptly send a representative back to Kili with an additional $25,000 in cash for the people.

112. The trust fund established by the 1956 agreement yielded $9,035.28 in interest per year, or $12 a year for each Bikinian. In 1970, the value of the corpus of the trust fund had inexplicably decreased to $196,000.

113. On or about June 20, 1957, the Trust Territory conveyed its "use and occupancy rights" in Bikini Atoll to the United States through an agreement purportedly "made as of the 15th day of April, 1946." See "Use And Occupancy Agreement For Land In The Trust Territory Of The Pacific Islands Under The

Administrative Responsibility Of The Department Of The Interior," a copy of which is attached as Exhibit H and incorporated by reference. The Agreement provided at paragraph 2:

> A. Use To Be Consistent With Trusteeship Agreement. The use to which the land [Bikini] is put by the United Stands of America shall be consistent with the provisions and purposes of the Trusteeship Agreement relating to the Administration of the Trust Territory of the Pacific Islands.
>
> B. Review of Need for Land Every Five Years. On or about June 30, 1961, and on a similar date each five-year period thereafter, an agency of the United States of America having the use and occupancy of [Bikini] . . . and Grantor [Trust Territory] shall jointly review and determine the need for continuing the use and occupancy granted . . . hereby.
>
> *  *  *  *
>
> D. Terminations of Use and Occupancy. In the event of a decision . . . that a need for the continued use and occupancy of said land does not exist, the use granted . . . hereby shall terminate thirty days from the date of such decisions and all interest in said land shall revert to the Grantor. . . .

As described in paragraph 79, supra, defendant determined and announced in 1968 that the Bikinians could return to their homeland.

114. On March 17, 1970, the United States and the Trust Territory entered into an agreement entitled "Agreement Acknowledging The Return Of Bikini Atoll To The Trust Territory Of The Pacific Islands Subject To Certain Retention Areas And Rights Of The United States of America," a copy of which is

attached as Exhibit I and incorporated by reference. This agreement, with minor exceptions, terminated the "use and occupancy" rights that had been given the United States by the Trust Territory "as of April 15, 1946" and all other U.S. interests in Bikini Atoll.

115. On January 24, 1979 the High Commissioner executed a Quitclaim Deed pursuant to DOI Secretarial Order No. 3030 that, inter alia, conveyed to the Bikinians "all rights, title and interest of the Government of the Trust Territory of the Pacific Islands" in Bikini Atoll. A copy of the Quitclaim Deed is attached as Exhibit J and incorporated by reference. Thus, on January 24, 1979, Bikini Atoll was returned to the Bikinians as a matter of law.

M. Prohibitions Against Return to Bikini Atoll

116. Since May 1946, two months after they were evacuated, the Bikinians have consistently and continually made known to the U.S. Government their desire to return to Bikini Atoll. Defendant, in turn, has repeatedly affirmed that its occupation and use of Bikini was temporary only and that the Bikinians could return when defendant no longer needed the atoll for nuclear testing and it was safe for resettlement. Defendant's use and occupancy of the atoll has ceased. However, the Bikinians are prohibited from returning to Bikini Atoll by defendant and by the unsafe conditions defendant has created.

FIRST CAUSE OF ACTION: UNLAWFUL TAKING OF BIKINI ATOLL FROM MARCH 7, 1946 TO JANUARY 24, 1979

117. Plaintiffs incorporate the allegations of Paragraphs 1-116 by reference.

118. Between March 7, 1946 and January 24, 1979, defendant unlawfully engaged in a total or partial taking of the land and lagoon of Bikini Atoll without providing just compensation to the Bikinians as required by the Fifth Amendment of the United States Constitution. The taking was effected on March 7, 1946, when defendant compelled the Bikinians to move from their atoll in preparation for "Operation Crossroads." This taking ended as a matter of law (except as described in paragraph 119, infra) on January 24, 1979, when defendant's agent, the Trust Territory Government, deeded back to plaintiffs all legal rights to Bikini Atoll. See paragraph 115, supra.

119. As described in paragraph 65, supra, several islands of Bikini Atoll were totally annihilated by the 1954 "Bravo" shot. These islands were not returned to the Bikinians in 1979, and thus have been permanently taken without just compensation.

120. The taking of Bikini Atoll was not made legal by the purported 1951 and 1956 agreements between the Bikinian alabs and defendant's agent, the Trust Territory. These purported agreements had no legal effect. As described in paragraph 107, supra, not all the alabs signed the 1951 documents. Moreover, the alabs who signed the 1951 and 1956 agreements, who were not represented by counsel, were made aware of defendant's superior bargaining power and thus believed they had no choice

but to sign. Defendant was guilty of overreaching, and any resulting agreements were unconscionable, unreasonable, onerous contracts and/or contracts of adhesion, which were null and void.

