IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE PEOPLE OF BIKINI, BY AND THROUGH THE KILI/BIKINI/EJIT LOCAL GOVERNMENT COUNCIL, ELDON NOTE, et al. | No. 06-288C |
| Plaintiffs, | Judge Block |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**MEMORANDUM OF THE PEOPLE OF BIKINI ATOLL**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Jonathan M. Weisgall

Jonathan M. Weisgall, Chartered
1200 New Hampshire Avenue,
N.W., Suite 300
Washington, D.C. 20036-6812
Telephone: (202) 828-1378
Facsimile: (202) 828-1380

Attorney for People of Bikini Atoll

Of Counsel:

Robert K. Huffman
Miller & Chevalier Chartered
655 15th St., N.W.
Washington, DC 20005
Telephone: (202) 626-5824
Facsimile: (202) 626-0858

Elizabeth Langer
Law Offices of Elizabeth Langer
3712 Ingomar Street, N.W.
Washington, D.C. 20015
Telephone: (202) 244-0456
Facsimile: (202) 244-0456

December 18, 2006

# TABLE OF CONTENTS

MEMORANDUM OF THE PEOPLE OF BIKINI ATOLL IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION AND STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. This Court Has Statutory Subject Matter Jurisdiction Over the Claims and That Jurisdiction Was Not Validly Withdrawn in the Compact of Free Association Act . . . . . . . . . . . . . . . . . . . . . 5

A. The Prior Litigation Left the Door Open for the People of Bikini to Return to This Court if the Tribunal Failed to Award Just Compensation, Notwithstanding Article XII . . . 5

B. Absent a Valid Settlement and Release or the Payment of Just Compensation, It is Unconstitutional to Eliminate All Jurisdiction Over Takings Claims . . . . . . . . . . . . . . . . . . . . . 8

C. No Court Has Decided Whether Article XII's Jurisdiction-Stripping Provision is Constitutional in the Absence of a Valid Settlement or the Payment of Just Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D. Because Just Compensation Has Not Been Paid, the Constitutionality of Jurisdiction-Stripping Depends on Whether There Has Been a Valid Settlement and Release of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

E. The Compact Act Can Be Construed to Avoid Unconstitutionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II. The Prior Dismissal of the People of Bikini's Claims for Lack of Jurisdiction Does Not Bar the Present Claims . . . . . . . . . . . . . . . . . 29

A. The Prior Litigation Did Not Decide Whether the Compact Validly Stripped Jurisdiction If the Compact Process Failed to Provide Just Compensation . . . . . . . . . . . 29

B. The Prior Litigation Was Not Dismissed on the Merits, So There is No Claim Preclusion . . . . . . . . . . . . . . . . . . . . . 30

C. The Claims Alleged in the Complaint Were Reserved in the Earlier Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III. The Adjudication of Takings Claims is a Core Judicial Function, Not a Non-Justiciable "Political Question" . . . . . . . . . . . . . . . . . . . 32

IV. Claims That Could Not Have Been Brought Until the Alternative Process Established in the Compact Were Exhausted Cannot be Barred by the Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . 35

V. The Amended Complaint Alleges Valid Causes of Action for Unpaid Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B. Under RCFC 12(b)(6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Fifth Amendment Takings Claims Against Defendant . . . . . . . . . . . . . . . . . . . . . . . . . 37

C. Under RCFC 12(b)(6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Breach of Implied Contract Claims Against Defendant . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

**CASES:** **PAGES:**

*Alliance of Texas Land Grants v. United States*,
37 F.3d 1478 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Antolok v. United States*,
873 F.2d 369 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 26

*Arakaki v. Lingle,*
423 F.3d 954 (9th Cir. 2005), *judgment vacated on other grounds*, 126 S.Ct. 2859 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Arkansas Val. Ry. v. United States*,
107 Ct.Cl. 240, 68 F.Supp. 727 (Ct.Cl. 1946) . . . . . . . . . . . . . . . . . . . 14

*Baker v. Carr*,
369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Baltimore & Ohio Ry. Co. v. United States*,
298 U.S. 349 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bartlett v. Bowen*,
816 F.2d 695 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Battaglia v. General Motors Corp.*,
169 F.2d 254 (2d Cir. 1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bingaman v. Dept. of the Treasury*,
127 F.3d 1431 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Blanchette v. Connecticut Gen. Ins. Corp.*,
419 U.S. 102 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 26

*Central States Pension Fund v. Hunt Truck*,
296 F. 3d 624 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Chisolm v. House*,
183 F.2d 698 (10th Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Clark v. Martinez*,
543 U.S. 371, 385 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Conley v. Gibson*,
355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ditmars v. Camden Trust Co.*,
76 A.2d 280 (N.J. Super 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Do-Well Machine Shop, Inc. v. United States*,
870 F.2d 637 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Doe v. United States*,
2006 WL 2589154, * 9 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 31

*El-Shifa Pharmaceuticals Indust. Co. v. United States*,
378 F.3d 1346 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Estate of Amuso*,
176 N.Y.S. 2d 175 (N.Y. Surr. Ct. 1958) . . . . . . . . . . . . . . . . . . . . . 19

*Environmental Defense Fund. v. EPA*,
369 F.3d 193 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gross v. German Foundation Industrial Initiative*,
456 F.3d 363 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Gulf Power Company v. United States*,
187 F.3d 1324 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hamdam v. Rumsfeld*,
126 S.Ct. 2749 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hornback v. United States*,
405 F.3d 999 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Info. Sys. & Networks Corp. v. United States*,
68 Fed.Cl. 336 (Ct.Cl. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Irwin v. Dept. of Veterans Affairs*,
498 U.S. 89 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Jacobs v. United States*,
290 U.S. 13 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Japan Whaling Ass'n. v. Am. Cetacean Soc.*,
478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Juda v. United States*,
6 Cl.Ct. 441 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Juda v. United States*,
13 Cl.Ct. 667 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Juda v. United States*,
Nos. 172-81L, 543-81L and 561-82L,
April 13, 1983 Transcript of Proceedings at 67 . . . . . . . . . . . . . . . . . 32

*Jung v. Assn of Am. Medical Colleges*,
339 F. Supp 2d 26 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kohl v. United States*,
91 U.S. 367 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kwan v. United States*,
272 F.3d 1360 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lagenegger v. United States*,
756 F.2d 1565 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Liston v. Gottsegen*,
348 F.3d 294 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Loveladies Harbor, Inc. v. United States*,
27 F.3d 1545 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Lynch v. United States*,
292 U.S. 571 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Maas v. Lonstorf*,
194 F. 577 (6th Cir. 1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Meinhard v. Salmon*,
249 N.Y. 458 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Meinhardt v. Unisys Corp.*,
74 F.3d 420 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ministry of Defense v. Elahi*,
126 S.Ct. 1193 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Monongahela Navigation Co. v. United States*,
148 U.S. 312 (1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Morgan v. DOE*,
424 F.3d 1271 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Morgan Guaranty Trust Co. v. Republic of Palau,*
924 F.2d 1237 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People of Enewetak, et al. v. United States,*
864 F.2d 134 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*People of Saipan v. Dept. of the Interior*,
356 F. Supp. 645 (D. Ha. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pepper v. Litton*,
308 U.S. 295 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Reich v. Collins*,
513 U.S. 106 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 26

*Rust v. Sullivan*,
500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sanchez-Llamas v. Oregon*,
126 S.Ct. 2669 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Schillinger v. United States*,
155 U.S. 163 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Seaboard Air Line Ry. Co. v. United States*,
261 U.S. 299 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Seminole Nation v. United States*,
316 U.S. 286 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Siegemund v. Shapland*,
324 F.Supp. 2d 176 (D. Me. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Spruill v. Merit. Sys. Prot. Bd.*,
978 F.2d 679 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Street v. J.C. Bradford & Co.*,
886 F.2d 1472 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Clarke*,
445 U.S. 253 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Klein,*
80 U.S. 128 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States v. Munoz-Flores*,
495 U.S. 385 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. New River Collieries Co.*,
262 U.S. 341 (1923). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Sioux Nation*,
448 U.S. 371 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. White Mountain Apache Tribe,*
537 U.S. 465 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. X-Citement Video, Inc.*,
513 U.S. 64 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Walker v. United States*,
105 Ct.Cl. 553, 64 F.Supp. 135 (Ct.Cl. 1946) . . . . . . . . . . . . . . . . . 14

*Ware v. Hylton*,
3 U.S. 199 (1796) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Webster v. Doe*,
486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Zadvyas v. Davis,*
533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Zoltek Corp. v. United States,*
442 F.3d 1345 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATUTES:**

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

48 U.S.C. § 1903(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

61 Stat. 3301 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

Pub. L. No. 99-239, 99 Stat. 1770 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pub. L. No. 100-446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**MISCELLANEOUS**

131 Cong. Rec. H11, 829,
829 (daily ed. Dec. 11, 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bogert's Trust and Trustees,
§ 943, n.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

51 Fed. Reg. 40399 (November 3, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

James Crawford, The International Law Commission's Articles on
State Responsibility, 264 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Geneva Convention of 1930 on Certain Questions Relating to the
Conflict of Nationality Laws, Art. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Matthew Duschesne, "The Continuous-Nationality of Claims Principle:
Its Historical Development and Current Relevance to
Investor-State Investment Disputes,"
36 Geo. Wash. Int'l L. Rev. 783 (2004) . . . . . . . . . . . . . . . . . . . . . . 22

