# Attachment 1

United States Department of State

*Under Secretary of State*
*for Political Affairs*

*Washington, D.C. 20520*

JAN -4 2005

Dear Mr. Bingaman:

In March 2002, the Senate Energy and Natural Resources Committee and the House Resources Committee asked that the Administration evaluate the Republic of the Marshall Islands' "Petition Presented to the Congress of the United States of America Regarding Changed Circumstances Arising from U.S. Nuclear Testing in the Marshall Islands" of September 2000. Enclosed please find the Administration's report.

The friendship between the United States and the Republic of the Marshall Islands remains strong under the revised Compact of Free Association, which will provide assistance for twenty years, with an emphasis on health and education, and establishes a permanent Trust Fund toward the same ends. Over the past fifty years, the United States has spent over $531 million for health and environmental remediation specifically related to nuclear testing done by the United States. The enclosed report outlines many of these efforts but specifically addresses only the Marshall Islands' September 2000 request to Congress.

The Honorable
Jeff Bingaman,
United States Senate.

In response to the Congress' request for an evaluation of the Marshall Islands' "changed circumstances" submission, the Administration's report concludes that the Marshall Islands' request does not qualify as "changed circumstances" within the meaning of Article IX of the nuclear test claims settlement agreement enacted under Title II, Section 177(c) of the Compact of Free Association Act of 1985 (P.L. 99-239). In consequence, there is no legal basis under the Section 177(c) settlement agreement for considering additional payments.

Sincerely,

Marc Grossman

Enclosure:
As stated.

# Report Evaluating the Request of the Government of the Republic of the Marshall Islands presented to the Congress of the United States of America

"Regarding Changed Circumstances Arising from U.S. Nuclear Testing in the Marshall Islands pursuant to Article IX of the Nuclear Claims Settlement Approved by Congress in Public Law 99-239"

November 2004

Executive Summary ........ iii
Report ........ 1
1. Legal Framework ........ 1
2. Historical Background ........ 10
3. Exposure of Marshallese to radiation and the health effects: ........ 31
4. Summary of the Request from the Republic of the Marshall Islands .. 54
5. Health Care ........ 59
6. Personal Injury Claims ........ 74
7. Loss of Land Use and Hardship ........ 77
8. Atoll Rehabilitation ........ 81
9. Occupational Safety ........ 94
10. Nuclear Stewardship ........ 95
11. Nuclear Education ........ 101
Appendix A – Chronology of U.S. Nuclear Testing in the Marshall Islands ........ 103
Appendix B: Estimates of U.S. Nuclear Testing-Related Assistance and Compensation ........ 107
Appendix C: Descriptions of Federal Radiation Exposure Programs ........ 123
Appendix D: Table of Radiation Compensation Programs: ........ 134
Appendix E: Executive Summary Included in "Findings of the Nationwide Radiological Study of the RMI" ........ 140
Appendix F: References ........ 143

**Executive Summary**

Background: In 1986, in section 177 of the Compact of Free Association between the United States and the Marshall Islands, the Government of the United States accepted responsibility for compensation owing to citizens of the Marshall Islands for loss or damage to property and person of the citizens of the Marshall Islands resulting from the nuclear testing programs which the United States Government conducted in the Northern Marshall Islands between June 30, 1946 and August 18, 1958, and the two governments agreed to set forth in a separate agreement provisions for the just and adequate settlement of all such claims.

The Compact and the separate agreement (the "Section 177 Settlement Agreement") entered into effect on the same day, October 21, 1986. The two governments agreed that the Section 177 Settlement Agreement, incorporated by reference into the Compact, "constitutes the full settlement of all claims, past, present, and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees, contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum" (Article X (1)).

As part of this full settlement, the two parties agreed that the U.S. would give the Government of the Marshall Islands $150 million to create a nuclear claims trust fund. The U.S Government has no role in the Tribunal's decisions regarding the distribution of the trust fund among claimants or in the administration of the trust fund.

Article IX of the Section 177 Settlement Agreement provided that "if loss or damage to property and person of the citizens of the Marshall Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, and such injuries were not and could not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate," the RMI may request that the U.S. Government provide for such injuries by submitting such a request to the U.S. Congress. Article IX

explicitly states that it is understood that it does not commit the Congress to authorize and appropriate funds.

