Program, today the entire DOE patient population receives the same medical care services.

The DOE medical program administers annual cancer-oriented comprehensive health examinations as the most effective means of fulfilling its congressional mandate. Advice is provided on decreasing risk factors for cancer.

Results of these examinations indicate that the DOE patient population of the special medical program caseload, including survivors and volunteers, is at greater risk of developing certain endocrine problems, such as thyroid disease, than the general population. For exposed individuals, specialists administer annual thyroid function blood tests and thyroid examinations.

Referrals to Majuro, Kwajalein, and Honolulu are the responsibility of a DOE-funded logistics contractor in Honolulu. DOE patients who require tertiary medical services not available in the RMI are transported to Honolulu, Hawaii and treated at the Straub Clinic. When patients with general medical problems not associated with Bravo-related radiation exposure are identified among DOE patients, they are referred to the 177 Health Care Program. DOE assists in providing emergency care for patients with any life-threatening condition. Emergency care is coordinated with the 177 Health Care Program and RMI national health care program.

From 1954 to June 1998, Brookhaven National Laboratory supported the Special Medical Program. The Brookhaven program was a ship-based medical examination program. The ship visited the Rongelap and Utrõk Islands twice a year through 1995. Physicians examined the exposed population and conducted a general sick-call for the island residents. Brookhaven sponsored resident physicians in the Marshall Islands for a one or two year appointment. The resident physician program ended in 1986, when the Compact of Free Association Act was enacted. From 1995 to 1998, Brookhaven operated a land-based medical program.

Since 1998, medical services under DOE's Special Medical Care Program have been delivered by Honolulu-based Pacific Health Research Institute (PHRI) and based on year-round, on-island primary and secondary care to survivors and volunteers residing in the RMI and annual physical examinations to patients living in Hawaii and the continental United States. PHRI clinics are located on Kwajalein Island and in Majuro, where local

Marshallese physicians and nurse supervisory personnel can see patients daily. A full-time Chief of Clinical Operations oversees the program from Majuro. Program managers coordinate closely with the 177 Health Care Program and the RMI national health care system to leverage assets and ensure continuity of patient care. Physicians at Honolulu's Straub Clinic and Hospital, Kaiser-Permanente, Wahiawa General Hospital, and the University of Hawaii School of Medicine support the work of the program's Marshallese physicians and nurses.

## 6. Personal Injury Claims

### 6.1. The Nuclear Claims Tribunal

The Section 177 Settlement Agreement provided a lump sum settlement and the governments agreed on division of the proceeds from the settlement among various purposes. The Section 177 Settlement Agreement does not prescribe criteria on which the Nuclear Claims Tribunal is to base compensation awards, and the NCT is not required to adhere to standards that would be applied under U.S. law. Among others, the NCT has made awards for the following categories of claims:

-- The NCT awards damages to persons from throughout the Marshall Islands, assuming the effects of the U.S. nuclear testing to have gone beyond the four populated northern atolls that are the subject of the Section 177 Settlement Agreement.

-- The scientific community has not found transference of nuclear effects to the second generation in humans. However, the Tribunal has awarded the biological children of a mother who was physically present at the time of the testing 50% of amounts offered first generation claimants.

-- The NCT has awarded some amount less than $2 million for other conditions not recognized by the United States as radiogenic but deemed radiogenic by the Tribunal; those conditions include benign salivary and parathyroid gland tumors, hyperparathyroidism, hypothyroidism for individuals not on Rongelap in March 1954, and unexplained "bone marrow failure."

Most U.S. radiation-related compensation programs require proof of a minimal level of exposure at a particular age relative to the date of diagnosis to qualify for compensation. The four northerly RMI atolls are those that were exposed and affected by the U.S. testing program. There is no similar basis for recognizing the claims of children of exposed parents or those of individuals located south of ten degrees north latitude at the time of testing.

Part of the RMI request is for $26.9 million to pay personal injury awards already approved by the Tribunal in excess of the trust fund. The United States Government has played no role in the management of the fund, nor in the investment decisions affecting the proceeds generated by the Trust Fund. The mixed earnings record of the Trust Fund is not attributable to the U.S. nuclear testing program and does not provide a basis for a "changed circumstances" funding request under the Article IX of the Section 177 Settlement Agreement.

## 7. Loss of Land Use and Hardship

### 7.1 Nuclear Claims Tribunal Awards

Loss of Land Use: In its loss of use judgments, the Tribunal reasoned that, because the United States never intended to permanently preclude Bikinians or Enewetakese from returning to their home atolls, this constituted a "temporary taking". The Tribunal relied on expert appraisal witnesses to arrive at fair rental values of the land for the periods of denied use, and offset compensation previously paid to claimants.