121. Defendant was obligated under the Trusteeship Agreement to "protect the [Bikinians] against the loss of their lands and resources," and thus owed fiduciary duties to the Bikinians concerning their homeland. As a party whose interests were adverse to the Bikinians, defendant, as their trustee, had a conflict of interest concerning the purported 1951 and 1956 agreements. Defendant could not lawfully consummate agreements that greatly advantaged it and severely disadvantaged the Bikinians.

122. The unconscionable, unreasonable and onerous nature of the purported 1956 agreement is underscored by two facts: (1) the alabs signing it were forced to agree therein that all future claims by the Bikinians for use of their atoll and for resettlement on Kili must be brought against <u>those representatives</u>, not against the United States or the Trust Territory (<u>see</u> paragraph 110, <u>supra</u>); and (2) the Bikinians were unfairly induced to sign the agreement by the High Commissioner's promise that $25,000 would be immediately distributed to the people if they accepted the agreement.

123. While the named plaintiffs and members of their class have been given other islands to reside on and certain monetary and other benefits, these "compensations" fall far

short of being "just". Rather, as described in paragraphs 50-62, supra, the resettlement arrangements forced on the Bikinians by defendant have been sadly inadequate. In fact, the removal from Bikini in 1946 and the subsequent resettlements have caused plaintiffs severe suffering, hardships, and social and cultural dislocation.

SECOND CAUSE OF ACTION;
UNLAWFUL TAKING BEGINNING
JANUARY 24, 1979, AND CONTINUING

124. Plaintiffs incorporate the allegations of paragraphs 1-116 and 118-123 by reference.

125. Since January 24, 1979, defendant has unlawfully taken the land and lagoon of Bikini Atoll from plaintiffs without providing them just compensation as required by the Fifth Amendment to the United States Constitution.

126. As of January 24, 1979, the Trust Territory returned legal title and all legal rights to Bikini Atoll to the people of Bikini. However, since that date the Bikinians have been prevented from returning to the atoll that they legally own by defendant. Defendant has recognized that Bikini Atoll, because of radioactivity in its soil, water and vegetation caused by defendant's nuclear tests, is not safe. The best available evidence indicates that Bikini Island will not be safe for habitation for approximately 30 to 60 years, and that Eneu Island will not be habitable for approximately 20 to 25

years. Defendant thus has effectively taken all or part of the atoll for the next 20 to 60 years. See paragraphs 97-99, supra.

127. Even if, contrary to the allegations of this complaint, the purported 1951 and 1956 agreements referred to in paragraphs 108-110, supra, are determined to have some legal effect, these agreements terminated as a matter of law on January 24, 1979, the date of execution of the Quitclaim Deed, if not before.

THIRD CAUSE OF ACTION:
BREACHES OF FIDUCIARY DUTIES
ENTITLING NAMED PLAINTIFFS
AND THEIR CLASS TO DAMAGES

128. Plaintiffs incorporate the allegations of paragraphs 1-116, 118-123 and 125-127 by reference.

129. When defendant removed the Bikinians from their atoll on March 7, 1946, it assumed fiduciary responsibilities for the people. The Bikinians recognized these fiduciary obligations by placing themselves in defendant's care. In fact, the circumstances of their removal from Bikini Atoll created a contract implied in fact between the Bikinians and defendant obligating defendant as a fiduciary to protect the health, well-being and economic condition of the Bikini people.

130. On various occasions the United States has recognized and expressed its obligations as trustee to the Bikini people. For example, in a "Statement Of Understanding On The Part Of The Government Of The United States And The Government Of The Trust Territory Of The Pacific Islands Concerning The Move Of The

People Of Bikini Island, August, 1978," defendant declared that "[t]he Government of the United States considers itself generally responsible for the well being of the Bikini people and their descendants . . . ." The Statement of Understanding is attached as Exhibit K and incorporated by reference.

131. Defendant has recognized its fiduciary obligations to the Bikinians in various other ways, including the provisions of a trust fund, an _ex gratia_ payment, food, and temporary housing. Such actions, however, have not met the full fiduciary obligations owed the Bikinians by defendant.