First Judiciary Act,
Stat. 73, § 25 (1789) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Sean Murphy, "Contemporary Practice of the United States Relating To International Law," 96 Am. J. Int'l L. 262 (2002) . . . . . . . . . . . . . . . . . . . 22

Restatement (2nd) of Contracts,
§ 173 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Restatement (3d) of Foreign Relations,
§ 713, Comment f; § 902, Comment K (1987) . . . . . . . . . . . . . . . . . 22, 23

Restatement (2nd) of Judgments (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31, 32

Restatement (2nd) of Trusts,
§ 217(2) (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2A Sutherland Statutory Construction,
§ 45:11, n. 13 (6th ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7 U.S. Dept. of State, Foreign Affairs Manual: Consular Affairs,
U.S. § 613.c.(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Wright, Miller & Cooper, Federal Practice & Procedure . . . . . . . . . . . . . . . . 25, 31, 32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE PEOPLE OF BIKINI, BY AND THROUGH THE KILI/BIKINI/EJIT LOCAL GOVERNMENT COUNCIL, ELDON NOTE, et al. | ) | |
| Plaintiffs, | ) | No. 06-288C |
| v. | ) | (Judge Block) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**MEMORANDUM OF THE PEOPLE OF BIKINI IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs, the people of Bikini, by and through the Kili/Bikini/Ejit Local Government Council, oppose defendant's motion to dismiss, as follows:

INTRODUCTION AND STATEMENT OF THE CASE

The claims alleged in the Amended Complaint arise from the obligation of the United States, under the Fifth Amendment to the Constitution and pursuant to implied-in-fact contracts, to pay the people of Bikini just compensation for the destruction and long-lasting radioactive contamination of their lands resulting from the nuclear weapons testing program it conducted there. The United States exercised sovereignty over Bikini Atoll and the rest of the Marshall Islands as a United Nations trustee following World War II. The 23 atomic and hydrogen bomb tests conducted at Bikini Atoll bolstered America's predominance over the Soviet Union and helped win the Cold War, but the United States has yet to discharge its obligations to the nuclear nomads of Bikini Atoll. Amended Complaint ("Am. Compl.") ¶¶ 1, 21, 29-30, 39, 40.

The fundamental teaching of the Fifth Amendment takings clause is that the federal government may lawfully take any private property under its sovereign control for a public purpose, but it must also compensate the owners for what it has taken. The people of Bikini sought just compensation in the Court of Claims in 1981, and in 1984 the Court denied the government's motion to dismiss, holding, *inter alia*, that the Fifth Amendment's just compensation clause is applicable to Bikini and that "[d]uring the course of the program to test atomic weapons, the United States created a relationship with plaintiffs that exceeded in both nature and degree the relationship normally taken with a 'foreign' county or by a trustee charged to protect the inhabitants against the loss of their lands. . . ." *Juda v. United States*, 6 Cl.Ct. 441, 458 ("*Juda I*"); Am. Compl. ¶ 73.

While that litigation was pending, the United States negotiated, and Congress enacted into law, a Compact of Free Association ("Compact") with what became the Republic of the Marshall Islands ("RMI"). Section 177(a) of the Compact states that the defendant "accepts the responsibility for compensation owing to citizens of the Marshall Islands . . . for loss or damage to property . . . resulting from the nuclear testing program. . . ." Section 177(b) states that defendant and the RMI Government shall "set forth in a separate agreement provisions for the just and adequate settlement of all such claims which have arisen . . . and which have not as yet been compensated or which in the future may arise. . . ." The "separate agreement," known as the "Section 177 Agreement" and incorporated into the Compact, created an alternative remedy – the Nuclear Claims Tribunal ("NCT") – to resolve these claims, and it provided the Tribunal with $45.75 million to pay claims. *Id.* ¶¶ 58, 60, 63-66. Plaintiffs were not parties or

signatories to either the Compact or the Section 177 Agreement, and they voted nearly 80% against the Compact. Am. Compl. ¶¶ 71, 59.

Relying on provisions of the Section 177 Agreement, the government moved to dismiss the claims of the people of Bikini for lack of jurisdiction. The people of Bikini opposed dismissal, contesting the adequacy of the fund provided by the Section 177 Agreement to pay just compensation and therefore the constitutionality of the statute approving the Compact and the Section 177 Agreement as applied. The Court of Claims concluded that it was "premature" to decide the constitutionality of the agreement until the alternative remedy provided in the Section 177 Agreement had been exhausted, at which point it would be possible to determine whether just compensation had been paid:

> The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time. . . . This alternative procedure for compensation cannot be challenged judicially until it has run its course.

*Juda v. United States*, 13 Cl.Ct. 667, 689 1987) ("*Juda II*"); Am. Compl. ¶ 74.

The people of Bikini dismissed their appeal of the jurisdictional ruling in return for a Congressional appropriation, while preserving their rights to seek just compensation. Meanwhile, the Federal Circuit affirmed the jurisdictional ruling as to other claimants:

> The [Compact] and the section 177 Agreement, provide, in perpetuity, a means to address past, present and future consequences, including the resolution of individual claims, arising from the United States nuclear testing program in the Marshall Islands. . . . [W]e are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate.

*People of Enewetak v. United States*, 864 F.2d 134, 136 (Fed. Cir. 1988) ("*Juda II*"). Am. Compl. ¶¶ 74-77.

Plaintiffs have now exhausted that alternative remedy. In April 2001, the NCT rendered its award to the people of Bikini for the loss of their property due to nuclear weapons testing. Of that total net award of $563,315,500, the NCT was able to pay only $2,279,179, or 0.375% of the award, because it did not have adequate funding to pay the rest. It has under $2 million available for awards. Am. Compl. ¶¶ 79-88.

In September 2000, the RMI government filed a petition with the U.S. Congress, requesting additional funds to cover unpaid NCT awards under the "Changed Circumstances" provisions of Article IX of the Section 177 Agreement. After six years, Congress has yet to act on the petition, and the U.S. State Department in 2005 advised Congress that the petition should be denied. *Id.* ¶ 100. Accordingly, consistent with the rulings of the Court of Claims and the Federal Circuit in the prior litigation, the people of Bikini have returned to this Court to press their claims for just compensation and to determine the constitutionality of the Section 177 Agreement if it is applied and construed to deny them just compensation.

## QUESTIONS PRESENTED

1. Does this Court have jurisdiction to determine whether the award of the Nuclear Claims Tribunal provides just compensation for plaintiffs' takings claims under the Fifth Amendment and/or adequate compensation for plaintiffs' breach of implied contract claims?

2. Are plaintiffs' claims barred by the political question doctrine?

3. Are plaintiffs' claims barred by the statute of limitations?

4. Are plaintiffs' claims subject to dismissal under Rule 12(b) (6) for failure to state a claim upon which relief can be granted?

## ARGUMENT

### I. This Court Has Statutory Subject Matter Jurisdiction Over the Claims, and That Jurisdiction Was Not Validly Withdrawn in the Compact of Free Association Act

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers jurisdiction on this Court "to render judgment upon any claim against the United States founded upon either the Constitution, . . . or upon any express or implied contract with the United States." Each of the claims in the complaint falls within that statutory grant of subject matter jurisdiction. The question before the Court is whether Congress validly repealed that grant of jurisdiction with regard to claims described in Article X of the Section 177 Agreement by enacting the Compact of Free Association Act ("Compact Act"), Pub. L. No. 99-239, 99 Stat. 1770 (1986), and whether the claims alleged in the complaint are covered by Article X of the Section 177 Agreement.

#### A. The Prior Litigation Left the Door Open for the People of Bikini to Return to This Court if the Nuclear Claims Tribunal Failed to Award Just Compensation, Notwithstanding Article XII

This Court must be guided by the Supreme Court's decision in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), which also involved the termination of certain claims (albeit against Iran, rather than the United States) in favor of proceedings before a tribunal established by an international agreement. Just as the government conceded and the Court concluded in *Dames & Moore* that the agreement with Iran necessarily preserved jurisdiction over takings claims, the United States was careful in the prior *Juda* litigation not to argue that Congress could constitutionally eliminate takings jurisdiction if – as has

proven to be the case – the alternative remedy proved to be inadequate.[1] As shown in section I.B, *infra*, any other conclusion would render Article XII unconstitutional and unenforceable.

In *Dames & Moore*, the Supreme Court considered the constitutionality of an agreement between the United States and Iran that resulted in the release of hostages held at the U.S. embassy, provided a non-judicial forum (the U.S. – Iran Claims Tribunal) to hear claims by U.S. citizens against Iran, and terminated all claims pending in U.S. courts against Iran and its assets. Even though Iran made an open-ended commitment to pay judgments rendered by the tribunal, Dames & Moore argued that the extinguishment of its rights of action against Iran in favor of proceedings before the U.S. – Iran Claims Tribunal constituted a taking by the United States.

Neither the government nor the Court thought that petitioner's rights of action could be eliminated without a right of judicial redress against the United States. The government conceded at oral argument – and the Supreme Court held – that claimants who were dissatisfied with the tribunal's award could sue in this Court, which would retain its jurisdiction to hear takings claims against the United States based on the extinguishment of the rights of action against Iran.[2] Although the Court concluded that it

---

[1] Brief of Appellee at 45, *People of Bikini v. United States*, Nos. 88-1206-1207-1208 (Fed. Cir., June 24, 1988). *See also* footnote 2, *infra*.