Citing Article IX of the Section 177 Settlement Agreement, the Republic of the Marshall Islands (RMI) submitted a "Changed Circumstances" request to the United States Congress in September 2000, asserting, and seeking additional compensation and remedies for, injuries and losses to the people of the Marshall Islands arising from the U.S. nuclear testing program at Enewetak and Bikini atolls from 1946 to 1958.

Through its request, the RMI seeks over $3 billion in additional compensation and assistance, above and beyond monies provided in the Section 177 Settlement Agreement, to pay for an enhanced national health care system, Tribunal awards for personal injury claims, loss of land use and hardship, and atoll rehabilitation, as well as new money for occupational safety, nuclear stewardship, and nuclear education.

Exposure: The facts regarding radioactive fallout do not support a request under the "changed circumstances" provision of the section 177 settlement agreement. In its request, the RMI asserts that a far wider area of the Marshall Islands than the northerly atolls and islands that are the focus of the section 177 settlement agreement was exposed to dangerous levels of radioactivity. The weight of expert scientific evidence indicates that the present impact of radioactive fallout on the Marshall Islands is limited to the more northerly atolls and islands. Although some islands may never be suitable for communities or food gathering and should remain off limits, most historically inhabited islands in the northern atolls could be resettled under specific conditions. The section 177 settlement agreement recognized that, within the northern atolls, some islands would be more habitable than others. In the section 177 settlement agreement, the Government of the Marshall Islands took responsibility for controlling the use of areas in the Marshall Islands affected by the nuclear program.

Health care: Through its request, the RMI seeks enhanced primary, secondary and tertiary health care systems, integrated with existing RMI health services, to serve the entire RMI population for fifty years. The RMI estimates operating costs at $45 million a year for those fifty years, not including travel and housing costs, and requests $50 million to cover estimated capital costs.

As part of the Section 177 Settlement Agreement, $2 million per year for 15 years was provided from the trust fund to provide medical care to the populations of the four nuclear-affected atolls (Bikini, Enewetak, Rongelap, and Utrik). The Section 177 Health Care Program, originally designed for the people of the four atolls, serves 13,460 enrollees. Funding under the Section 177 Settlement Agreement ended in 2001 in accordance with the terms of that agreement. In addition, Congress mandated in the Compact of Free Association Act of 1985 continued special medical care for the remaining members of the population of Rongelap and Utrik exposed to radiation from the 1954 thermonuclear Bravo test. The U.S. Department of Energy and its predecessors have provided that special medical care continuously for 49 years. In its request, the RMI seeks an enhanced medical care system not limited to the individuals affected by the U.S. testing program. There is no basis for the RMI request for medical care for the entire RMI population under the "changed circumstances" provision of the Section 177 Settlement Agreement.

Furthermore, because the RMI request was submitted in September 2000, it does not take into account the role of the amended Compact of Free Association that took effect on May 1, 2004. Under the amended Compact, RMI Government health sector expenditures will total $15.9 million in FY 2005 and are estimated to be $16.5 million in FY 2006, $16.6 million in FY 2007 and $16.8 in FY 2008. Under the amended Compact, U.S. funds will cover approximately two-thirds of these expenditures.

Personal Injury Claims: The RMI seeks $26.9 million to pay personal injury awards already approved by the Nuclear Claims Tribunal (NCT) in excess of the trust fund.

The U.S. Government played no role in establishment of the NCT's award eligibility criteria, which embrace persons and compensable conditions not recognized under U.S. radiation injury compensation programs. Nor has the U.S. Government played any role in fund management or the investment decisions affecting the proceeds generated by the trust fund. The mixed earnings record of the trust fund is not attributable to the U.S. nuclear testing program and does not provide a basis for a funding request under the "changed circumstances" provision of the Section 177 Settlement Agreement.