The Nuclear Claims Tribunal made loss of land use awards to Enewetak of $244 million on April 13, 2000 and $278 million to Bikini on March 5, 2001.

Hardship: In its Enewetak judgment, the NCT explained its reasoning in evaluating hardship claims:

> These damages, which were suffered on a community wide basis differ from those typically addressed in the personal injury program, which are basically radiogenic diseases ... The injuries at issue here are those arising out of relocation to Ujelang and the hardships

> endured there by the people because of its remoteness and lack of adequate resources ... The damages are a consequence of the loss of their land and their relocation attendant to that loss ... The Tribunal will adopt the approach suggested by claimants for quantification of these damages, by paying an annual amount for each person on Ujelang for each of thirty three years between 1947 and 1980 the years the people of Enewetak were on Ujelang.

On this basis, the NCT determined that the damages for hardship during the relocation to Ujelang amounted to $30,084,500. Applying the same procedure to relocation of Bikinians to Rongerik and Kili, the NCT made a hardship award of $33,814,500 to Bikini.

### 7.1 Comment

All losses and damage to property arose before the Section 177 Settlement Agreement entered into force. The Section 177 Settlement Agreement recognizes that there would be an indefinite period during which some of the affected atolls and islands would be uninhabitable or unusable and that in some cases the land would never be useable. The loss of land use and hardshipclaims deemed compensable by the NCT do not involve losses or damage to property that "could not reasonably have been identified." The facts regarding loss and damage to property do not support a funding request under the "changed circumstances" provision of the Section 177 Settlement Agreement.

In making its awards, the Tribunal exceeded the amount of money provided through the settlement agreement for loss or damage to property. The Government of the United States played no role in fund management or the investment decisions affecting the proceeds generated by the Trust Fund. The mixed earnings record of the Trust Fund is not attributable to the nuclear program and does not provide a basis for a funding request under Article IX of the Section 177 Settlement Agreement.

## 8. Atoll Rehabilitation

### 8.1 Nuclear Claims Tribunal Awards

The NCT accepted the position of the IAEA that "... policies and criteria for radiation protection of populations outside national borders from releases of radioactive substances should be at least as stringent as those for the population within the country of release." The NCT adopted current U.S. standards and considered numerous alternative strategies and approaches to how these standards could be met. These included removal of contaminated soil, application of potassium to reduce plant intake of cesium and phytoremediation, the use of plants to uptake the radioactive contaminants from the soil, and soil washing.

The NCT considered strategies costing from $217.7 million to $1.4 billion for Bikini and a similar range of options for Enewetak. The NCT awarded $251,500,000 to Bikini on March 5, 2001, and $91,710,000 to Enewetak on April 13, 2000, "to restore [them] to a safe and productive state."

### 8.2 Cleanup Standards

There are multiple U.S. federal standards applied to various cleanups that cover a wide range of doses but in general, they tend to control doses to as far below the 1 mSv per year limit as is practical. However, the International Commission on Radiological Protection (ICRP-82) and the International Nuclear Safety Advisory Group (INSAG) to the International Atomic Energy Agency have established basic principles of radiation protection and safety on which their policy on intervention, the Basic Safety Standard, is based.

Decisions on whether to intervene, and how, depend on the circumstances of individual cases. Quantitative criteria used in determining whether and when an intervention should be undertaken are called intervention levels or action levels.

There are no agreed international guidelines on intervention levels for chronic exposure to radioactive residues from events such as nuclear weapons testing. However, guidance established in the Basic Safety Standard for other situations indicates intervention levels that might be appropriate in the aftermath of nuclear weapons testing.

Intervention levels are determined based on the expected dose to be avoided by a specific remedial action such as soil scraping, topping with crushed coral, or potassium fertilization of food crops. Internationally agreed guidance on generic levels applicable to any intervention situation, especially for chronic exposure situations, has been established by the IAEA.

Intervention can be expected in almost all cases where doses approach levels at which the likelihood of deleterious health effects is very high. Intervention would be unlikely when the annual effective dose does not exceed about 10 mSv in any year. An annual dose of less than 1 mSv is generally accepted as the dose limit for the public.

Doses from natural background radiation provide a useful reference for comparison. In general, people receive a background dose from natural radiation sources in the range of 1 to 20 mSv, in certain locations 100 mSv. Most people receive a few mSv per year and annual doses of 10 mSv are unusual, but doses in excess of 100 mSv do occur in some places. The Marshall Islands natural background dose is 2.4 mSv. About 2 mSv of the 2.4 mSv natural background dose is acquired by eating fresh fish.

In situations such as those in the Northern Marshall Islands, generic guidance for rehabilitation of areas of chronic exposure is available. An annual effective dose of up to 10 mSv (1 rem) can be used as a robust and pragmatic action level in areas of chronic exposure. Doses below this level require careful consideration. However, areas where such levels are observed generally would be declared safe without further remediation.