132. The existence of defendant's fiduciary obligations does not depend upon the Trusteeship Agreement, which was consummated in July 1947, over one year after defendant assumed fiduciary responsibilities for the Bikini people. The Trusteeship Agreement, however, does memorialize defendant's responsibilities as trustee to protect the rights and health of the Bikinians, to guard against loss of their lands and resources, to promote their economic advancement and self-sufficiency, and to improve their means of transportation. These obligations are also mandated by the Trust Territory Code, 1 T.T.C. §101(1).

133. This cause of action is for unliquidated damages for breaches of the fiduciary obligations imposed on defendant in 1946 by a contract implied in fact between defendant and the Bikinians. These obligations were created before the Trusteeship Agreement came into being, and exist independently and did not grow out of that Agreement. In addition, plaintiffs

sue for unliquidated damages under that Agreement, which is self-executing and establishes direct, affirmative, judicially enforceable rights, but is not a "treaty entered into with foreign nations" as that term is used in 28 U.S.C. § 1502. In addition, the people of Bikini sue for unliquidated damages for breaches of fiduciary obligations placed on defendant by the Trust Territory Code, 1 T.T.C. § 101(1), which made the Trusteeship Agreement part of Trust Territory law and established independent rights that are judicially enforceable.

134. Defendant has breached its fiduciary obligations to the Bikinians by failing to observe the high standards of care required in resettling certain Bikinians at Bikini Atoll during 1969 to 1978. As discussed in paragraphs 70-105, <u>supra</u>, because of its failure to exercise the high degree of care required, defendant erroneously underestimated the radiological risks of resettling the Bikinians on Bikini Atoll, and in that regard:

(a) relied upon a grossly inaccurate AEC diet study in erroneously determining in 1968 to permit resettlement (<u>see</u> paragraphs 70-76, <u>supra</u>); and

(b) erroneously concluded on at least three occasions in 1964, 1967 and 1971 that Bikini's well water was radiologically safe (see paragraphs 77, 82, 88 and 94, <u>supra</u>).

135. Defendant has never informed the Bikinians of the breaches of fiduciary duties discussed in paragraph 134, supra. Rather, it has concealed these breaches from the Bikinians who have been unaware of their existence until recently.

136. Defendant has also breached its fiduciary obligations to the Bikinians by failing from 1972 until 1978 to conduct a thorough radiological survey of Bikini Atoll with the best available equipment, even though it (a) allowed Bikinians to remain at the atoll and receive potentially dangerous amounts of radiation; and (b) knew as early as 1974 that serious questions existed as to the atoll's safety.

137. Defendant has also breached its fiduciary obligations to the Bikinians by:

(a) presenting to them misleading, erroneous, incomplete and contradictory information as to when radiological conditions on Bikini will permit them to return to their homeland; and

(b) failing to comply with Paragraph 6 of the Memorandum Agreement settling the 1975 lawsuit (see paragraph 93, supra), which requires defendant to translate or summarize in Marshallese all major documents relating to the resettlement of Bikini.

138. Defendant has also failed to meet its fiduciary responsibilities by allowing conditions to exist on Kili that have been, and continue to be, detrimental to the health and

economic well being of the Bikini people, as discussed in paragraphs 59-62, <u>supra</u>. Defendant, in this regard, has failed to provide adequate housing and health care for the Bikinians. Moreover, defendant has not provided adequate means of transportation to and from Kili and thus caused severe depression of the local economy.

139. Defendant has also breached its fiduciary obligations to the Bikinians by its continued takings of their homeland and its refusal to return their atoll to them in a habitable condition.

140. The above described breaches of fiduciary duties by defendant have benefited defendant and resulted in substantial injuries, including severe physical, emotional and financial injuries to plaintiffs. Upon information and belief, certain Bikinians have sustained physical injuries that are inherently unknowable at this time.

DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs pray:

1. That the Court enter judgment against defendant for the unconstitutional taking described in the First Cause of Action in an amount to be determined, but not less than $150,000,000.

2. That the Court enter judgment against defendant for the unconstitutional taking described in the Second Cause of Action in an amount to be determined, but not less than $150,000,000.

3. That the Court enter judgment against defendant for the breaches of fiduciary duties described in the Third Cause of Action in an amount to be determined, but not less than $150,000,000.

4. That the Court order an accounting to determine the amounts in which plaintiffs have been damaged by defendant.

5. That the Court grant such other and further relief as it deems just and proper.

Respectfully submitted,

James Hamilton

Jonathan M. Weisgall ATTORNEY OF RECORD

GINSBURG, FELDMAN, WEIL AND BRESS
1700 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20006
(202) 637-9000

Attorneys for Plaintiffs
and Plaintiffs-intervenors

Dated: December 31, 1981