[2] Transcript of oral argument in *Dames & Moore v. Regan*, available at http://www.oyez.org/cases/case?case=1980-1989/1980_80_2078:

Question: It may be at the end of the road they'd [i.e. petitioners] still have a taking claim but not until they've gone to the end of the road. Is that correct?

Mr. Lee: That is correct, Justice Brennan.

Question: Well but then, doesn't the Government have to answer the question, what if they go through all these steps and come back and can show a loss, then do they have a takings claim?

was then premature to decide whether there was a valid takings claim – the adequacy of the tribunal process being untested – it was not premature to determine the availability of a United States judicial forum to hear a takings claim. "[T]he possibility that the President's actions may effect a taking of petitioner's property . . . make ripe for adjudication the question whether petitioner will have a remedy at law under the Tucker Act." 453 U.S. at 689. The Court held that the Court of Claims would have jurisdiction, *id.*, thus avoiding the grave constitutional question that would have been posed by a scheme that created a non-judicial remedy and extinguished judicial power to determine just compensation. *See also id.* at 691 (Powell, J., *concurring in part and dissenting in part*) ("parties whose valid claims are not adjudicated or not fully paid may bring a 'taking' claim against the United States in the Court of Claims . . . .").

To argue, as the government does in its motion to dismiss, that the prior litigation determined that the door to this Court is closed to the people of Bikini, even after they exhausted the alternative remedy provided in the Section 177 Agreement and established that they could not obtain just compensation, is inconsistent with *Dames & Moore*, with the government's position in that case and in the prior litigation in *Juda*, and with the earlier holdings in *Juda II* and *People of Enewetak*. *Juda II* held that the "possibility of ultimate resort to the . . . Claims Court has been preserved," but that plaintiffs must first exhaust their remedy under the "alternative tribunal to provide compensation":

---

Mr. Lee: Justice Rehnquist, I think the answer to that is no, but it need not be answered in this case. . . .

Question: That there is no taking and that the President can violate the Bill of Rights on his own?

Mr. Lee: No, no, no. Clearly that is not. But that rather –

Question: If there's still a taking, you think there's a remedy for it?

Mr. Lee: That is correct, and that remedy is the Tucker Act.

> Whether the compensation, in the alternative procedures provided by Congress in the Compact Act, is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures. Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract. The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time.
>
> . . . This alternative procedure for compensation cannot be challenged judicially until it has run its course.

*Juda II*, 13 Cl.Ct. at 689. The government agreed in its brief to the Federal Circuit: "The Claims Court's determination that it is premature to resolve appellants' Tucker Act contentions is thus wholly correct." Brief of Appellee at 45, *People of Bikini v. United States*, Nos. 88-1206-1207-1208 (Fed. Cir., June 24, 1988). And the Federal Circuit agreed as well: "[W]e are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate." *People of Enewetak*, 864 F.2d at 136.

B. <u>Absent a Valid Settlement and Release or the Payment of Just Compensation, It is Unconstitutional to Eliminate All Jurisdiction Over Takings Claims</u>

There is no reason to think that Congress intended to defy the Fifth Amendment or *Dames & Moore* when it approved the Compact.

Article X of the Section 177 Agreement, entitled "Espousal," provides:

> This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program and which are against the United States. . . .

Article XII of the Section 177 Agreement provides:

> All claims described in Article X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.[3]

The legal effect of Article XII of the Section 177 Agreement depends on Section 103(g)(2) of the Compact of Free Association Act, *codified at* 48 U.S.C. § 1903(g)(2). That provision "ratified and approved" the Section 177 Agreement between the United States and the Republic of the Marshall Islands on the following terms:

> It is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of [the 177] Agreement are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

These words are straightforward. The plain text makes the withdrawal of jurisdiction in Article XII operative only to effectuate what Congress understood to be a "full and final settlement" of all claims against the United States, § 103(g)(1), and was intended to be implemented only in conjunction with such a settlement.

Section 103(g) (2) was carefully crafted by Congress to leave the doors of this courthouse open to claims within the scope of the Tucker Act in the absence of a valid settlement agreement:

> The new language is intended to make clear that court-stripping provisions of article XII of the section 177 agreement have no independent force or effect and their sole function is to implement the provisions of article X. Thus, if article X is valid, espousal stands, and if article X is invalid, claims covered

[3] Article XI of the Section 177 Agreement requires the RMI Government to "indemnify and hold the United States . . . harmless from all claims and all actions or proceedings which may hereafter be asserted in any court or other judicial forum related in any way to the nuclear testing program."

> by the espousal provisions will remain justiciable in U.S. courts, regardless of article XII.

131 CONG. REC. H11,829 (daily ed. Dec. 11, 1985) (remarks of Rep. Seiberling explaining resolution of House-Senate conference) *quoted in Juda II,* 13 Cl.Ct. at 685. By conditioning the withdrawal of jurisdiction on the existence of a valid settlement, Congress sought to avoid enacting an unconstitutional revocation of judicial power to order the just compensation guaranteed under the Fifth Amendment whenever the United States takes private property for its own use. Congress may well have "assumed espousal was valid and effective," *Juda II*, 13 Cl.Ct. at 685, but that has nothing to do with whether Congress intended to withdraw jurisdiction over nuclear testing claims described in Article X if that assumption proved to be incorrect. Congress did not condition the effectiveness of Article XII on a *prior* judicial review of the "espousal" provision in Article X (as an earlier House version of section 103(g)(2) arguably required), but it did insist that the two stand or fall together when such review occurred. *See* pp. 26-27, *infra*.

Section 103(g)(2) would be unconstitutional if it were construed, contrary to its plain terms, to deny any court of the United States – state, federal, or the Supreme Court – jurisdiction to award just compensation for private property taken by the United States. If Congress could prohibit any court from enforcing the Fifth Amendment, it could legislate precisely what the Fifth Amendment expressly forbids.[4] Congress could abrogate contracts or deprive landowners of the use of their property by regulation without having to pay a dime in compensation, provided that it withdrew all jurisdiction to award just compensation at the same time that it authorized the taking. That is why the

---

[4] *See* footnote 2, *above*. *Dames & Moore* proves that it makes no difference that Congress acted here by approving an international agreement.

Supreme Court, in every case in which it has considered an alternative procedure for just compensation, has sustained the validity of the arrangement only by preserving a judicial remedy under the Tucker Act for any shortfall in the compensation awarded through such alternative remedy. *See, e.g., Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1018 (1984); *Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 126 (1974); *Dames & Moore, supra.*

The validity *vel non* of a blanket prohibition of all jurisdiction by *any* U.S. court (such as Article XII purports to impose) does not call into question the long-debated authority of Congress to make regulations and exceptions to legislatively conferred jurisdiction pursuant to Article III, § 2 of the Constitution. *Bartlett v. Bowen*, 816 F.2d 695, 703-04 (D.C. Cir. 1987) ("little question" that eliminating jurisdiction of state and federal courts to review constitutionality is unconstitutional). *See also Battaglia v. General Motors Corp.,* 169 F.2d 254, 257 (2d Cir. 1948):

> The exercise of Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation.

While Congress could eliminate *this* Court's jurisdiction over takings claims, it must provide some judicial forum for such claims. *See Kohl v. United States,* 91 U.S. 367 (1875) (district court necessarily had jurisdiction over condemnation action prior to conferral of jurisdiction on the Court of Claims in the Tucker Act). Article XII of the Section 177 Agreement, however, does not provide any judicial forum empowered to award just compensation. Article IV of that Agreement establishes an alternative

remedial process – the NCT – but if, at the end of the day, this alternative process fails to provide just compensation, a judicial remedy in this Court must remain available.

Nor can the United States avoid takings liability by invoking sovereign immunity to bar claims for just compensation for taking private property. The Fifth Amendment establishes the federal government's monetary liability, so there can be no sovereign immunity to just compensation awards. *See United States v. Clarke*, 445 U.S. 253, 257 (1980) (claims for just compensation are grounded in the Constitution).[5]

The government cannot set a cap on just compensation for taking private property and deprive the courts of jurisdiction to determine the adequacy of the payment any more than Congress can do so by legislation or the President can do by executive fiat. The Supreme Court has repeatedly rebuffed legislative efforts to dictate what constitutes just compensation. For example, in *Jacobs v. United States*, 290 U.S. 13 (1933), the Court held that the failure of Congress to authorize payment of interest on property taken as a result of dam construction by the TVA did not prevent a court from awarding interest as just compensation, because the obligation to pay arose from the Constitution, not from a statute. The Court has repeatedly recognized that it is for a court, not the political branches, to determine what just compensation is due.[6]

---

[5] *Dicta* in *Lynch v. United States*, 292 U.S. 571, 582 (1934), suggests that the United States could withdraw consent to be sued for a taking, but the Supreme Court has never so held, and it has repeatedly adopted constructions of federal statutes to avoid that question, including in *Lynch*. Examples include *Ruckelshaus v. Monsanto, supra,* 467 U.S. at 1018; *Dames & Moore v. Regan*, *supra*, 453 U.S. at 686-87; and *Blanchette v. Connecticut Gen. Ins. Corp., supra,* 419 U.S. at 126. The only authority cited in support of the *Lynch dicta* is *Schillinger v. United States*, 155 U.S. 163, 171-72 (1894), in which the patent infringement claims are properly classified as governmental torts, not takings. *See Zoltek Corp. v. United States*, 442 F.3d 1345, 1350-53 (Fed. Cir. 2006).