Loss of Land Use and Hardship: All losses and damage to property arose

before the Section 177 Settlement Agreement entered into force. There are no losses or damage to property that "could not reasonably have been identified." The facts regarding loss and damage to property do not support a funding request under the "changed circumstances" provision of the Section 177 Settlement Agreement. The Nuclear Claims Tribunal awarded Enewetak roughly $244 million for loss of land use and $30 million for hardship. The Tribunal awarded Bikini approximately $278 million for loss of land use and $33 million for hardship. Additional claims are pending for Utrik and Rongelap. In making these awards, the Tribunal exceeded the amount of money provided through the Settlement Agreement for loss or damage to property. The United States played no role in evaluating the Bikini and Enewetak claims or in the Tribunal's judgments on them. Nor, as noted above, has the Government of the United States played any role in fund management or the investment decisions affecting the proceeds generated by the trust fund. The mixed earnings record of the trust fund is not attributable to the U.S. nuclear testing program and does not provide a basis for a funding request under the "changed circumstances" provision of the Section 177 Settlement Agreement.

<u>Atoll Rehabilitation</u>**:** The Nuclear Claims Tribunal considered strategies estimated to cost from $217 million to $1.4 billion for Bikini and a similar range of options for Enewetak. The Tribunal awarded $251 million to Bikini on March 5, 2001 and $91 million to Enewetak on April 13, 2000 "to restore [them] to a safe and productive state." In making these awards, the Tribunal exceeded the amount of money provided through the Settlement Agreement. There is no "changed circumstance" on which an additional funding request can legitimately be made under Article IX of the Section 177 Settlement Agreement.

An important element underlying the RMI request is the assertion that the United States Government has adopted stricter standards for domestic nuclear cleanup activities in the United States since the 1986 settlement agreement was reached. The current dose limit used by the U.S. Government to protect the public from all sources of radiation is 1 millisievert (mSv) per year. The sievert is a unit of radiation dose which describes the effectiveness of various types of radiation to produce biological effects. A millisievert is one thousandth of a sievert. The current U.S. dose limit has been used to guide cleanup decisions in the RMI before and after the Compact was enacted. Extensive monitoring of individuals on Marshall Islands atolls where cleanup has been effected indicates actual

radiation doses are below 0.15 mSv, the value advocated by the Tribunal. RMI cleanup decisions to date have conferred a degree of protection that exceeds all existing U.S. federal agency guidelines as well as the Tribunal's desired standard.

Occupational Safety, Nuclear Stewardship and Education: In its request, the RMI contends that the Section 177 Settlement Agreement does not include important occupational safety, nuclear stewardship or nuclear education programs. These are all programs that the parties could have chosen to include in the full settlement, but they chose not to. They do not constitute "changed circumstances" on which a funding request can legitimately be made under the Section 177 Settlement Agreement. To the extent the Government of the Republic of the Marshall Islands considers these programs are needed, they should be included in the RMI budget, and they could then be considered by the Joint Economic Management and Financial Accountability Committee for possible coverage under a sector grant under the amended Compact.

# Report Evaluating the Request of the Government of the Republic of the Marshall Islands Regarding Changed Circumstances Arising from U.S. Nuclear Testing

## 1. Legal Framework

The Compact of Free Association (the Compact), together with its related agreements, including the Agreement Between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact of Free Association (the Section 177 Settlement Agreement), was signed by the governments of the United States and the Marshall Islands on June 25, 1983. The Compact, including the Section 177 Settlement Agreement which was incorporated by reference, was approved by Joint Resolution of the United States Congress on January 14, 1986 (PL99-239, 99 Stat. 1770), and the Compact and its related agreements took effect between the United States and the Republic of the Marshall Islands on October 21, 1986.

### 1.1 Section 177 of the Compact

As it relates to the Marshall Islands, Section 177 of the Compact of Free Association dealt with:

"loss or damage to property and person of the citizens of the Marshall Islands, . . . resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946, and August 18, 1958."

Specifically, Section 177 provided that the Government of the United States and the Government of the Marshall Islands "shall set forth in a separate agreement provisions for the just and adequate settlement of all such claims which have arisen in regard to the Marshall Islands and its citizens and which have not as yet been compensated or which in the future may arise.... This separate agreement shall come into effect simultaneously with this Compact and shall remain in effect in accordance with its own terms."