A process of balancing human and environmental protection determines the form, scale and duration of the intervention. Provided that the principles set out in the Basic Safety Standards have been applied, a situation in which chronic exposures produce dose rates of less than 10 mSv per year would normally be acceptable but may not be practical due to public perceptions.

### 8.3 Radiological remediation and current radiological condition of the Four Atolls

Radiation protection principles have always been applied in making cleanup decisions for the northern Marshall Islands -- Bikini, Enewetak, Rongelap

and Utrik atolls. A brief history of cleanup activities and current radiation exposure levels are provided below. Radiation exposure differs from radiation dose in that exposure does not include information about the effectiveness of the radiation to cause biological effects.

Bikini Island: Following a 1967 IAEA radiological survey that determined that Bikini and Eneu Islands could be readied for reoccupation, President Lyndon Johnson announced that Bikini Atoll was safe for habitation. About 500 tons of radioactively contaminated debris had been removed. Agricultural areas of Bikini and Eneu Islands were prepared for use and coconut trees, pandanus and breadfruit were planted in 1969. Additional radiological surveys were conducted in the 1960's and 1970's. House building commenced following the cleanup, with some Bikini families moving back to Bikini Island by 1970. A 1975 survey sampled local food crops that had by then produced enough fruit to analyze. Dose predictions based on sample data showed that, when food crops matured, the resulting whole body dose would exceed then-existing U.S. federal guidelines. In August 1978, Trust Territory officials moved the people to Kili Island, where many remain. Further remedial actions have been taken on Bikini and Eneu Islands. The outer islands, Nam, Enidrik, Aerokoj, and Aomen, had small communities or were food-gathering locations. Aside from Bikini and Eneu, only Nam would be suitable for a resettled community and only after remediation. Most of the small islands lack resources, such as water supplies and infrastructure.

The Bikini Atoll Rehabilitation Committee in 1984 set an action level of 1.7 mSv per year based on U.S. Federal Radiation Protection Standards. The Committee reported that Eneu Island could be used without restriction; Bikini Island could be settled provided that settlers consumed only imported foods and drank cistern water for 80 years (until 2064). A 1994 radiation dose assessment reported that the estimated maximum annual dose at Bikini Island would be 4 mSv if Bikinians were to resettle in 1999, take no remedial measures, and continue to use imported foods. This annual dose could be reduced to 0.4 mSv with limited soil scraping of the top 16 inches in housing and village areas, crop fertilization, and adding some imported foods to the diet. The IAEA in 1998 reported directly to the Bikini people that Bikini Island was suitable for permanent resettlement if the remedial actions used on Rongelap Island were applied on Bikini. An ongoing limited environmental monitoring program was recommended.

Enewetak: In its 1967 radiological survey, the Atomic Energy Commission stated that Bikini and Eneu Islands could be readied, and President Lyndon Johnson announced that Bikini Atoll was safe for habitation. A 1973

radiological assessment concluded that living patterns in the northern half of the atoll, including Enjebi Island, would result in exposures exceeding U.S. federal guidelines. The southern half, including Enewetak Island, was determined to be safe for habitation and agriculture. A three-year cleanup began in 1977 that included removing about 6,000 cubic yards of radioactively contaminated debris, such as plutonium-contaminated soil, from Enjebi and various other islands. Contaminated soil was placed in a concrete structure on Runit Island where it remains quarantined.

The standard for cleanup was based on a maximum plutonium contamination of the soil at a concentration of 400 pCi per gram of soil. (A pico Curie, one-trillionth of a Curie, is the usual measure of the number of nuclear disintegrations per second in a specific quantity of material.) Conservatively, this level was equivalent to the current maximum permissible exposure in air. It was customary to set the levels at 10 percent of maximum (40 pCi per gram of soil) to provide a wide margin of safety. Below this level, no soil removal was deemed required. Later, when 1977 EPA guidelines were issued, the upper limit for agricultural use was set at 80 pCi per gram of soil and 160 pCi per gram of soil for food gathering land. The EPA guidance was roughly equivalent to a lifetime risk of approximately 14 cancer deaths per 100,000 persons exposed or to a probability of one cancer every twenty-one hundred years assuming that the population size of Enewetak Island remained constant

As the cleanup concluded, 116 homes had been built to accommodate the returning population. Shortly thereafter, about 100 people returned to Ujelang because of shortages of locally grown food. Resettlement would require an ample supply of coconuts for drinking and efforts to plant trees on northern islands strictly for a source of water in periods of drought; planting of about 22,000 trees began in 1979.