[6] *See also Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) ("Just compensation is provided for by the Constitution and the right to it cannot be taken away

In *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893), Congress enacted a statute severely limiting the amount of compensation it would provide for the condemnation of plaintiff's property by mandating that plaintiff's franchise to collect tolls for passage along the river not be considered in determining the sum to be paid by the United States. The Supreme Court soundly rejected the government's position that Congress, through legislation, could have the final say in determining the amount of compensation due under a Fifth Amendment taking:

> By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry. . . . If anything can be clear and undeniable, upon principles of natural justice or constitutional law, it seems that this must be so.

148 U.S. at 327-328. Similarly, in *United States v. New River Collieries Co*., 262 U.S. 341, 343-44 (1923), the Court struck down the government's determination of how compensation for coal taken during wartime should be computed, holding that "[t]he ascertainment of compensation is a judicial function, and no power exists in any other department of the government to declare what the compensation shall be or to prescribe

---

by statute. Its ascertainment is a judicial function."); *Baltimore & Ohio Ry. Co. v. United States*, 298 U.S. 349, 368 (1936) ("The just compensation clause may not be evaded or impaired by any form of legislation. . . . [W]hen [an owner] appropriately invokes the just compensation clause, he is entitled to a judicial determination of the amount. The due process clause assures a full hearing before the court or other tribunal empowered to perform the judicial function involved.")

any binding rule in that regard."

As the Eleventh Circuit recently explained:

> It is ultimately the responsibility of the judicial branch to ensure that the compensation awarded for a taking satisfies the constitutional standard of just compensation. . . . If Congress (or the executive branch) attempts to impose a limitation on the measure of compensation for a taking, a court must evaluate that standard to see if it is consistent with the constitutionally mandated level of just compensation, and a court is not bound to follow that standard in making judicial determinations of the compensation due if the standard fails to secure just compensation.

*Gulf Power Company v. United States*, 187 F.3d 1324, 1333 (11th Cir. 1999) (*citing Monongahela Navigation, Co., supra*).[7]

Wholly apart from whether limitations on jurisdiction violate the Fifth Amendment's just compensation guarantee, Congress also cannot legislate the outcome of pending litigation by requiring dismissal for separation of powers reasons. *United States v. Klein*, 80 U.S. 128 (1871) (Congress cannot preclude jurisdiction to determine the effect of a pardon on a pending appeal of property claim against the United States); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225-228 (1995) (Congress cannot reopen final judgments). *Klein*, like this case, involved an attempt by Congress to dictate by legislation the outcome of claims litigation against the government. The statute was an unconstitutional infringement on the powers of the judiciary because "it prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the

[7] *Accord Walker v. United States*, 105 Ct.Cl. 553, 64 F.Supp. 135, 139 (Ct.Cl. 1946) ("The determination of just compensation under the Fifth Amendment is exclusively a judicial function. This is now undisputed and requires no citation of authority"); *Arkansas Val. Ry. v. United States*, 107 Ct.Cl. 240, 68 F.Supp. 727 (Ct.Cl. 1946) (stating that "the determination of just compensation under the Fifth Amendment is exclusively a judicial function").

courts to decide a controversy in the Government's favor." *United States v. Sioux Nation*, 448 U.S. 371, 404 (1980) (describing holding of *Klein*).

Congress can eliminate substantive legal rights it has created, but it must do so directly, not by dictating the outcome of litigation, as Article XII attempts to do. *See Jung v. Assn of Am. Medical Colleges*, 339 F. Supp. 2d 26, 41-42 (D.D.C. 2004) (concluding that Congress had altered substantive antitrust law, not interfered with judicial decision making). However, as explained above, Congress has no legislative control whatsoever over takings claims. Those derive from the Constitution, not from legislation. Congress cannot extinguish constitutionally-based takings claims by directing courts to dismiss them for lack of jurisdiction.

C. No Court Has Decided Whether Article XII's Jurisdiction-Stripping Provision is Constitutional in the Absence of a Valid Settlement or the Payment of Just Compensation

No court has yet adjudicated the constitutionality of extinguishing all judicial review of takings claims against the United States absent (1) a valid settlement and release of the claims; or (2) the provision of adequate compensation by the Nuclear Claims Tribunal. In the earlier litigation, this Court, the Federal Circuit, and the D.C. Circuit all concluded that it was premature to decide that question until the alternative compensation scheme established in the Compact had run its course. *Juda II*, 13 Cl.Ct. at 689 ("premature" to decide whether the Compact framework provides adequate compensation); *People of Enewetak*, 864 F.2d at 136-37 ("we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate."); *Antolok v. United States*, 873 F.2d 369, 378 (D.C. Cir. 1989) (challenge to the constitutionality of the alternative remedy is not

properly before the court; "[i]f there is an uncompensated or inadequately compensated taking, the plaintiffs' remedy is in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a), not in the District Court under the Federal Tort Claims Act").

In *People of Enewetak*, the Federal Circuit affirmed the dismissal of claims filed prior to approval of the Compact on the understanding that Congress had established the Nuclear Claims Tribunal to provide just compensation and that it was unnecessary to decide whether that remedy was constitutionally adequate "in advance of the exhaustion of the alternative provided." 864 F.2d at 137. The court explained that "[i]n section 177 of the Compact the United States Government accepted responsibility for just compensation owing for loss or damage resulting from its nuclear testing program." *Id.* at 135. It referred to the payment of "an initial sum of $150,000,000, with additional financial obligations over fifteen years for the settlement of all claims."[8] It also referred to the "changed circumstances" provision of Article IX of the Section 177 Agreement,[9] which allows for additional compensation if previously undiscovered injuries render the original amount "manifestly inadequate," *id.* at 135-36, and it noted the recent appropriation by Congress of $90 million for the benefit of the people of Bikini as

[8] The Section 177 Agreement established a $150 million trust fund (the "Nuclear Fund"), the annual income from which was earmarked for various purposes related to the nuclear testing program. The Agreement provided that $45.75 million of income was to be made available to the NCT over the first 15 years. Am. Compl. ¶ 66.

[9] Article IX, entitled "Changed Circumstances," provides: "If loss or damage to property and person of the citizens of the Marshall Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, and such injuries were not and could not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate, the Government of the Marshall Islands may request that the Government of the United States provide for such injuries by submitting such a request to the Congress . . . for its consideration."

evidence "that its alternative provision for compensation be adequate." *Id.* Am. Compl. ¶ 76. Nothing in the Federal Circuit's opinion suggests that the court would uphold the constitutionality of withdrawing jurisdiction over these takings claims if the $150 million Nuclear Fund proved "manifestly inadequate" to compensate the Marshallese.

The "alternative procedure for compensation . . . has run its course," *Juda II*, 13 Cl.Ct. at 689. We now know that the Tribunal could not and cannot award just compensation to the Bikinians and that it had under $2 million available for awards and its own administrative operations as of December 31, 2005. Am. Compl. ¶ 88. We also know that the federal government did not fulfill its promise to "accept liability" for takings by appropriating additional funds or otherwise paying compensation under the "changed circumstances" provisions or under the amended Compact. Am. Compl. ¶¶ 100-102. Accordingly, the question of the constitutionality of jurisdiction-stripping in the absence of a valid settlement and release of claims is now ripe for decision.

D. <u>Because Just Compensation Has Not Been Paid, the Constitutionality of Jurisdiction-Stripping Depends on Whether There Has Been a Valid Settlement and Release of Claims</u>

Section 103(g) (2) of the Compact Act demonstrates that Congress intended to effectuate a settlement, not to extinguish constitutional claims for just compensation. Although the final version of section 103(g) deleted earlier references to judicial scrutiny of the validity of the agreement by the RMI to release these, the statute explicitly conditions the withdrawal of jurisdiction on the existence of a settlement. "It is clear that section 103(g) links Article X 'Espousal' with Article XII, 'United States Courts' in the Section 177 Agreement." *Juda II*, 13 Cl.Ct. at 684. Withdrawing jurisdiction over

claims that have been validly settled and released is perfectly constitutional. Withdrawing jurisdiction to enforce claims in the absence of a valid release is not.

The settlement upon which Congress premised section 103(g) (2) was not with the plaintiffs. It was a settlement with the RMI, a government established by the United States in the exercise of its trust authority and without sovereign status or standing under international law until *after* the execution of the Compact and the Section 177 Agreement.[10] Therefore, a necessary element of any argument for the constitutionality of jurisdiction-stripping based on a settlement and release of claims depends on the enforceability against the private plaintiffs of the RMI's release of their claims. It is up to the government to show that a release by the RMI can be enforced in this Court to release the plaintiffs' claims, invoking the international law of espousal.

The government's motion does not seek dismissal on the basis of a release of its liability by the RMI or otherwise directly rely on the RMI's espousal and release of claims.[11] Release, of course, is an affirmative defense that must be pleaded in an answer, RCFC 8(c), not presented in a motion to dismiss. RCFC Rule 12(b). Consequently, it would be premature to fully brief the reasons for finding the RMI's purported release in the Section 177 Agreement to be invalid. However, for purposes of deciding the government's motion to dismiss for lack of jurisdiction, this Court should assume the

---

[10] President Reagan proclaimed the Compact of Free Association in effect on November 3, 1986, long after the Compact and Section 177 Agreements were negotiated. 51 Fed. Reg. 40399. The United Nations did not terminate the Trusteeship Agreement until 1990. Am. Compl. ¶ 61.

[11] The government refers to the release in connection with its claim preclusion argument, discussed at Part II, *infra,* and its motion to dismiss for failure to state a claim, discussed at Part V, *infra*.

release is invalid and should decide whether Congress could constitutionally withdraw all jurisdiction over the claims on that assumption.