## 1.2 The Section 177 Settlement Agreement

### 1.2.1. Full Settlement of All Claims

Article X Section 1 of the Section 177 Settlement Agreement is entitled "Full Settlement of All Claims" and states:

"This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees, contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum, including the courts of the Marshall Islands and the courts of the United States and its political subdivisions."

### 1.2.2 Changed Circumstances

Article IX of the Section 177 Settlement Agreement is entitled "Changed Circumstances" and states:

"If loss or damage to property and person of the citizens of the Marshall Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, and such injuries were not and could not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate, the Government of the Marshall Islands may request that the Government of the United States provide for such injuries by submitting such a request to the Congress of the United States for its consideration. It is understood that this Article does not commit the Congress of the United States to authorize and appropriate funds."

Citing this provision of the Section 177 Settlement Agreement, the Government of the Republic of the Marshall Islands submitted a request to the United States Congress in September of 2000.

In March of 2002, Congress transmitted the request of the Republic of the Marshall Islands to the President for evaluation by the appropriate agencies.

This document is the Administration's evaluation of the request submitted by the Government of the Republic of the Marshall Islands and of whether the request contains the elements mutually agreed to in Article IX of the Section 177 Settlement Agreement as being necessary for submission of a request to Congress for its consideration under that Article.

In order to be the subject of a request to Congress under Article IX of the Section 177 Settlement Agreement, an injury:

(1) must be loss or damage to property and person of the citizens of the Marshall Islands;

(2) must result from the Nuclear Testing Program;

(3) must arise or be discovered after the effective date of the Agreement (October 21, 1986);

(4) must be injuries that were not and could not reasonably have been identified as of the effective date of the Agreement (October 21, 1986); and

(5) such injuries must render the provisions of the Section 177 Settlement Agreement manifestly inadequate.

If these five conditions are met, the Government of the Marshall Islands may request the Government of the United States to provide for such injuries by submitting such a request to the United States Congress for its consideration, in which case the settlement agreement explicitly provides that it "is understood that this Article does not commit the Congress of the United States to authorize and appropriate funds".

### 1.2.3. Other Elements of the Section 177 Settlement Agreement

Government of the Marshall Islands Responsible for Providing Medical and Health Care:

The Preamble to the Section 177 Settlement Agreement states that the Government of the United States and the Government of the Marshall Islands agree to the terms of the Agreement, inter alia, "[i]n fulfillment of the provisions of Section 177 of the Compact relating to the nuclear testing program" and "[i]n recognition of the authority and responsibility of the

Government of the Marshall Islands to provide medical and health care to all of the people of the Marshall Islands".

In Fulfillment of U.S. Government Obligations, $150 million to the Government of the Marshall Islands to Create An Independent Nuclear Claims Fund:

"In fulfillment" of its obligations under Section 177 of the Compact, the United States Government provided to the Marshall Islands Government $150,000,000 to create an independent nuclear claims fund, the proceeds from which were to be distributed in accordance with the Section 177 Settlement Agreement.

Distribution for Health, Medical Surveillance, Radiological Monitoring, and for Atoll Claims for Loss or Damage to Property and Person:

Article II, Distribution of Annual Proceeds, requires disbursement to the RMI Government from the proceeds of the Fund fixed amounts for health ($2 million annually for 15 years), medical surveillance and radiological monitoring ($1 million annually for the Agreement's first three years); and disbursement to four atoll authorities of the following amounts in payment of claims for loss or damage to property and person: $75 million for Bikini, $48.75 million for Enewetak, $37.5 million for Rongelap and $22.5 million for Utrik. These disbursements were to be made in 60 quarterly payments over 15 years. Section 8 of this Article obliges the governments of the four atolls, in order to provide long-term means to address the consequences of the nuclear testing program, to establish individual trust funds "with all or a portion" of the proceeds received under Section 177 to "provide a perpetual source of income" for the peoples of the atolls (article II, section 8, sentence 2). The subsidiary agreement empowers the government of each of the four atolls to decide whether these funds should "be distributed, placed in trust or otherwise invested."

The $30 million ($2 million annually for 15 years) for health care provided under Article II, Section 1(a) and mentioned in the previous paragraph, was in addition to the amounts provided to the four atolls as their share as constituent governments of the Marshall Islands under Compact sections 216(a)(2), $1,791,000 annually for nationwide health and medical programs, including referrals, and 221(b), $10,000,000 annually for education and health care. Article II, section 1(d) provides for a U.S. Department of Agriculture supplemental food program.