From resettlement in 1980 through 1996, the average dose to the population was 0.015 mSv per year; others could receive up to 0.05 mSv by eating mostly local foods. The Nationwide Rradiological Survey in 1994 found that the annual dose from radioactive cesium in the soil was 0.06 mSv.

Enewetak Island residents have available on-island monitoring of internal depositions of radioactive cesium, through whole body counting at the Enewetak Health Physics Laboratory established by the U.S. Department of Energy. For 2001, the average dose from radioactive cesium via food

sources was less than 0.001 mSv per year, compared to a natural background annual dose of 1.4 mSv. Therefore, the typical total radiation dose is below 0.15 mSv per year. The Enewetak people have made no decision about resettling the other traditional residential islands such as Enjebi, Japtan, and Medren.

In 1999, a scientist representing Enewetak Atoll testified before Congress that, if all the islands of the atoll were resettled in 2000, with no further remedial actions, nine people would experience a serious health problem over the next 1,000 years.

Rongelap: Rongelap atoll resettlement plans were based on an action level of 1 mSv per year from exposure to soil and diet, not including natural background, both for persons consuming a traditional Rongelap diet and those consuming local and imported traditional foods. The natural background annual radiation dose is about 2.4 mSv. The Rongelap resettlement action level was originally 1 mSv predicated on U.S. federal radiation exposure guidance at that time. It was determined that the actual exposure would be less than the resettlement action level.

Following radiological surveys, soil was removed in areas with high doses, and crushed coral topping was applied in the village and service areas. A potassium fertilizer regime was initiated to achieve a new lower dose standard for Rongelap of 0.01 mSv for the service and village areas.

There is a whole body counting facility on Rongelap Island. For the year 2001, among those counted, the average dose was 0.006 mSv. For the three-year period 1999-2001, the measured average annual dose for resettlement workers on Rongelap, from radioactive cesium via all food sources, was less than 0.001 mSv. The intake of plutonium and other similar long-lived substances in soil was measured among the construction and agricultural workers who have the greatest potential for intake of dust. No worker had an internal exposure greater than global fallout from nuclear testing. Because there is no large permanent population on Rongelap Island at this time, it is not possible to estimate what the actual range of dose would be for people with different dietary preferences, but it would be below 0.15 mSv. Radiological conditions on other islands of Rongelap Atoll vary and, depending on projected uses, different action levels apply.

Utrik: Radiological conditions dictated no formal environmental remediation of Utrik Atoll. The NWRS estimated in 1994 that the total annual dose from radioactive cesium in the soil and radiation from diet and soil would be about 0.20 mSv, assuming a traditional diet on each of the islands. A 1999 Lawrence Livermore National Laboratory dose assessment found that the maximum annual dose rate from all environmental sources, with a diet including imported foods, would be 0.038 mSv. Eating mostly local foods would result in a dose of about 0.098 mSv. Whole body counting for the Utrik people is now available, with the installation of a whole body counting facility in Majuro in July 2003. This facility will permit Utrikese to monitor their internal cesium levels, and to confirm that their traditional and contemporary food choices are safe.

**8.4 Comment**

An important element underlying the RMI request for Atoll Rehabilitation is the assertion that the United States Government has adopted stricter standards for domestic nuclear cleanup activities in the United States since the 1986 settlement agreement was reached. The current dose limit used by the U.S. Government to protect the public from all sources of radiation is 1 mSv per year. The current dose limit has been used to guide cleanup decisions in the RMI before and after the Compact was enacted. Extensive monitoring of individuals on atolls where cleanup has been effected indicates actual doses are below the NCT standard of 0.15 mSv per year. Cleanup decisions to date have conferred a degree of protection that exceeds all existing U.S. federal agency guidelines as well as the Tribunal's desired standard. There is no "changed circumstance" on which a funding request can legitimately be made under Article IX of the Section 177 Settlement Agreement.

**9. Occupational Safety**

In its request, the Republic of the Marshall Islands states that "Section 177 does not include an occupational safety program for Marshallese and other workers involved in environmental remediation or cleanup programs. As a result, Marshallese and other workers are exposed to occupational sources of radiation. Medical screening of past and present radiation workers is greatly needed to reduce the risk of further illness and claims." These are programs

that the parties could have chosen to include in the full settlement, but they chose not to. The desirability of such programs does not constitute "changed circumstances" on which a funding request can legitimately be made under the Section 177 Settlement Agreement. To the extent the Government of the Republic of the Marshall Islands considers these programs are needed, they should be included in the RMI budget, and they could then be considered by the Joint Economic Management and Financial Accountability Committee for possible coverage under a sector grant under the amended Compact.

## 10. Nuclear Stewardship

### 10.1 RMI Request

In its request, the Republic of the Marshall Islands states that "Section 177 does not provide programs for communities to develop strategies for safely containing radiation and living near radioactive waste storage areas."