Indeed, an assumption that the release is invalid is well-founded. As explained below, the government's effort to rely on a release by the RMI would fail for three independent reasons: (1) the release utterly fails the standards under U.S. common law for the release of a trustee by a trust beneficiary; (2) the RMI cannot espouse for injuries that occurred to the Marshallese before the RMI had international sovereignty and while the United States itself was the international sovereign with espousal power on behalf of the Marshallese; and (3) the RMI cannot espouse claims while domestic (*i.e.* U.S.) remedies remain available to its nationals.

1. The release violates the federal government's fiduciary obligations and is invalid under federal common law.

The Compact and the Section 177 Agreement were not the product of arms-length negotiations between international sovereigns. Throughout the negotiations, the United States was the trustee and the RMI was its ward. The Section 177 Agreement violates the black letter requirements for the release of a trustee by a beneficiary. [12]

The United Nations Trusteeship Agreement, which Congress enacted into domestic law, 61 Stat. 3301 (1947), created legally enforceable trust obligations, including the explicit duty to protect the Marshallese "against the loss of their land and resources." Am. Compl. ¶ 40. *See also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473-74 (2003) (statute holding land in trust imposed a duty to conserve

[12] Am Compl. ¶¶ 51-57. The burden of proving the validity of a release rests on the fiduciary. *Ditmars v. Camden Trust Co.*, 76 A.2d 280 (N.J. Super 1950); *In re Estate of Amuso*, 176 N.Y.S. 2d 175 (N.Y. Surr. Ct. 1958); Bogert's TRUST AND TRUSTEES § 943, n.6.

property used by the United States); RESTATEMENT (2ND) OF TRUSTS § 176 (1957) (general duty of a trustee to conserve the corpus of the trust). The transactions of a fiduciary with a beneficiary are "subjected to rigorous scrutiny," with the burden resting on the fiduciary "not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the [beneficiary]." *Pepper v. Litton*, 308 U.S. 295, 306 (1939). As trustee, the United States was obligated to deal fairly with the RMI and the Marshallese; it could not take advantage of its superior knowledge or superior bargaining power, but in fact it did both. Am. Compl.¶¶ 51-53, 56-57, 72. *See Seminole Nation v. United States*, 316 U.S. 286, 297 n.12 (1942) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, Ch. J.).

More specifically, the release of claims by a beneficiary against a trustee is deemed invalid as a matter of federal common law if (a) the beneficiary did not know his rights or did not know material facts the trustee knew or should have known; (b) the release was induced by the trustee's improper conduct; or (c) the transaction involved a bargain with the trustee which was not fair and reasonable to the beneficiary. RESTATEMENT (2ND) OF TRUSTS § 217(2) (1959); RESTATEMENT (2ND) OF CONTRACTS § 173 (1981); BOGERT'S TRUSTS AND TRUSTEES § 943 (2d ed.) (trustee must make full disclosure, prove that the transaction is fair, and avoid concealment, misrepresentation and undue influence).

The federal courts have applied these standards to invalidate releases in favor of trustees in a variety of contexts, *See, e.g.*, *Siegemund v. Shapland*, 324 F.Supp. 2d 176 (D. Me. 2004); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989); *Chisolm v. House*, 183 F.2d 698 (10th Cir. 1950); *Meinhardt v. Unisys Corp.*, 74 F.3d 420 (3d Cir.

1996); *Maas v. Lonstorf*, 194 F. 577, 587 (6th Cir. 1912). At a minimum, there must be full disclosure. *Liston v. Gottsegen*, 348 F.3d 294, 303-04 (1st Cir. 2003).

The government cannot demonstrate the validity of the release given by the RMI in the Section 177 agreement. At a minimum, before seeking a release of liability, the government had a duty to determine that the payments it was offering to make were equivalent in value to the damages incurred by the Marshallese and the corresponding value of their claims. But the government told Congress it had no basis for concluding that a $150 million fund would be adequate to satisfy the claims (Am. Compl. ¶ 67). It assured the RMI that the Section 177 trust fund would "create and maintain, in perpetuity, a means" to pay the "resultant claims" from the nuclear testing program (Am. Compl. ¶ 65), and it held out to the Court of Appeals for the Federal Circuit that the plan to disburse funds under the Section 177 agreement "has been structured to operate permanently," to "provide continuous funding," and, "at a base investment of $150 million, to generate sufficient proceeds to address all identified needs," predictions all of which have proved illusory.[13] Moreover, the United States exploited its trust relationship with the RMI to place coercive pressure on the RMI (Am. Compl. ¶¶ 56, 57). Nor did it

---

[13] Brief of the United States at 34, 45, *People of Bikini v. United States*, Nos. 88-1206-1207-1208 (Fed. Cir., June 24, 1988). Looking into its own crystal ball, the government also predicted that "the 1987 "stock market 'correction' . . . in no way impairs the long-term performance and viability of the Fund," because it anticipated that those losses "will be fully restored in the near future." Moreover, it assured the court that "[i]n ratifying the [Section 177] Agreement, Congress also recognized that should changed circumstances arise which would prevent the program from functioning as planned, Congress would need to consider possible additional funding." When faced with such a changed circumstances petition 17 years later, with the value of the "perpetual" $150 million down to less than $2 million, the government advised Congress that the "facts . . . do not support a funding request under the 'changed circumstances' provision. . . . Am. Compl. ¶ 100.

fulfill its duty to make full disclosure to the Marshallese, as it consistently understated the risks of occupying land contaminated by nuclear testing (Am. Compl. ¶¶ 33-38, 54, 94).

2. The RMI's espousal of private claims is unenforceable under international law.

To extinguish the claims of private parties on the basis of the Section 177 Agreement, the government must show that the RMI had valid authority to act on behalf of the Marshallese people by invoking the international law doctrine of espousal. However, the RMI's espousal would not be given effect under international law.

*First*, the RMI did not act as the agent of the people of Bikini when it negotiated the Section 177 Agreement. In fact, the people of Bikini were not parties either to the negotiations on the Compact or the Section 177 Agreement, they voted nearly 80% against the Compact, and they sought to pursue their takings litigation against the United States before this Court. Am. Compl. ¶¶ 71, 59. Thus, the RMI prevented the people of Bikini from exhausting their local law (*i.e*. U.S.) remedies against the United States, which is ordinarily a precondition for espousal. RESTATEMENT (3RD) OF FOREIGN RELATIONS § 713, Comment f; § 902, Comment k (1987); *Republic of Austria v. Altmann*, 541 U.S. 677, 714 (2004) (Breyer, J., *concurring*). An exhaustion of remedies requirement precludes a sovereign from stripping its people of domestically viable claims, as the Compact purported to do on behalf of the RMI.

*Second*, the doctrine of espousal is based on the principle that an injury to the national of a sovereign state is an affront to the sovereign, for which the sovereign is entitled to redress using the means of international diplomacy.[14] The people of Bikini

[14] Matthew Duschesne, *The Continuous-Nationality of Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes*, 36 GEO.

were not RMI nationals for purposes of espousal at the time the claims accrued, because the RMI government was not then an international sovereign capable of invoking international remedies. Put another way, injuries to the people of Bikini were not affronts to the RMI because it was not a sovereign state. *See Morgan Guaranty Trust Co. v. Republic of Palau*, 924 F.2d 1237, 1243-44 (2d Cir. 1991) (Compact of Free Association was not yet effective, so Palau, as a trust territory, lacked the attributes of statehood and was not deemed a foreign state); RESTATEMENT (3RD) OF FOREIGN RELATIONS § 201 (1987).[15] Nor was the RMI government a successor to a sovereign; the international relations of the Marshall Islands had been governed by a succession of colonial or occupying powers (Spain, German and Japan) (Am. Compl. ¶ 19). Because the RMI was not a sovereign when it executed the Section 177 agreement, it could not claim to have been injured by harm to its nationals.

*Third*, the claims of the people of Bikini against the United States – their trustee – were domestic claims of persons under U.S. sovereignty based on U.S. law, not international claims subject to espousal. The United States, as the United Nations' administering authority over the Marshall Islands, exercised international sovereignty over the Marshalls at the time of the Compact. *People of Saipan v. Dept. of the Interior*, 356 F. Supp. 645, 655 (D. Ha. 1973) (Trusteeship gives the United States "in practical effect the exercise of full sovereign power"). The U.N. Trusteeship Agreement explicitly

---

WASH. INT'L L. REV. 783 (2004); Sean Murphy, *Contemporary Practice of the United States Relating to International Law*, 96 AM. J. INT'L L. 262 (2002).

[15] *See* 7 U.S. DEPT. OF STATE, FOREIGN AFFAIRS MANUAL: CONSULAR AFFAIRS U.S. § 613.c.(3) (identifying continuous nationality and exhaustion as prerequisites for espousal); James Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY 264 (2002).

made the United States responsible for extending the diplomatic and consular protection to the Marshallese that is the basis for espousal. Trusteeship Agreement, Art. 11.2, 61 Stat. 3301 (1947). The power to espouse claims under international law thus resided in the United States, which cannot invoke international law espousal to defeat its own domestic law obligations. A state cannot extend its "diplomatic protection to one of its nationals against a State whose nationality such person also possesses." *Geneva Convention of 1930 on Certain Questions Relating to the Conflict of Nationality Laws*, Art. 4. Otherwise, nationals of one state could turn domestic claims into international disputes by persuading another country to sponsor and espouse their claims.