Government of the Marshall Islands to Establish a Claims Tribunal:

Article IV of the Section 177 Settlement Agreement requires the Marshall Islands Government to establish a claims tribunal to render final determination upon all claims of the Government and people of the Marshall Islands related to the nuclear testing program and upon all disputes arising from distributions of the nuclear claims fund. Under Article II, Section 6(c), $45.75 million is to be available "for whole or partial payment" of monetary awards, to be disbursed in annual amounts of up to $2.25 million during the first 3 years and in annual amounts of up to $3.25 million during the next 12 years. The overall, net personal injury compensation totaled $63,127,000 dollars as of December 31, 1997. This represented 1,685 awards to or on behalf of 1,549 individuals.

## 2. Historical Background

### 2.1 The U.S. Nuclear Testing Program, 1946-58

The United States carried out sixty-six underwater, surface and atmospheric nuclear tests at Bikini and Enewetak atolls in the northern Marshall Islands between 1946 and 1958, and an additional shot 100 kilometers west of Bikini. The people of Bikini (population at the time 167) and Enewetak (population at the time 145) atolls were relocated to atolls outside the testing area prior to testing.

Among these tests, the world's second hydrogen bomb test, code-named Bravo, was carried out at Bikini Atoll on February 28, 1954. (The first was at Enewetak.) The energy yield of the bomb exceeded predictions, and sudden wind changes sent a cloud of radioactive debris unexpectedly over populated land areas. Consequently, radioactive debris fell on the populations of Rongelap (86 people at the time) and Utrik (167 people at the time) for 2-3 days before these inhabitants were evacuated to Kwajalein Atoll for medical care.

Appendix A provides a complete list of all 67 U.S. nuclear tests conducted in the Marshall Islands.

### 2.2 Explanation of Atoll Populations

Local atoll governments are responsible for maintaining census records for their respective atolls and qualifying individuals as "persons of the atoll." Criteria for qualification as a "person of the atoll" vary by jurisdiction, but in general relate to traditional and historical factors based on blood lineage, land rights, marriage and extended family.

Below is a comparison of actual populations of the atolls in 1954 and "persons of the atolls" as of June 1996, according to local atoll governments:

| | 1954 | 1996 |
|---|---|---|
| Bikini | 167 | 2,191 |
| Enewetak | 145 | 1,561 |
| Rongelap | 86 | 4,384 |
| Utrik | 167 | 2,783 |
| Total | 565 | 10,919 |

### 2.3 U.S. Compensation and Assistance

U.S. compensation and assistance to the RMI for nuclear testing totaled approximately $238,273,000 for the people of Bikini atoll; $146,167,300 for the people of Enewetak atoll; $93,301,000 for the people of Rongelap atoll; and $44,190,000 for the people of Utrik atoll.

Among major components of this compensation and assistance:

-- The Department of the Interior made nuclear claims compensation payments totaling $183,750,000 to Bikini, Enewetak, Rongelap and Utrik atolls.

-- The Department of Energy and its predecessor agencies have provided radiation-related health care for the Rongelap and Utrik survivors of the 1954 thermonuclear Bravo test, and radiological environmental characterization and monitoring of the four nuclear-affected atolls for fiscal years 1954 - 2002 totaling $137,395,000.

-- The U.S. Congress appropriated $20,000,000 in fiscal year 1977 military construction funds for the clean-up and rehabilitation of Enewetak atoll and directed the Department of Defense to draw upon other needed resources, without reimbursement for materials, equipment and support forces.

Appendix B provides a detailed accounting of U.S. nuclear testing-related compensation and assistance, including funds from the 177 Settlement Agreement, presented in 2003 dollars.