### 10.2 Runit Dome

The 43 nuclear tests conducted at Enewetak Atoll by the United States between 1948 and 1958 produced close-in fallout that contaminated the islands and lagoon of the atoll with radioactive fission and activation products, and unfissioned nuclear fuel. In 1972, the U.S. Government announced that it would conduct a cleanup and restoration operation to return the atoll to the Enewetak people. The radiological cleanup was conducted between 1977 and 1980 and focused on reducing the concentration of transuranium elements in soils on some of the islands that might eventually be used for residence or for subsistence agriculture. The cleanup plan called for relocating soil and some other contaminated debris to Runit Island on the eastern perimeter of the Atoll. Some of the contaminated soil was mixed with cement and the mixture placed below the water level in the Cactus Crater formed by a nuclear explosion in 1958. The remainder of the contaminated material was mixed with concrete and placed above ground over the crater in the shape of a dome. A concrete cap was constructed over the dome of soil.

Concern has been expressed by the people of Enewetak over the possible aquatic impacts from the radionuclides entombed in the crater. A National

Academy of Sciences committee examined the dome and concluded that the containment structure and its contents present no credible health hazard to the people of Enewetak, either now or in the future. The committee suggested that "at least part of the radioactivity contained in the structure is available for transport to the groundwater and subsequently to the lagoon and it is important to determine whether this pathway may be a significant one." Therefore, a surveillance program was started in 1980, in conjunction with other research efforts, to study the radionuclides in samples of fish, groundwater, and lagoon seawater. Data collected support the finding of the National Academy committee that any fear that this structure contains amounts of activity whose release would cause damage to the environment that will result in greater effect on human health is unfounded. Indeed, research has shown that the land area adjacent to the dome has a different radiological "signature" than is found in the dome. This suggests that there had been no seepage from the dome up to the time samples were collected in 2000.

### 10.3 Comment

Kurt Campbell, Deputy Assistant Secretary of Defense, testified before the House Resources Committee on May 11, 1999:

> ...As part of the U.S. Government's acceptance of responsibility 'for compensation owing to citizens of the Marshall Islands...for loss or damage … resulting from the nuclear testing program...conducted...between June 30, 1946, and August 18, 1958,' the Department of Defense participated in the clean up of Enewetak Atoll. Contaminated matter was deposited in Cactus Crater on Runit Island, and the Army Corps of Engineers constructed a concrete dome over the crater for containment. Pursuant to the terms of the Compact of Free Association, the Republic of the Marshall Islands bears full responsibility for maintaining and monitoring the dome and Runit Island.

Appearing at the same session, Allen Stayman, Director of the Office of Insular Affairs at the Department of the Interior, testified:

> ...Perhaps the most significant, bilateral issue outstanding is the condition of Runit Island, a responsibility that the Enewetak Government claims still rests with the U.S. Departments of Defense or Energy. The Federal

position is that, although either or both Federal departments have occasionally sent personnel to inspect the condition of the Runit dome, this has been ex gratia. As article VII, sentence one, of the Section 177 Subsidiary Agreement states:

> 'The Government of the United States is relieved of and has no responsibility for, and the Government of the Marshall Islands, . . . shall have and exercise responsibility for, controlling the utilization of areas in the Marshall Islands affected by the Nuclear Testing Program.'

This remains the Administration's position.

The parties could have chosen to include long-term stewardship programs, including monitoring, in the full settlement, but they chose not to. The Administration agrees that such programs might be desirable. At a June 14, 2001 meeting, the Departments of Energy and the Interior agreed with the RMI on the "need [for] long-term stewardship programs for sites in the RMI with long-lived wastes, including monitoring of the Runit dome to ensure its integrity." However, the desirability of such programs does not constitute "changed circumstances" on which a funding request can legitimately be made under the Section 177 Settlement Agreement. The Government of the Republic of the Marshall Islands could include such programs in the RMI budget and they could then be considered by the Joint Economic Management and Financial Accountability Committee for possible coverage under a sector grant under the amended Compact.

**11. Nuclear Education**

In its request, the Republic of the Marshall Islands states that Compact Section 177 provides no means to educate Marshallese citizens in radiation-related fields or to build local capacity to undertake research, archive relevant information, or educate the public about the consequences of the U.S. Nuclear Testing Program in the Marshall Islands.

The parties could have chosen to include nuclear education in the full settlement, but they chose not to. The Administration agrees that nuclear education is desirable. However, the desirability of such education does not constitute a "changed circumstance" on which a funding request can

legitimately be made under the Section 177 Settlement Agreement. The Government of the Republic of the Marshall Islands could include nuclear education in the RMI budget and it could then be considered by the Joint Economic Management and Financial Accountability Committee for possible coverage under a sector grant under the amended Compact.