E. The Compact Act Can Be Construed to Avoid Unconstitutionality

It is hornbook law that courts read statutes to avoid declaring them unconstitutional when they can. *See, e.g., Zadvyas v. Davis*, 533 U.S. 678, 689 (2001) (referring to constitutional avoidance as a "cardinal principle" of statutory construction). 2A SUTHERLAND STATUTORY CONSTRUCTION § 45:11, n. 13 (6th ed. 2000). The doctrine of constitutional avoidance is rooted in two important structural precepts: that courts should, when possible, refrain from invalidating legislation to minimize inter-branch conflict, *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998), and that Congress is presumed to be mindful of the Constitution when it legislates. *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) ("This canon is followed out of respect for Congress, which we assume legislates in light of constitutional limitations"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994) ("we do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court"). Previous constructions of the Compact Act did not apply the doctrine of constitutional

avoidance because the courts deemed premature the constitutional question that must now be decided. As a result, they did not consider the constitutionality of the Act or apply the canon of constitutional avoidance.[16] It is now time to apply that "cardinal principle" to determine whether the Compact Act can be construed to avoid the unconstitutional result that no court of the United States would have the power to award just compensation for a taking of private property by the federal government.

The Supreme Court has consistently embraced constructions of statutes that avoid constitutionally suspect jurisdiction stripping. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507, 532-33 (2004) (plurality opinion); *Webster v. Doe*, 486 U.S. 592, 603 (1988). In particular, it has done so in the precise context here:

---

[16] *Juda II*, 13 Cl. Ct. at 689; *People of Enewetak*, 864 F.2d at 136. Moreover, both the operative facts and the legal context have changed dramatically since Judge Harkins' decision, so that his legal conclusion about the interpretation of section 103(g)(2) would not be binding on the Court, even if the issues were the same. *See Morgan v. DOE*, 424 F.3d 1271, 1274 (Fed. Cir. 2005); *id.* at 1275 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 28(2)(b)) (1982); 18A Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE § 4425 at 72 (2002). The critical factual difference is that it is now clear that the Bikinians will not receive just compensation from the Nuclear Claims Tribunal, so the constitutional issue deemed premature in *Juda* is now ripe. *See Bingaman v. Dept. of the Treasury*, 127 F.3d 1431 (Fed. Cir. 1997) (relitigation permissible where consequences of applying legal rule to new facts differ).

The difference in the legal context is that Judge Harkins addressed the question whether Article XII went into effect without prior judicial review of the validity of the espousal provisions of Article X. He found that "Article XII is not made contingent upon a judicial determination of the validity of espousal in Article X." *Juda II*, 13 Cl.Ct. at 686. He did not address the question whether the provisions were severable so that Article XII could constitutionally survive invalidation of Article X and be enforced even if Article X were to be held invalid. *See Environmental Defense Fund v. EPA*, 369 F.3d 193, 201-03 (2d Cir. 2004). Indeed, in its briefs to the Supreme Court opposing certiorari, the government was careful not to argue that Articles X and XII could be severed if Article X proved to be invalid, confining its argument to whether Congress had required a judicial evaluation of Article X before a court could dismiss under Article XII. Brief of the United States in Opposition to Writ of Certiorari in *People of Enewetak v. United States*, No. 88-1466 (May 5, 1989).

the elimination of jurisdiction to adjudicate a takings claim. *Dames & Moore,* 453 U.S. at 684-85 (rejecting jurisdiction stripping construction of an executive order); *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1018 (1984); *Blanchette v. Connecticut Gen. Ins. Corp*., 419 U.S. 102, 126 (1974) (construing statute to avoid eliminating jurisdiction over a takings claim).

Here, the Court need do nothing more than read section 103(g)(2) of the Compact Act at face value to conclude that Congress did not intend to unconstitutionally eliminate all judicial power to award just compensation if the process established by the Section 177 Agreement did not do so.[17] Congress linked implementation of jurisdiction-stripping Article XII to the settlement-release provisions of Article X, showing that it intended to effectuate a settlement extinguishing takings claims, which is constitutional, not to authorize the taking of private property without providing just compensation. Even if there are other plausible readings of section 103(g) (2), the canon of constitutional avoidance resolves any ambiguity in favor of a construction that makes the validity of Article XII jurisdiction-stripping depend on the validity of RMI's release of private claims. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005).

The Section 177 Agreement can also be read, consistent with *Dames & Moore*, to preserve jurisdiction in this Court over claims arising from the termination of lawsuits without payment of fair compensation, once the alternative remedy has been exhausted and the inadequacy of compensation can be proved. The language of the agreement

[17] The majority in *Antolok v. United States,* 873 F.2d 369, 375 (D.C. Cir. 1989) read section 103(g)(2) to "make[] it plain that the deprivation of jurisdiction applies not to all claims by the Marshall Islanders against the United States, but only those described in Articles X and XI of the Section 177 Agreement." However, section 103(g)(2) remains superfluous in that reading, because Article XII itself is explicitly limited to "claims described in Articles X and XI of this Agreement."

between the United Sates and Iran in *Dames & Moore* obligated the United States "to terminate all legal proceedings in United States courts" against Iran, 453 U.S. at 665, but the Court viewed this as "the suspension of claims," *id*. at 688, 689, because of the residual jurisdiction in the Court of Claims. That is precisely the reasoning the court used in *Juda II*, in which it declined to hold that the claims "terminated" under Article XII thereby extinguished plaintiffs' underlying claims. Rather, the Court explicitly limited Article XII's withdrawal of jurisdiction to the termination of "proceedings" related to the nuclear testing program, not to the extinguishment of plaintiffs' underlying "claims":

> There is a question of whether the word "terminated" in the first sentence of Article XII relates to *proceedings* involving such claims, or to the extinguishment of such *claims*. Article X, § 2 requires the RMI to terminate "any legal proceedings" in the courts of the Marshall Islands involving claims arising out of the nuclear testing program. Article XI . . . requires the RMI to indemnify and hold the United States . . . harmless from all claims and all actions or proceedings which may hereafter be asserted in any court or other judicial forum related in any way to the nuclear testing program. These provisions are persuasive that *the word "terminated" in the first sentence of Article XII applies to termination of proceedings, and not to extinguishment of the basic claims involved*.

13 Cl.Ct. at 686 (emphasis added).[18]

Moreover, while Article XII provides that "[a]ll claims described in Articles X and XI . . . shall be terminated and that "[n]o court of the United States shall have jurisdiction to entertain such claims," it makes no mention of a withdrawal of jurisdiction over claims described in Article IV, which established the Nuclear Claims Tribunal "to render final determination upon all claims past, present and future, of the Government,

[18] The court's interpretation of the withdrawal of jurisdiction as applying solely to the "termination of proceedings," *i.e.* the ending of proceedings already in existence, is fully consistent with the meaning of the word "terminate." It would be unusual, to say the least, to terminate a proceeding, like this one, that had not even commenced.

citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program. . . . ” It is thus reasonable to conclude that Article XII should not be read to eliminate the ability to enforce Article IV awards. This interpretation conforms to the canon of constitutional avoidance and reads the various provisions as a harmonious, integrated whole, rather than as contradictory and potentially unconstitutional. *See Info. Sys. & Networks Corp. v. United States,* 68 Fed.Cl. 336, 342 (Ct.Cl. 2005).

Finally, the Compact Act can also be read to emphasize the primacy of the United States' acceptance of responsibility for compensation in Compact section 177(a). The mechanism for carrying out that responsibility was the Nuclear Claims Tribunal, established in Article IV of the Section 177 Agreement. However, there is nothing in the Section 177 Agreement that allows the United States to disclaim its avowed responsibility if the damages exceed the "initial sum" paid to establish the Nuclear Fund. The Federal Circuit's opinion in *People of Enewetak* does not treat the $150 million Nuclear Fund as the exclusive means by which the United States would discharge its just compensation obligations. Indeed, in its brief to the Federal Circuit, the United States renounced the notion that the United States had no duty to provide additional funds if the Nuclear Fund came up short "because of long-term investment difficulties or substantial unforeseen damages." It also cited the "Changed Circumstances" provision of Article IX as a source of "possible additional funding," and it quoted Senator McClure's statement, as floor manager in the Senate, that

> There is a continuing moral and humanitarian obligation on the part of the United States to compensate any victims – past, present or future – of the nuclear testing program. For this reason, I fully expect

> that if new claims develop, Congress should and will provide any assistance required, absent compelling contradictory evidence.

Brief of Appellee at 34-35, 45, *People of Bikini v. United States*, Nos. 88-1206-1207-1208 (Fed. Cir., June 24, 1988). It is little wonder that the Federal Circuit referred to the $150 million as "an initial sum" and pointed to subsequent congressional actions and Article IX's changed circumstances provisions as allaying concerns about the adequacy of the Nuclear Fund to provide just compensation. 864 F.2d at 135-36.[19]

II. <u>The Prior Dismissal of the People of Bikini's Claims for Lack of Jurisdiction Does Not Bar the Present Claims</u>

The government's *res judicata* argument muddles claim preclusion, the doctrine that generally prevents a party from litigating claims that could have been brought in an earlier case (whether they were litigated or not) with collateral estoppel or issue preclusion, the doctrine that generally prevents a party from relitigating issues that were decided earlier. Neither doctrine helps the government here.