**2.3.1 Bikini**

The Congress appropriated $90,000,000 over a five-year period for the clean-up and resettlement of Bikini, which was added to $20,000,000 appropriated in 1985. The Congress based its further appropriation on section 103(l) of the Compact Act. Moreover, the Congress designed and intended this appropriation, in the words of the then Ranking Minority Member of the Committee on Energy and Natural Resources, Senator James A. McClure, on the floor of the Senate on September 8, 1988:

> …to fulfill both the moral and legal commitment of the U.S. Government to the people of Bikini contained in section 103(l) of the Compact Act… and in article VI of the Compact Section 177 Agreement… and … to provide for the full and final settlement of all claims arising from the Nuclear Testing Program. …There are those who may incorrectly argue that this appropriation is made outside of the Section 177 Agreement and therefore Congress did not intend for Section 177 to provide a final settlement. The opposite is true. … It is intended that these funds will be deposited in the existing resettlement trust fund - of approximately $20 million - and that the terms of that trust will be modified to provide that the corpus and income from the trust may be used for the rehabilitation and resettlement of Bikini Atoll and that up to $2 million per year may be used for projects on Kili and Ejit. Following rehabilitation and resettlement, these funds will no longer be available to Kili and Ejit, and any funds remaining in the trust, not identified for future needs, shall be deposited in the U.S. Treasury. It is anticipated that these future needs… will include: first, maintenance of the resettlement infrastructure until the

> Bikinians are prepared to assume that task; second, training the Bikinians for the operations and maintenance of the infrastructure; ... Once this objective is reasonably met, then all funds in the trust shall revert to the United States. The people of Bikini will then need to rely on other funds, such as the other $75 million provided pursuant to [the Section 177 Settlement Agreement, article II, section 2], ... In the context of the Section 177 Agreement the Bikinians will have accepted this trust arrangement as full and final discharge of all United States obligations... related to their relocation from Bikini... and no further appropriations will be required in order, finally, to have fulfilled the United States commitments to the Bikini people, except as provided under article IX of the Section 177 Agreement.

From the inception of Congressional funding of the separate Resettlement Trust Fund for the People of Bikini, the U.S. Government has had as its full-fledged partner the people and local government of Bikini. As the then-Chairman of the Committee on Energy and Natural Resources, the Honorable J. Bennett Johnston, said on the floor of the Senate on September 8, 1988:

> The work of the Bikini Atoll Rehabilitation Committee (BARC)... provided the information needed to quantify the obligation of the United States Government to clean up and resettle Bikini. It was from the BARC information that this $90 million appropriation was developed. ... [L]anguage was specifically included in the statute to rebut any indication that enactment of the Compact did not constitute a full and final settlement and a complete and absolute bar to either continued or further litigation. The analysis... set forth in the record at the time of passage is clear: ... '[A]dditional ex gratia ' - and I want to emphasize the words ' ex gratia ' - 'assistance will be available in the future if circumstances warrant and this provision in no manner lessens the concern which we have for the population of the affected atolls.' ... These funds are provided to the Bikinians so that they, and not the United States Government, will be responsible for the management and the decisions involved in returning to their homeland. ... It is the responsibility of the people of Bikini to... expend these funds

> so that they meet the objectives of rehabilitation and resettlement and provide for limited future needs. ... All decisions and responsibilities for rehabilitation and resettlement of Bikini rest with the people of Bikini.

While having a limited, on-island presence in their home atoll -- about 25 persons -- principally connected with a commercial dive program owned by the atoll government, most Bikinians live in Majuro Atoll, including Ejit Island (about 1,000), or elsewhere in the Marshall Islands (about 1,100), principally Ebeye and Kili Islands and Lae Atoll.

A September 1996 International Atomic Energy Agency report on radiological conditions at Bikini concluded that:

> (1) Bikini Island should not be permanently resettled under the present radiological conditions without remedial measures if inhabitants were going to eat entirely locally produced foodstuffs;
> (2) the diet of the peoples of the Marshall Islands, including the people of Bikini, contained and would continue to contain a substantial proportion of radionuclide-free, imported food;
> (3) provided certain remedial measures were taken, especially continued potassium fertilization, Bikini Island could be permanently reinhabited; and
> (4) should such remedial steps be taken, radiation doses for people living on Bikini Island would be acceptable in terms of international standards and their health would be adequately protected against radiation exposure due to the atoll's residual radioactive materials.