**Appendix A – Chronology of U.S. Nuclear Testing in the Marshall Islands**

| No. | Date | Site | Type | Yield (kt.) | Operation | Test |
|---|---|---|---|---|---|---|
| 1 | 6/30/1946 | Bikini | Airdrop | 21.0 | CROSSROADS | ABLE |
| 2 | 7/24/1946 | Bikini | Underwater | 21.0 | CROSSROADS | BAKER |
| 3 | 4/14/1948 | Enewetak | Tower | 37.0 | SANDSTONE | XRAY |
| 4 | 4/30/1948 | Enewetak | Tower | 49.0 | SANDSTONE | YOKE |
| 5 | 5/14/1948 | Enewetak | Tower | 18.0 | SANDSTONE | ZEBRA |
| 6 | 4/7/1951 | Enewetak | Tower | 81.0 | GREENHOUSE | DOG |
| 7 | 4/20/1951 | Enewetak | Tower | 47.0 | GREENHOUSE | EASY |
| 8 | 5/8/1951 | Enewetak | Tower | 225.0 | GREENHOUSE | GEORGE |
| 9 | 5/24/1951 | Enewetak | Tower | 45.5 | GREENHOUSE | ITEM |
| 10 | 10/31/1952 | Enewetak | Surface | 10400.0 | IVY | MIKE |
| 11 | 11/15/1952 | Enewetak | Air Drop | 500.0 | IVY | KING |
| 12 | 2/28/1954 | Bikini | Surface | 15000.0 | CASTLE | BRAVO |
| 13 | 3/26/1954 | Bikini | Barge | 11000.0 | CASTLE | ROMEO |
| 14 | 4/6/1954 | Bikini | Surface | 110.0 | CASTLE | KOON |
| 15 | 4/25/1954 | Bikini | Barge | 6900.0 | CASTLE | UNION |
| 16 | 5/4/1954 | Bikini | Barge | 13500.0 | CASTLE | YANKEE |
| 17 | 5/13/1954 | Enewetak | Barge | 1690.0 | CASTLE | NECTAR |
| 18 | 5/2/1956 | Bikini | Air Drop | 3800.0 | REDWING | CHEROKE |
| 19 | 5/4/1956 | Enewetak | Surface | 40.0 | REDWING | LACROSSE |
| 20 | 5/27/1956 | Bikini | Surface | 3500.0 | REDWING | ZUNI |
| 21 | 5/27/1956 | Enewetak | Tower | 0.2 | REDWING | YUMA |
| 22 | 5/30/1956 | Enewetak | Tower | 14.9 | REDWING | ERIE |
| 23 | 6/6/1956 | Enewetak | Surface | 13.7 | REDWING | SEMINOLE |
| 24 | 6/11/1956 | Bikini | Barge | 365.0 | REDWING | FLATHEAD |
| 25 | 6/11/1956 | Enewetak | Tower | 8.0 | REDWING | BLACKFOOT |
| 26 | 6/13/1956 | Enewetak | Tower | 1.5 | REDWING | KICKPOO |
| 27 | 6/16/1956 | Enewetak | Air Drop | 1.7 | REDWING | OSAGE |
| 28 | 6/21/1956 | Enewetak | Tower | 15.2 | REDWING | INCA |
| 29 | 6/25/1956 | Bikini | Barge | 1100.0 | REDWING | DAKOTA |
| 30 | 7/2/1956 | Enewetak | Tower | 360.0 | REDWING | MOHAWK |