A. <u>The Prior Litigation Did Not Decide Whether the Compact Validly Stripped Jurisdiction If the Compact Process Failed to Provide Just Compensation</u>

The government does not squarely argue issue preclusion. The half-hearted references in its memorandum in support of its motion to dismiss ("MSMD") at 16, 17 to the prior resolution of the jurisdictional issue do not support issue preclusion, because the prior decisions did not reach the issues now before the Court. In fact, both the Court of Federal Claims and the Federal Circuit considered it premature to decide whether Congress could eliminate jurisdiction to adjudicate nuclear testing claims if the Nuclear

[19] Footnote 8, *supra*, and Am. Compl. ¶ 66 explain the confusion that can revolve around the $150 million Nuclear Fund and the $45.75 million of annual income from that fund that was made available to the NCT over 15 years.

Claims Tribunal process did not produce just compensation. *Juda II*, 13 Cl.Ct. at 689; *People of Enewetak v. United States*, 864 F.2d at 136. Thus, the prior litigation does not support dismissal for lack of jurisdiction.

B. The Prior Litigation Was Not Dismissed on the Merits, So There is No Claim Preclusion

First, as defendant acknowledges in its brief (MSMD at 16, 17), the bar of *res judicata* requires that the prior decision be a decision on the merits. There was no decision on the merits in the *Juda* litigation. Rather, the court deemed the constitutionality of the Compact and Section 177 Agreement, as well as the other issues raised, unripe and specifically declined to address them.[20] The *Juda* dismissal was pursuant to RCFC 41(b), which expressly states that a dismissal for lack of jurisdiction is not a decision on the merits: "Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision of this rule and any dismissal not provided for in this rule, *other than a dismissal for lack of jurisdiction* . . . operates as an adjudication upon the merits" (emphasis added). The court in *People of Enewetak* could not have been clearer: "[W]e affirm the decision of the Claims Court to dismiss appellants' complaints for lack of subject matter jurisdiction . . . ." 864 F.2d at 136 n. 4.[21]

---

[20] Defendant strives to meet the dismissal "on the merits" requirement for claim preclusion rather obliquely by attempting to merge the jurisdictional limitations in the Section 177 Agreement with the espousal-release provision, as if the prior dismissal had been based on a settlement. This attempt must fail, because the *Juda* judgment was not based on the espousal-release or § 103(g) of the Compact Act. As stated above, both courts declined to address the validity of the "settlement" and release of claims. The government successfully argued that the validity of the jurisdictional provision did not depend on whether there had been a settlement.

[21] For the same reason, plaintiffs' dismissal of their *Juda* appeal pursuant to Pub. L. No. 100-446 is also not a *res judicata* bar, because that was an appeal of a dismissal for lack of jurisdiction. Pub. L. No. 100-446 (*see* Am. Compl. ¶ 76) is clear that it did not intend

The distinction between jurisdictional dismissals and dismissals on the merits is firmly established. *Doe v. United States*, 2006 WL 2589154, * 9 (Fed. Cir. 2006). Jurisdictional dismissals are not claim preclusive. *Do-Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 640 (Fed. Cir. 1989); ("A dismissal on the merits carries *res judicata* effect and dismissal for want of jurisdiction does not"); *accord Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687 n.10 (Fed. Cir. 1992) (noting the difference in *res judicata* effect between a dismissal for lack of jurisdiction and a dismissal for failure to state a claim); RESTATEMENT (SECOND) OF JUDGMENTS § 20(a) (1982) (no claim preclusion "[w]hen the dismissal is one for lack of jurisdiction"); 9 Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE § 2373 & n.23; 18A Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE § 4427 (2002) (general discussion of preclusion); and § 4436 ("there is little mystery" that a jurisdictional dismissal is not preclusive).[22]

C. <u>The Claims Alleged in the Complaint Were Reserved in the Earlier Litigation</u>

The dismissal for lack of subject matter jurisdiction in *Juda II* was a *qualified* dismissal. As noted above, pp. 7-8, this Court expressly left the courthouse doors open in the event that the compensation provided by the alternative procedure should prove

---

to prevent the Bikinians from pursuing just compensation before the NCT, because it clearly states that the $90 million appropriation could be supplemented by additional "payment, rights entitlement and benefits provided for under the Section 177 Agreement." As provided for in the Section 177 Agreement, the NCT deducted from plaintiffs' award the $90 million appropriated under this law. Am. Compl. ¶80.

[22] *Hornback v. United States*, 405 F.3d 999 (Fed. Cir. 2005), the only case cited by defendant on this issue, is not an exception to the rule. *Hornback* involved a dismissal under the statute of limitations. Even though the statute of limitations is regarded as "jurisdictional" in this Court in the context of sovereign immunity, a dismissal on statute of limitations grounds is on the merits (as well as having consequences for jurisdiction).

inadequate. *Juda II,* 13 Cl.Ct. at 688. The qualified nature of this dismissal was affirmed by the Court of Appeals for the Federal Circuit in *People of Enewetak*, 864 F.2d at 136. Because of this reservation of the opportunity to return to this Court at the conclusion of the proceedings of the Nuclear Claims Tribunal, *res judicata* has no bearing in the instant litigation. *See* RESTATEMENT (2ND) OF JUDGMENTS § 26(b) (1982) (no preclusion when "the court in the first action has expressly reserved the plaintiff's right to bring the second action."); 18 Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE § 4413, pp. 31-32 (2002); *Central States Pension Fund v. Hunt Truck*, 296 F.3d 624, 627-29 (7th Cir. 2002).

III. The Adjudication of Takings Claims is a Core Judicial Function, Not a Non-Justiciable "Political Question"

Defendant further argues (MSMD at 22) that this litigation raises a non-justiciable political question and therefore should be dismissed because it "challenges the propriety of an agreement entered into by the governments of the RMI and the United States. . . ." The government loses sight of the fact that the core complaint – that the United States has failed to pay just compensation for taking property – is one traditionally and historically committed to the judiciary for resolution.[23] As this Court emphasized years ago in the *Juda* litigation, these are "money claims which are the grist of the judicial mills, particularly the function of this court . . . ." *Tomaki Juda v. United States*, Nos. 172-81L, 543-81L and 561-82L, April 13, 1983 Transcript of Proceedings at 67. And, as the court noted in *Lagenegger v. United States*, 756 F.2d 1565, 1569 (Fed. Cir. 1985),

---

[23] Indeed, as a practical matter, the United States removed the ability of the RMI to negotiate anything about the Section 177 Agreement when it refused to discuss the terms of that Agreement when the parties negotiated a renewal of the Compact that went into effect in 2003. (Am. Compl. ¶¶ 101-102.)

"consideration of land taking claims is clearly the role of the judiciary according to the Constitution, Amendment V, and ascertainment of 'just compensation' is a judicial function." Furthermore, as discussed at pp. 12-13, *supra*, the Constitution commits the determination of just compensation to the judiciary, *not* the political branches, so it cannot be said that resolving this case encroaches on turf "textually committed" to the legislative or executive branches of government.

The most telling case in point again is *Dames & Moore*, where, far from treating a dispute about whether the United States' settlement with Iran was a non-justiciable political question, the Supreme Court reached into the middle of a foreign policy crisis to decide the case by an extraordinary writ of certiorari before judgment, decided it on the merits, and noted in its opinion that the United States had conceded that the Court of Claims would have jurisdiction over takings claims arising from the settlement. 453 U.S. at 689. In light of the fact that the Supreme Court perceived no infringement on or disrespect to the political branches in the context of takings claims arising out of the politically delicate settlement with Iran, it is inconceivable that this Court would do so here.

The government cannot demonstrate, under *Baker v. Carr*, 369 U.S. 186, 217 (1962), a "textually demonstrable constitutional commitment of the issue to a coordinate political department" simply because this taking claim arises in the context of an international agreement.[24] "[T]he Constitution does not provide a foreign affairs

---

[24] There is no merit to the argument that the RMI's submission of a Changed Circumstances Petition to Congress "commits" the takings issue to Congress. Congress can usually act to redress a grievance even in the absence of a specific provision in an agreement, but that has no effect on the authority of the courts to apply existing law. *See Gross v. German Foundation Industrial Initiative*, 456 F.3d 363, 387 (3d Cir. 2006);

exception" to jurisdiction over taking claims. *Langenegger v. United States*, 756 F.2d at 1569. *See also Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) (the political question doctrine "requires careful case-by-case analysis," not blanket application). The Constitution expressly confers judicial power over cases arising under treaties as well as cases involving public consuls and ministers, so it impossible to justify a broad foreign affairs exclusion. U.S. Constitution, Art. III, § 2; *see also* First Judiciary Act, 1 Stat. 73, § 25 (1789). "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. at 211-12.

Courts have adjudicated sensitive cases involving the interpretation and constitutionality of treaties since the earliest days of the Republic, and they continue to do so today. *Ware v. Hylton*, 3 U.S. 199 (1796) (adjudicating claim by British subject based on conflict between Virginia statute and a federal treaty); *Japan Whaling Ass'n. v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) ("the courts have the authority to construe treaties and executive agreements); *Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669, 2677, 2683 (2006) (addressing effect of Vienna Convention on an International Court of Justice decision on domestic law); *Ministry of Defense v. Elahi*, 126 S.Ct. 1193 (2006) (*per curiam*) (execution of a judgment against property of Iran). This case questions not whether to carry out the government's foreign policy, but whether the government has

---

*Arakaki v. Lingle*, 423 F.3d 954, 975-76 (9th Cir. 2005), *judgment vacated on other grounds*, 126 S.Ct. 2859 (2006). Defendant has cited no cases in support of this contention. Nor is there any pragmatic reason to defer judicial action until Congress acts on the petition filed by RMI in 2000. Nothing has happened for six years, and the State Department has taken the position that there are no changed circumstances, so it would be disingenuous for the government to hold that process out as a meaningful alternative at this time. Am. Compl. ¶ 100.

paid constitutionally-mandated just compensation for private property it decided to appropriate. *Compare El-Shifa Pharmaceuticals Indust. Co. v. United States*, 378 F.3d 1346, 1364 (Fed. Cir. 2004) (declining to review President's designation of "enemy property" in the exercise of war making powers). A takings claim presumes that the government is entitled to use property as it sees fit in pursuit of whatever policy decisions the political branches make. The judiciary's function is to make sure that the government pays just compensation for the private property that it uses.