**2.3.2 Enewetak**

This atoll was the site of forty-three of the sixty-seven nuclear tests conducted by the U.S. Government in the northern Marshall Islands from 1946 to 1958. Five islands were partially or completely destroyed; the remaining islands in the atoll's northern half, including Enjebi and Runit, were contaminated by radioactivity. The atoll's southern islands of Enewetak and Medren were mostly covered by concrete and asphalt as they were used for various facilities required by the nuclear testing program. As a result, the entire atoll was devastated and nearly all vegetation destroyed.

In order to permit the people of Enewetak to begin their return home, from 1977 to 1980, the U.S. Government undertook a resettlement program which included clean-up of some affected islands and revegetation. Radiation-contaminated soil from this clean-up was placed in a nuclear test-created crater on the north of Runit Island and the crater was capped by a concrete dome.

Section 103(k) of the Compact Act and the subsidiary agreement implementing it established an ex gratia trust fund for the Enewetak community from Enjebi and credited to the fund the amount of $7,500,000, which the U.S. Government transferred to the Marshall Islands Government. Under article I, section 4, of this subsidiary agreement, if the people of Enewetak from Enjebi resettle their island by October 21, 2011, the people will receive from the fund such amounts as will be necessary to re-establish their community and to replant their island appropriately. However, under section 5, if they do not resettle by this date, then the fund manager will distribute the fund to the people for their resettlement at some other location. Whichever route the people of Enewetak from Enjebi take, prior to and during the distribution of the fund's corpus, they may receive at least quarterly the interest earned by the fund (section 6).

The Enewetak resettlement program has included revegetating portions of the atoll. Crops of coconut, pandanus, breadfruit, taro, bananas and lime have been planted since 1979. The planting continues as a part of the Department of the Interior-funded Enewetak Food and Agriculture Program, the funding level of which has been approximately $1,091,000 annually since fiscal year 1986. Due to a growing population, the crops are not the only food source for the people of Enewetak; they also import food. The situation is exacerbated by having less than one-third of the atoll's land useable for food production. For as long as the people of Enewetak need substantial amounts of off-island food, as recommended by the U.S. Department of Energy-Lawrence Livermore Laboratory's environmental assessment program, there will be a need for some supplemental support in this area, such as that provided by the United States Department of Agriculture's food program, and the Department of the Interior-funded agricultural program. This need will remain constant even if local food production increases significantly above current levels.

**2.3.3 Rongelap**

In 1994, the National Research Council issued its report on "Radiological Assessments for the Resettlement of Rongelap in the Republic of the Marshall Islands." On the basis of its review, the committee made the following recommendations:

> (1) a local-food-only diet [should be] limited to food gathered on the southern islands of Rongelap Atoll.
> (2) the returning population [should] restrict the quantities of some local foods in their diet. A modest supplementary food program would help the returning Rongelap people to obtain the necessary quantities of imported food.
> (3) the upper layer of soil [should be removed] from the village and on each houseplot [and] ...a layer of crushed coral [added] around the houses and to common areas of congregation throughout the village.
> (4) the application of potassium chloride as fertilizer, and for remediation of agricultural areas.

A $45 million agreement to assist the people of Rongelap with resettlement was signed on September 19, 1996. After years of studies and negotiations involving the Departments of the Interior and Energy, independent scientists, Congressional committees and representatives of the Rongelap people, the Congress set forth the general parameters for a final settlement in section 118(d) of Public Law 104-134 (April 26, 1996). In August 1996, after nearly three years of negotiations with Rongelap Atoll Local Government representatives, the Department of the Interior reached a settlement that the September 1996 agreement embodies. The agreement's terms constitute, in accordance with section 118(d) of Public Law 104-134, "a full and final settlement of all obligations of the United States to assist in the resettlement of Rongelap Atoll" pursuant to section 103(i) of the Compact Act. The agreement requires the building of sufficient homes after construction of dock, water, electric, school, and local government facilities; property will be surveyed, and cemeteries located.

The agreement provided $39,740,000 for the resettlement of Rongelap Island, the fund then having $18,127,000 available. The balance of $19,530,000 was provided by the Department of the Interior through a reprogramming of surplus appropriations authorized by the Congress. The remaining amount, $1,983,000, was included in the fiscal year 1997 Department of the Interior appropriations. The balance of the settlement