| | | | | | | |
|---|---|---|---|---|---|---|
| 31 | 7/8/1956 | Enewetak | Barge | 1850.0 | REDWING | APACHE |
| 32 | 7/10/1956 | Bikini | Barge | 4500.0 | REDWING | NAVAJO |
| 33 | 7/20/1956 | Bikini | Barge | 5000.0 | REDWING | TEWA |
| 34 | 7/21/1956 | Enewetak | Barge | 250.0 | REDWING | HURON |
| 35 | 4/28/1958 | Near Enewetak | Balloon | 1.7 | HARDTACK | YUCCA |
| 36 | 5/5/1958 | Enewetak | Surface | 18.0 | HARDTACK | CACTUS |
| 37 | 5/11/1958 | Bikini | Barge | 1360.0 | HARDTACK | FIR |
| 38 | 5/11/1958 | Enewetak | Barge | 81.0 | HARDTACK | BUTTERNUT |
| 39 | 5/12/1958 | Enewetak | Surface | 1370.0 | HARDTACK | KOA |
| 40 | 5/16/1958 | Enewetak | Underwater | 9.0 | HARDTACK | WAHOO |
| 41 | 5/20/1958 | Enewetak | Barge | 5.9 | HARDTACK | HOLLY |
| 42 | 5/21/1958 | Bikini | Barge | 25.1 | HARDTACK | NUTMEG |
| 43 | 5/26/1958 | Enewetak | Barge | 330.0 | HARDTACK | YELLOWWD |
| 44 | 5/26/1958 | Enewetak | Barge | 57.0 | HARDTACK | MAGNOLIA |
| 45 | 5/30/1958 | Enewetak | Barge | 11.6 | HARDTACK | TOBACCO |
| 46 | 5/31/1958 | Bikini | Barge | 92.0 | HARDTACK | SYCAMORE |
| 47 | 6/2/1958 | Enewetak | Barge | 15.0 | HARDTACK | ROSE |
| 48 | 6/8/1958 | Enewetak | Underwater | 8.0 | HARDTACK | UMBRELLA |
| 49 | 6/10/1958 | Bikini | Barge | 213.0 | HARDTACK | MAPLE |
| 50 | 6/14/1958 | Bikini | Barge | 319.0 | HARDTACK | ASPEN |
| 51 | 6/14/1958 | Enewetak | Barge | 1450.0 | HARDTACK | WALNUT |
| 52 | 6/18/1958 | Enewetak | Barge | 11.0 | HARDTACK | LINDEN |
| 53 | 6/27/1958 | Bikini | Barge | 412.0 | HARDTACK | REDWOOD |
| 54 | 6/27/1958 | Enewetak | Barge | 880.0 | HARDTACK | ELDER |
| 55 | 6/28/1958 | Enewetak | Barge | 8900.0 | HARDTACK | OAK |
| 56 | 6/29/1958 | Bikini | Barge | 14.0 | HARDTACK | HICKORY |
| 57 | 7/1/1958 | Enewetak | Barge | 5.2 | HARDTACK | SEQUOIA |
| 58 | 7/2/1958 | Bikini | Barge | 220.0 | HARDTACK | CEDAR |
| 59 | 7/5/1958 | Enewetak | Barge | 397.0 | HARDTACK | DOGWOOD |
| 60 | 7/12/1958 | Bikini | Barge | 9300.0 | HARDTACK | POPLAR |
| 61 | 7/14/1958 | Enewetak | Barge | Low | HARDTACK | SCAEVOLA |
| 62 | 7/1/1958 | Enewetak | Barge | 255.0 | HARDTACK | PISONIA |
| 63 | 7/22/1958 | Bikini | Barge | 65.0 | HARDTACK | JUNIPER |

| | | | | | | |
|---|---|---|---|---|---|---|
| 64 | 7/22/1958 | Enewetak | Barge | 202.0 | HARDTACK | OLIVE |
| 65 | 7/26/1958 | Enewetak | Barge | 2000.0 | HARDTACK | PINE |
| 66 | 8/6/1958 | Enewetak | Surface | Fizz | HARDTACK | QUINCE |
| 67 | 8/18/1958 | Enewetak | Surface | 0.02 | HARDTACK | FIG |

---

Sources: U.S. Department of Energy, United States Nuclear Tests: July 1945 through September 1992. Document No. DOE/NV-209 (Rev. 14), December 1994. RMI Nuclear Claims Tribunal. Annual Report to the Nitijela for the Calendar Year 1996. Majuro: 1997. for the Calendar Year 1996. Majuro: 1997.

## Appendix B: Estimates of U.S. Nuclear Testing-Related Assistance and Compensation

Total: $531,931,000
(Total estimated '03 funds: $837,390,000 - based on U.S. Department of Commerce, Bureau of Labor Statistics' Inflation Calculator. Inflation calculations are low/conservative due to use of final year of funding for calculation of multi-year program/payout entries.)

**Bikini Projects**

| Year | Amount | USG Source/Purpose |
|---|---|---|
| 1964 | $2,000,000 | Defense/Settlement for use of Bikini |
| 1954-02[1] | $37,342,450 | Radiological monitoring |
| 1970-75 | $2,881,000 | Interior/Rehabilitation and Resettlement |
| 1975 | $3,000,000 | Interior (P.L.94-34)/Establish Trust Fund |
| 1978 | | Interior (P.L.95-348) |
| | $6,000,000 | /Resettlement-Kili |
| | $3,000,000 | /Addition to trust fund |
| 1978 | $35,000 | Interior/Feeding program |
| 1979-84 | $1,754,000 | Agriculture/Surplus food program[2] |
| 1980 | $1,400,000 | Interior (P.L. 97-257)/ex gratia payment |
| 1981 | $400,000 | Energy/Health plan for treatment of radiation exposure |