The government is also mistaken in supposing that a court's ordinary powers of judicial review are suspended for international agreements. Courts disapprove of actions by the political branches by holding them unconstitutional in many contexts. Those rulings do not convey disrespect for the political branches or sow confusion. Instead, they are an inevitable consequence of a governmental framework in which the actions of the political branches are constrained by the Constitution. *See United States v. Munoz-Flores*, 495 U.S. 385, 390 (1990) ("[D]isrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, every challenge to a congressional enactment would be impermissible").

## IV. Claims That Could Not Have Been Brought Until the Alternative Procedures Established in the Compact Were Exhausted Cannot be Barred by the Statute of Limitations

Remarkably, having persuaded the courts that takings claims were not ripe until the Nuclear Claims Tribunal process had run its course, the government now maintains (MSMD at 25-31) that it is too late for the Bikinians to press their claims. Just as a state may not "hold out what plainly appears to be a 'clear and certain' post-deprivation remedy and then declare, only after the disputed taxes have been paid, that no such

remedy exists," the government cannot, consistent with due process, argue that it is premature to challenge the adequacy of the Tribunal's process and then declare that such a challenge necessarily comes too late. *Reich v. Collins*, 513 U.S. 106, 108 (1994). That, in Justice O'Connor's words, would be an unconstitutional "bait and switch." *Id.* at 111.

Plaintiffs' first four causes of action are based on the failure of the alternative claims procedure to provide adequate compensation for the loss of their lands. This failure was unknowable until after March 5, 2001, the date of the NCT decision awarding plaintiffs $563,315,500 in damages. Prior to that date, there had been no determination of what constituted "just compensation" in this matter. Had plaintiffs done what the government now suggests – sue based on the Compact itself and challenge the alternative remedy before the NCT had issued its award – this Court would have found, as did the courts in *Juda II,* 13 Cl.Ct. at 689, and *People of Enewetak,*, 864 F.2d at 136, that the alternative procedure could not be challenged until it had run its course. That is precisely what the Supreme Court concluded in *Dames & Moore*, when it held out the prospect of later adjudication of takings claims in this Court. Having obtained the dismissal of the *Juda* case as premature, the government cannot invoke the statute of limitations now. *Alliance of Texas Land Grants v. United States*, 37 F.3d 1478 (Fed. Cir. 1994) (cited at MSMD at 26) is inapposite, because plaintiffs in that case were not told that their claims were premature and to return to court after exhausting an alternative remedy.

Alternatively, the statute is equitably tolled under the rationale of *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 96 & n. 3 (1990) (tolling when the plaintiff files a timely but otherwise defective pleading or is induced to delay filing by the other side). *Irwin* "hold[s] that the same rebuttable presumption of equitable tolling applicable to suits

against private defendants should also apply to suits against the United States." *Id.* at 95-96. *See Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (Fed. Cir. 1994). Here, the earlier suit can be characterized as "defective" because it was premature with respect to the takings claims. Unless the statute of limitations is construed to allow equitable tolling in these circumstances, the government's own conduct could lead to the denial of a forum for constitutionally protected takings claims, which would constitute a due process violation under *Reich*, *supra*, or a new takings claim.

Lastly, the Compact makes clear that Congress intended to accept responsibility and provide just compensation without regard to any statute of limitations period, giving the NCT jurisdiction to "render final determination upon *all* claims . . . related to the Nuclear Testing Program" (emphasis added). Am. Compl. ¶ 66. As the *Juda II* court noted in recognizing the purpose of the NCT, "Congress has recognized and protected plaintiffs' rights to just compensation for takings and breach of contract." *Juda II*, 13 Cl.Ct. at 689.

V. The Amended Complaint Alleges Valid Causes of Action for Unpaid Compensation

A. Standard of Review

Dismissal of a complaint under RCFC 12(b) (6) for failure to state a claim is proper only when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Defendant fails to meet that burden here.

B. Under RCFC 12(b) (6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Fifth Amendment Takings Claims Against Defendant

Defendant appears to repackage its statute of limitations argument concerning its Rule 12(b)(1) jurisdictional argument by contending (MSMD at 33) that plaintiffs have failed to allege the occurrence of any federal government act since 1986 that has deprived them of any property interest. Its failure to fund adequately the NCT's award was not an act that deprived plaintiffs of any property interest, and thus, defendant argues, the takings occurred in 1986 at the latest, the date Compact became effective, and are presumably barred by the statute of limitations.

As above, defendant simply ignores the earlier rulings in *Juda II* and *People of Enewetak* that plaintiffs' 1987-88 attack on the adequacy of the alternative remedy provided by Congress for compensation of their claims was "premature." *Juda II*, 13 Cl.Ct. at 689; *People of Enewetak*, 864 F.2d at 136. Defendant's argument demonstrates a misunderstanding of the takings claims at issue and their relationship to the statute of limitations. Plaintiffs' takings claims are premised on defendant's takings of their claims resulting from the defendant's failure to ensure the payment of just compensation to plaintiffs through the NCT (Count I) and the takings of their lands and other property through the Compact Agreements (Count V). These two causes of action accrued at the earliest on March 5, 2001[25] (or were equitably tolled until that date), the date the NCT

[25] For certain causes of action, the claims may have accrued on January 5, 2005, the date of defendant's letter urging Congress not to provide additional funds to plaintiffs under the RMI government's petition for changed circumstances. Am. Compl. ¶ 100. For practical purposes, however, it is inconsequential whether the claims accrued in 2001 or 2005, as both are within this Court's six-year statute of limitations, 28 U.S.C. § 2501.

issued its decision. Prior to March 5, 2001, it could not be ascertained whether plaintiffs had claims for just compensation beyond the funds defendant had allocated to the NCT.

Defendant also contends (MSMD at 34) that plaintiffs cannot establish a property interest in receiving just compensation, because the funds it provided under the Compact were in full settlement of plaintiffs' claims. This argument is both premature and inappropriate in a Rule 12(b) (6) context. Determination of the validity of the espousal or release in Article X of the Section 177 Agreement is a fact-intensive matter that should be decided only after full discovery, and plaintiffs have demonstrated that an assumption that the release is invalid is well-founded (see Part I-D, *supra*). Likewise, this Court could hold that the"full settlement" contemplated by Article X encompasses <u>any</u> award to be issued by the NCT, including an award greater than the funds authorized under the Compact. This Court should therefore decline to dismiss plaintiffs' claims under RCFC 12(b) (6).

C. <u>Under RCFC 12(b) (6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Breach of Implied Contract Claims Against Defendant</u>

Defendant's final argument appears to be that any breach of implied contract claims that may have existed were terminated in 1986 by the Compact and the Section 177 Agreement. This argument ignores the new causes of action in plaintiffs' Amended Complaint, in which the people of Bikini contend that the Compact and the Section 177 Agreement themselves constitute a breach of an implied-in-fact contract.

Defendant's contention that the Compact and the Section 177 Agreement provide full settlement of plaintiffs' claims must be rejected. First, this argument is not supported "beyond doubt" by the allegations in the pleadings, as required by RCFC 12(b) (6). Second, the Article X settlement or release may be invalid either as a breach of

defendant's fiduciary duty to its wards or as a defective espousal under international law. Third, there is ample evidence that the $150 million was "an initial sum . . . , with additional financial obligations over fifteen years for the settlement of all claims." *People of Enewetak*, 864 F.2d at 135-6. *See* pp. 28-29, *supra*. In this regard, there is no indication in the Agreement that the funds provided for the NCT and its awards were a cap, rather than an initial authorization. Accordingly, this Court should deny defendant's motion to dismiss.

## CONCLUSION

For the reasons set forth above, this Court should deny defendant's motion to dismiss.

Respectfully submitted,

/s/ Jonathan M. Weisgall
Jonathan M. Weisgall

Jonathan M. Weisgall, Chartered
1200 New Hampshire Avenue, N.W., Suite 300
Washington, D.C. 20036-6812
Telephone: (202) 828-1378
Facsimile: (202) 828-1380
E-mail: jmweisgall@midamerican.com

Attorney for People of Bikini Atoll

Of Counsel:

Robert K. Huffman
Miller & Chevalier Chartered
655 15th St., N.W.
Washington, DC 20005
Telephone: (202) 626-5824
Facsimile: (202) 626-0858
E-mail: RHuffman@milchev.com

Elizabeth Langer
Law Offices of Elizabeth Langer
3712 Ingomar Street, N.W.
Washington, D.C. 20015
Telephone: (202) 244-0456
Facsimile: (202) 244-0456
E-mail: el@elizabethlanger.com

December 18, 2006

Certificate of Filing

I hereby certify that on October 2, 2006, a copy of the foregoing "Plaintiffs' Unopposed Motion for Enlargement of Time" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing though the Court's system.

s/ Jonathan M. Weisgall