[1] The AEC/ERDA/DOE estimated expenditures for the environmental and special medical programs from 1954 through 2002 are $137,935,000 for the four atolls - Bikini, Enewetak, Rongelap, and Utrik. Bikini Atoll environmental activities cost $37,242,450. The short-term cost of medical care for 129 Bikini residents cannot be estimated with existing information. Other than the short-term medical care, the Congress did not mandate for Bikini residents special medical care mandated for the Rongelap and Utrik population exposed to radiation from the 1954 thermonuclear "Bravo" test.

| | | |
|---|---|---|
| 1982 | $20,600,000 | Interior (P.L. 97-527)/Bikini Resettlement Trust Fund |
| 1982 | $400,000 | Interior/Bikini Atoll Rehabilitation Committee |
| 1984 | $264,000 | Interior/Bikini Atoll Rehabilitation Committee |
| 1984 | $1,000,000 | Energy (P.L. 97-257) Four Atoll Health Program |
| 1985-94 | | Agriculture/Surplus food program |
| 1985 | $1,914,000 | Interior/Bikini Atoll Rehabilitation Committee |
| 1986 | $1,664,000 | Interior/Bikini Atoll Rehabilitation Committee |
| 1987 | $75,000,000 | Interior (P.L. 99-239)/Nuclear Claims Compensation |
| 1988 | $2,300,000 | Interior/Bikini Conception Plan |
| 1989 | $5,000,000 | Interior (P.L. 100-466)/Bikini Resettlement Trust Fund |
| 1990 | $22,000,000 | Interior (P.L. 100-466)/Bikini Resettlement Trust Fund |
| 1991 | $21,000,000 | Interior (P.L. 100-466)/Bikini Resettlement Trust Fund |
| 1992 | $21,000,000 | Interior (P.L. 100-466)/Bikini Resettlement Trust Fund |
| 1993 | $21,000,000 | Interior (P.L. 100-466)/Bikini Resettlement Trust Fund |
| Total | $238,273,000 | ($399,610,000 in '03 funds) |

**Enewetak Projects**

| Year | Amount | USG Source/Purpose |
|---|---|---|
| 1956 | $175,000 | Interior/TTPI/Enewetak atoll use rights |
| 1969 | $1,020,000 | Interior/Funds transfer to TTPI for the people of Enewetak |
| 1954-02 | $24,828,300 | Radiological monitoring |
| 1970-94[2] | | Agriculture/Surplus Commodity Food Program |
| 1977 | $20,000,000 | Defense/DNA (P.L.94-367)/ Radiological Clean-up and Rehabilitation Project |
| 1978 | $12,400,000 | Interior/TTPI/Enewetak Rehabilitation and Resettlement Program |
| 1980 | $1,475,000 | Interior/TTPI/Enewetak Rehabilitation and Resettlement Program |
| 1980 | $3,820,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1981 | $1,345,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1982 | $818,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1983 | $800,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1984 | $800,000 | Interior/TTPI/Enewetak Agriculture/Support |

[2] The AEC/ERDA/DOE estimated expenditures for the environmental and special medical program from 1954 through 2002 are $135,935,000 for the four atolls - Bikini, Enewetak, Rongelap, and Utrik. Enewetak Atoll environmental activities cost $24,828,300. Congress did not mandate for the Enewetak people special medical care mandated for the Rongelap and Utrik population exposed to radiation from the 1954 thermonuclear "Bravo" test.

| | | |
|---|---|---|
| 1984 | $1,000,000 | Energy (P.L. 97-257)/Four Atoll Health Program |
| 1985 | $882,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1986 | $818,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1986 | $818,000 | Interior/TTPI/Enewetak Agriculture/Support |
| 1986 | $48,750,000 | Interior (P.L. 99-239)/Nuclear Claims Compensation[7] |
| 1986 | $2,750,000 | Interior (P.L. 99-349)/Enjebi Resettlement Community Trust Fund |
| 1987 | $2,250,000 | Interior (P.L. 99-591) Enjebi Resettlement Community Trust Fund |
| 1987 | $900,000 | Interior/Enewetak Agriculture/Support |
| 1988 | $2,500,000 | Interior (P.L. 99-349)/Enjebi Resettlement Community Trust Fund |
| 1988 | $1,100,000 | Interior/Enewetak Agriculture/Support |
| 1989 | $1,100,000 | Interior/Enewetak Agriculture/Support |
| 1989 | $2,500,000 | Interior (P.L. 99-591)/Enjebi Resettlement Community Trust Fund |
| 1990 | $1,100,000 | Interior/Enewetak Agriculture/Support |
| 1991 | $1,094,000 | Interior/Enewetak Agriculture/Support |
| 1992 | $1,094,000 | Interior/Enewetak Agriculture/Support |
| 1993 | $1,091,000 | Interior/Enewetak Agriculture/Support |