IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **THE PEOPLE OF BIKINI, *et al.*** Plaintiffs, v. **THE UNITED STATES,** Defendant. | ) | No. 06-288C (Judge Miller) |
| **ISMAEL JOHN, *et al.*** Plaintiffs, v. **THE UNITED STATES,** Defendant. | ) | No. 06-289L (Judge Miller) |

**PLAINTIFFS' JOINT RESPONSE TO THE COURT'S ORDER OF APRIL 24, 2007**

## I. INTRODUCTION

This brief is filed jointly by *The People of Bikini* and the *Ismael John* plaintiffs (representing the People of Enewetak) in response to this Court's Order of April 24, 2007, which instructed the parties to address the following issues:

> (i) Caselaw and other guidance on the scope of judicial review of the adequacy of relief provided by an international tribunal, particularly in light of the statement made by the Federal Circuit in People of Enewetak v. United States, "Congress intended the alternative

> procedure to be utilized, and we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate," 864 F.2d 134, 136 (Fed. Cir. 1988), similar statements made in Juda v. United States, 13 Cl.Ct. 667, 689 (1987), and the facts of this case.
>
> (ii) Their understanding of the characterization of the appropriation of $150 million by Congress for the Claims Settlement Fund as an "initial sum" and "initial amount" by the Federal Circuit in People of Enewetak v. United States, 864 F.2d 134, 135-36 (Fed. Cir. 1988).

The Federal Circuit's determination, quoted in the Court's first question, that it was premature to address the adequacy of the alternative remedy, reflects the Federal Circuit's understanding that the United States could be trusted to make good on its commitment to "accept[] the responsibility for compensation owing to citizens of the Marshall Islands . . . for loss or damage to property and person" resulting from the nuclear testing program, as stated in Section 177(a) of the Compact of Free Association, even if the full extent of the "loss or damage to property and person" could not be fully compensated by the "initial sum" provided. For that reason, the Federal Circuit saw no reason "at this time" to grapple with the question now before the Court, but it clearly held the door open for the plaintiffs to return to this Court if the United States failed to make good on its commitment to "accept[] responsibility for compensation owing to citizens of the Marshall Islands." Those individuals are now properly before this Court to seek compensation for the taking of their property and breaches of contracts.[1]

[1] Neither Judge Harkins nor the Federal Circuit decided the validity of the espousal and release; their decisions rested instead on the prematurity of deciding whether it was constitutional to eliminate this Court's jurisdiction to hear the takings claims until the adequacy of the Nuclear Claims Tribunal remedy could be determined. *Juda v. United States*, 13 Cl.Ct. 667, 689 (1987) ("These assertions are premature."); *People of Enewetak v. United States*, 864 F.2d 134 136 (Fed. Cir. 1988) ("we are unpersuaded that judicial intervention is appropriate at this time"). At the same time, both courts and particularly the Federal Circuit relied on the government's representations about the open-endedness of its commitment to conclude that the adequacy of the Fund could not yet be determined, so that the claims should be effectively suspended while the Marshallese pursued their alternative remedy. 864 F.2d at 136 (emphasizing "Congress's concern that its alternative provision for compensation be adequate"). A release defense

## II. THIS COURT IS AVAILABLE TO PROVIDE REDRESS IF AN ALTERNATIVE FORUM (INCLUDING AN INTERNATIONAL TRIBUNAL) FAILS TO PROVIDE JUST COMPENSATION FOR A TAKING OF PROPERTY

The Federal Circuit in *People of Enewetak v. United States*, 864 F.2d 134, 136 (Fed. Cir. 1988), referred to *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984), and *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102 (1974), as well as to *Dames & Moore v. Regan,* 453 U.S. 654 (1981), before concluding that "judicial intervention" was premature with regard to the nuclear testing claims of the Marshall Islanders. Each of those cases recognized that takings claims could be filed in this Court if an alternative remedy proved inadequate. Nothing in the Federal Circuit's opinion suggests that a different standard would apply to a claim for a taking of property following exhaustion of an alternative remedy provided through an international tribunal than would apply to an alternative remedy provided by an administrative agency (such as one making an award under the statutory scheme reviewed in *Monsanto*) or a special court administering a special fund (as in *Blanchette*). Indeed, Judge Harkins, whose opinion the Federal Circuit adopted in this respect (*People of Enewetak v. United States*, 864 F.2d 134, 137 (Fed. Cir. 1988)), explained in greater detail that the plaintiffs' challenge to the constitutionality of Article XII of the Section 177 Agreement was "premature" because:

> *Whether the compensation, in the alternative procedures provided by Congress in the Compact Act, is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures. Congress*

---

is not properly before the Court on the government's motion to dismiss, and should be addressed – if the government pleads such a defense in its answer – only after discovery on a motion for summary judgment or at trial. *See Jones v. Bock*, 127 S.Ct. 910, 919-22 (2007) (overturning dismissals of prisoner complaints because exhaustion of administrative remedies, although statutorily required, is an affirmative defense that need not be pleaded in the complaint). Plaintiffs expect to show that any release of their claims by the Republic of the Marshall Islands is factually and legally unenforceable.

> *has recognized and protected plaintiffs' rights to just compensation and for breach of contract.* The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for providing compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time.

*Juda v. United States*, 13 Cl. Ct. 667, 689 (1987) (emphasis added). *See also Antolok v. United States*, 873 F.2d 369, 378 (D.C. Cir. 1989) ("If there is an uncompensated or inadequately compensated taking, then plaintiffs' remedy is in the Claims Court under the Tucker Act. . . ."). In short, the ultimate standard is whether the amount of compensation provided at the end of the day satisfies the Fifth Amendment.

**A. <u>The Termination of Takings and Contract Claims Gives Rise to a Claim in this Court for Just Compensation If a Required Alternative Procedure Fails to Provide Compensation that would be Deemed to be Fair by a U.S. Court.</u>**

The correct approach to the scope of judicial review of the adequacy of the Nuclear Claims Tribunal awards can be found in the Supreme Court's analysis in *Dames & Moore* and from subsequent decisions involving the Iran-United States Claims Tribunal, where most of the original claims (primarily for breach of contract) were against Iran, not the United States. The Supreme Court recognized in *United States v. Sperry Corp.,* 493 U.S. 52, 63 (1989) that the U.S. claimants gained certain distinct advantages by pursuing their claims against Iran in the Tribunal, because they could obtain enforceable judgments from its rulings, whereas judgments issued by U.S. courts might have been more difficult to collect against Iran. Nevertheless, the Supreme Court recognized that the suspension of pending claims by the United States might constitute a taking of property, for which the claimants would be entitled to just compensation under the Fifth Amendment. *Dames & Moore v. United States*, 453 U.S. at 689. S*ee also Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 245 (1796) ("claims for compensation are property interests that cannot be

taken for public use without compensation," in the context of treaty settling dispute with Great Britain following the American Revolution). Indeed, in response to questions from the Court, the government conceded in *Dames & Moore* that it could not extinguish claims against Iran for the public purpose of settling an international crisis without a forum in this Court to provide just compensation for any property rights taken in the process. 4A U.S. Op. Off. Legal Counsel 71, 1984 WL 54314, * 31 (1984).

As Justice Powell said in his opinion in *Dames & Moore*, "the Government must pay just compensation when it furthers the Nation's foreign policy goals by using as 'bargaining chips' claims lawfully held by a relatively few persons and subject to the jurisdiction of the courts." 453 U.S. at 691. This perspective was confirmed in *Behring International, Inc. v. Imperial Iranian Air Force,* 699 F.2d 657 (3d Cir. 1983), where the court explained that plaintiffs were obliged to utilize the Iran-United States Claims Tribunal, but that subsequently "'they will be able to argue that such relief as may be realized through arbitration has failed to make them whole and therefore that dismissal of their claims would constitute a compensable taking,'" and that "'[a]t that time the District Court will be able to determine whether any taking has in fact occurred and, if so, what should be done.'" *Id.* at 665 n. 5 (*quoting American International Group v. Islamic Republic of Iran*, 657 F.2d 430 (D.C.Cir. 1981)). *See also McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 591 (9th Cir. 1983) (explaining that "the Claims Court is the proper forum to award [former hostages and their families] relief for any taking of their property rights").[2]

[2] The Iran-United States Claims Tribunal, which commenced functioning in 1981, is still adjudicating claims. According to the communiqué issued by the Tribunal April 17, 2007, it had finalized an Award, Decision, or Order in 3,936 cases, and had issued 600 Awards to U.S. parties amounting to more than $2 billion. Iran-United States

It follows *a fortiori* that the United States may not close the courthouse door to the people of Bikini and Enewetak for redress of their claims against the United States if the Nuclear Claims Tribunal did not award just compensation.

## B. Takings Liability Depends on Whether the International Tribunal Actually Awards Full Compensation.

Just compensation is the full market value of the property taken. *Monongahela Navigation Co. v United States*, 148 U.S. 312, 326 (1893); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511-13 (1979). *United States v. Sperry Corp.*, 493 U.S. 52 (1989), *on remand,* 925 F.2d 399 (Fed.Cir. 1991), *cert. denied,* 502 U.S. 809 (1991), confirms that even a comparatively small difference between the value of a claim and the actual award by an international tribunal can trigger takings liability. Sperry challenged a Department of Treasury regulation requiring a 1½% deduction from each award given by the Iran-United States Claims Tribunal to defray the costs of operating the tribunal. There was no dispute that even a 1½% shortfall between the amount awarded and the value of the claim could trigger takings liability. The Supreme Court sustained the deduction after concluding it was a permissible "user fee" for companies that had benefited from the services of the Tribunal, not a taking. But the "user fee" rationale would not apply to the more than 99% reduction in the Nuclear Claims Tribunal awards made to the people of Bikini and Enewetak because the Tribunal lacked sufficient funds. If a 1½% reduction can give rise to a taking claim, then surely the divergence between the value of the plaintiffs' claims and the Tribunal payments does so as well.

---

Claims Tribunal, Communique No. 07/2, 17 April 2007, at <http://www.iusct.org/communique-english.pdf> (visited May 16, 2007).

Three important points follow from *Sperry Corp.,* in conjunction with the related cases discussed in Section A. *First,* takings claims against the United States based on the inadequacy of an international tribunal's award are justiciable and are not off-limits as political questions. *See also Nemariam v. Federal Democratic Republic of Ethiopia*, 315 F.3d 390 (D.C. Cir. 2003) (addressing adequacy of international tribunal in the context of forum non conveniens). "Consideration of land taking claims is clearly the role of the judiciary, according to the Constitution, Amendment V, and ascertainment of 'just compensation' is a judicial function." *Langenegger v. United States*, 756 F.2d 1565, 1569 (Fed. Cir. 1985). *Langenegger* holds that the United States can be sued for its involvement in an expropriation by a foreign government. *A fortiori*, the United States can be held liable for its own taking at a time when it exercised sovereignty over territory that only later achieved independent sovereign status.

*Second*, the issue in reviewing a takings claim after a litigant has exhausted a required alternative international tribunal is the amount of money the litigant has received as compensation, not the procedural adequacy of the international tribunal. Sperry's complaint was that it had recovered 1½% less than it should have recovered, and that it had therefore realized less than its property (the suspended claim) was worth, not that the Tribunal had failed to operate as it was supposed to do. *See United States v. 564.54 Acres of Land*, 441 U.S. 506, 511-13 (1979) (just compensation is "fair market value.").

*Third*, a takings claim arises from a shortfall in the amount of compensation. In *Sperry Corp.*, the government succeeded in showing that the deduction was a permissible user fee, but it is clear that otherwise even a relatively small shortfall would have entitled the Sperry Corporation to bring a takings claim against the United States for the balance. *See Kirby Forest*

*Industries, Inc. v. United States*, 467 U.S. 1, 16-18 (1984) (remanding to district court to rectify calculation of value by special commission). Otherwise, the alternative remedy would impermissibly displace the court's determination of just compensation.

In the present situation, plaintiffs have alleged the United States appropriated for its own use land and natural resources worth hundreds of millions of dollars without just compensation. Those claims are now ripe under the Federal Circuit's holding because the plaintiffs have exhausted their remedies before the Nuclear Claims Tribunal. Because the Tribunal has been able to award only a tiny fraction of the value of the property taken, plaintiffs' complaints validly allege a taking of property for which they have not received just compensation under the Fifth Amendment.

### C. The Scrutiny Given by Federal Courts to Actions of Alternative International Tribunals Is Essentially the Same as the Scrutiny Given to Alternative Administrative Tribunals, Because the Inquiry Is the Same – Whether the Overall Actions of the Government Constitute a Taking of Property or a Breach of Contract.

The Federal Circuit's holding that "Congress intended the alternative procedure to be utilized, and we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate," 864 F.2d at 136, followed the Court's citation to three Supreme Court decisions concerning whether a Tucker Act remedy remained available if other procedures resulted in an inadequately-compensated taking, only one of which (*Dames & Moore,* 453 U.S. 654 (1981)) concerned an international tribunal. 864 F.2d at 136. The other decisions (*Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984), and *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102 (1974)) involved purely domestic remedies. *Monsanto* reversed a district court decision holding a federal statute requiring

pesticide manufacturers to disclose trade secrets to the Environmental Protection Agency unconstitutional as an uncompensated taking. The Supreme Court agreed that exposing certain trade secrets submitted under a promise of confidentiality was a taking for public use, but nonetheless held that the overall procedure was not unconstitutional because the manufacturer could seek just compensation in this Court if it could not obtain just compensation under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) through an agreement with the government or through arbitration. The Supreme Court thus read FIFRA to preserve the Tucker Act remedy, but also "read FIFRA as implementing an exhaustion requirement as a precondition to a Tucker Act claim." 467 U.S. at 1018.

*Blanchette* likewise involved a specific statutory compensation scheme that had to be exhausted before seeking just compensation under the Tucker Act. The Supreme Court rejected the argument that Congress intended to eliminate recourse under the Tucker Act by creating a special court to make awards from a designated fund. Rather than evidencing an intent to withhold just compensation, "these provisions at least equally support the inference that Congress was so convinced the huge sums provided would surely equal or exceed the required constitutional minimum that it never focused on the possible need for a suit in the Court of Claims." 419 U.S. at 128. Nevertheless, the Tucker Act remedy remained available if the railroads did not receive just compensation under the specific procedures established in the Rail Act.

Nothing in the Federal Circuit's opinion suggested that the analysis would be different with respect to an international tribunal, such as the Iran-United States Claims Tribunal or the Nuclear Claims Tribunal, than with respect to the domestic tribunals in *Monsanto* and

*Blanchette*. Indeed, the Federal Circuit concluded its analysis with a discussion of *Blanchette,* which is inconsistent with the idea that special rules apply to "international" remedies. The Federal Circuit's linkage of situations involving alternative international and alternative domestic tribunals is certainly inconsistent with the government's claim that this Court cannot inquire into the adequacy of the relief provided by the Nuclear Claims Tribunal because of the political question doctrine.[3]

It is a general principle of takings law that a claimant cannot seek monetary damages for the denial of just compensation in violation of the Fifth Amendment before the governmental actions related to the property have been completed. This rule exists because "if the government provides an adequate process for obtaining compensation, and if resort to that process yields just compensation, the property owner has no claim against the government for a taking." AM. JUR. EMINENT DOMAIN § 806 (*citing Presault v. ICC*, 494 U.S. 1 (1990));[4] *see also* CORPUS JURIS SECUNDUM, EMINENT DOMAIN § 577. Indeed, the government's brief in the Federal Circuit in 1988 argued that the plaintiffs were required to "present their claims to the [Nuclear Claims] Tribunal even should a court construe Article XII to preserve a Tucker Act remedy." Brief for

[3] The government has argued that the rule is somehow different because the Compact granted sovereignty and international recognition to the Government of the Marshall Islands. But it cites no authority for the proposition that the United States can thereby eliminate a preexisting constitutional obligation to pay just compensation, especially one for which it had already been called to account in this Court. The plaintiffs' claims are no less justiciable now than they were in 1981 before the Compact was executed. Moreover, this Court can duly determine the adequacy of compensation without calling into question the recognition of the Marshall Islands Government. Nor would an award of just compensation be an affront to that government in view of the Changed Circumstances Petition it submitted in 2000.

[4] In *Presault,* as in *Blanchette*, Congress appropriated limited funds to be used as compensation for property rights taken for public trail use. The Supreme Court concluded that Congress had not thereby eliminated recourse to the Tucker Act if the payments from the separated appropriated account did not provide just compensation. 494 U.S. at 14-16. Accordingly, the Court agreed with the United States that "petitioners' failure to make use of the available Tucker Act remedy renders their takings challenge to the ICC's order premature." *Id.* at 17.

the United States, *People of Enewetak v. United States*, 864 F.2d 134 (Fed. Cir. 1988) (Fed. Cir. Br.) at 45 n.46. Quoting *Monsanto*, the government argued: "Exhaustion of the statutory remedy is necessary to determine the extent of the taking that has occurred. To the extent that the operation of the statute provides compensation, no taking has occurred and [there is] no claim against the Government." *Id.* (quoting 467 U.S. at 1018, n.21; brackets in the brief).

The general rule that a monetary claim for takings damages (as opposed to a facial challenge to legislation) is not ripe until it can be determined that the sovereign taking the property has not paid just compensation follows from the nature of the claim itself, which is for the difference between what (if anything) the sovereign has paid for the property taken and its fair value. Thus, a federal challenge to a state regulatory taking is not ripe until state procedures for obtaining compensation have been exhausted. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194-95 (1985); *Cormack v. Settle-Beshears*, 474 F.3d 528 (8th Cir. 2007); *Greenfield Hills v. Macklin*, 361 F.3d 934 (7th Cir. 2004).

The same is true in the international arena: There is no actionable claim for an expropriation under the Foreign Sovereign Immunities Act until the foreign sovereign's own remedies for takings have been exhausted. *Greenpeace, Inc. v. France*, 946 F. Supp. 773, 783 (C.D. Cal. 1996). Likewise, a takings claim based on a federal agency's application of a statutory scheme is not ripe until administrative procedures for obtaining compensation have been exhausted. *Gulf Power Co. v. United States*, 187 F.3d 1324 (11th Cir. 1999). A claimant who exhausts an alternative process may pursue a takings claim if the amount of compensation obtained proves inadequate. *Id.*

Like *Presault* and *Blanchette*, the *Gulf Power* case was a facial challenge to a federal statute on the ground that it took property without just compensation. The court of appeals agreed that the statute imposed a physical taking. The court, however, rejected the argument that the statute was unconstitutional simply because it required the Federal Communications Commission (FCC) to determine the compensation due in the first instance: "[T]he fact that our constitutional scheme dictates that the judicial branch is entrusted with the ultimate responsibility for ensuring that just compensation is awarded does not mean the other branches of government must be excluded from the process of determining the proper level of compensation." 187 F.3d at 1333. The court held that the Constitution was satisfied by judicial review of the FCC's compensation ruling, recognizing that the court could conduct its own fact-finding to determine "the proper level of just compensation owed." 187 F.3d at 1335; *see also id.* at 1337 ("Had the Act eliminated all possibility of judicial review and made the FCC the final arbiter of a utility's compensation, we would be faced with a different situation . . . . ."). Such an administrative scheme is constitutional, "so long as [the agency's] order is subject to judicial review to ensure that a court makes the ultimate determination of just compensation." *Id.*

It is this Court that must make the "ultimate determination of just compensation" due to the plaintiffs.

## III. <u>THE FEDERAL CIRCUIT CHARACTERIZED THE $150 MILLION PAYMENT TO THE NUCLEAR FUND AS "AN INITIAL SUM" BECAUSE THAT IS EXACTLY HOW THE DEFENDANT, HOPING TO DEFLECT THE CONSTITUTIONAL ISSUE OF CUTTING OFF ALL JURISDICTION TO U.S. COURTS, CHARACTERIZED THE PAYMENT</u>

In contrast to its current stance, the United States in the 1980s argued to this Court and to the Federal Circuit that it would honor its constitutional obligation to pay just compensation if the "initial sum" of $150 million to establish the compensation fund established by Article I of the Section 177 Agreement proved insufficient for that purpose. By so doing, the government was able to postpone judicial examination of the likelihood that the payments under the Section 177 Agreement would suffice. That explains why (in contrast to *Blanchette* and *Dames & Moore*) the Federal Circuit saw no need to address the availability of a later takings claim: There would be no reason to do so as long as the United States was going to make additional payments as just compensation.

To put it politely, the United States in 1988 characterized the Compact scheme to the Federal Circuit in 1988 as more of an open-ended commitment than it did subsequently. To put it bluntly, the defendant pulled a bait-and-switch. In 1988, the United States sought to assure the Federal Circuit that it would provide just compensation for all possible claims. It therefore represented to the Court that "the Compact and Section 177 Agreement provide a permanent alternative remedy, with substantial and regenerating funding, for compensating all claims, as necessary, in perpetuity," and its brief is replete with reassurances that the Section 177 compensation scheme would be permanent, substantial, continuous, and comprehensive.[5] In fact,

---

[5] Fed. Cir. Br. at 14. . *See also id*. at 33: "a complex, permanent mechanism for compensating claimants;" "a comprehensive, permanent means of resolving . . . nuclear claims"; 34: an "Agreement to provide *continuous* funding to resolve, not avoid, [the] consequences [of the Nuclear Testing Program] (emphasis in original); "create and maintain, *in perpetuity*, a means to address . . . "resultant claims" from the nuclear testing program (emphasis in

it argued, "[t]here is no basis to presume that the [177] Agreement . . . will fail to provide a just and adequate remedy." Fed. Cir. Br. at 45.

But what if the funding proved to be inadequate? No problem, according to defendant: "It is, of course, conceivable that the Fund could become depleted because of radical long-term investment difficulties, or substantial unforeseen damages," and it went on to quote Article IX, the changed circumstances provision, as one example of how additional funding would be available. Fed. Cir. Br. at 34-335. After quoting Article IX in its entirety, defendant drove home its point by quoting a statement by Senator McClure, the floor manager of the Compact in the Senate: "There is a continuing moral and humanitarian obligation on the part of the United States to compensate any victims – past, present or future – of the nuclear testing program. For this reason, I fully expect that if new claims develop, Congress should and will provide any assistance required, absent compelling contradictory evidence." *Id.*

If this were not a clear enough avowal that the $150 million was an "initial sum" that would be replenished if necessary, defendant returned to this point later in its brief to emphasize that the $150 million was a "base investment" and that additional funding could become available through other means, such as the changed circumstances provision:

> In the Section 177 Agreement . . . the United States has responded to the complex consequences of the nuclear testing program by negotiating a diverse compensation plan providing . . . a mechanism for direct adjudication of *all* claims. This plan has been structured to operate permanently, and, at a base investment of $150 million, to generate sufficient proceeds to address all identified needs. In ratifying the Agreement,

original); 37: "reasonable" and "well funded"; 38: "permanent funding mechanism"; "comprehensive, long-term compensation plan"; 45: "structured to operate permanently" to "provide continuous funding;" "structured and financed to operate 'in perpetuity'; "no basis to presume that the Agreement . . . will fail to provide a just and adequate settlement."

> Congress also recognized that should changed circumstances arise which would prevent the program from functioning as planned, Congress would need to consider possible additional funding.

Fed. Cir. Brief at 44-45 (emphasis in original).

As the United States correctly pointed out, the $150 million fund had to earn 12% annually in order to pay out $18 million each year for various compensation programs, including $3.25 million to the Nuclear Claims Tribunal. Defendant did not question the ability of the fund to earn this hefty amount year after year, but simply noted that "the Fund's principal may be drawn only if proceeds will not meet annual distribution schedules." Fed. Cir. Br. at 34. This dipping into principal had already occurred by 1988, but defendant was not fazed, assuring the Federal Circuit that this invasion of corpus "in no way impairs . . . the long-term performance and viability of the Fund." *Id.* at 34, n.33.

The United States assured the Federal Circuit that because the Section 177 Agreement provided for a "comprehensive long-term compensation plan to address all claims, claimants have not been deprived of a forum to seek redress." Fed. Cir. Br. at 38. It also argued that plaintiffs had to exhaust that remedy before returning to this Court to determine the adequacy of the compensation:

> [T]he Compact and Section 177 Agreement provide a permanent alternative remedy, with substantial and regenerating funding, for compensating all claims, as necessary, in perpetuity. As the Claims Court found, that program must be allowed to operate as intended, and cannot be challenged judicially until it has "run its course."

Fed. Cir. Br. at 14. That position, coupled with the view that there was essentially an open-ended commitment by the United States to provide additional funding, led the Federal Circuit to view the $150 million payment as "an initial sum."

Fast forward 17 years, to January 2005, with the value of the "perpetual" $150 million fund down to less than $2 million. Did defendant still believe, as it had represented to the Federal Circuit, that "in ratifying the [177] Agreement, Congress . . . recognized that should changed circumstances arise which would prevent the program from functioning as planned, Congress would need to consider possible additional funding"? No. By that time, the Compact had been renewed without any discussion of Section 177, and the Marshall Islands government's changed circumstances petition had languished before Congress for several years. In contrast to its earlier assurances, despite evidence of substantial uncompensated and unforeseen harm, the government told Congress that "the facts . . . do not support a funding request under the 'changed circumstances' provision . . . ." 2005 Report Evaluating the Request of the Government of the Republic of the Marshall Islands presented to the Congress of the United Sates of America (Report), p. iv. *See also* the amended Complaints in these cases (¶ 100 in *The People of Bikini, et a. v. United States* and ¶166 in *Ismael John, et al. v. United States*).

This Court, plaintiffs submit, was correct at oral argument in stating that "the issue of funding could have been stated very decisively such that we're not trying to look at that again now." Transcript of April 23, 2007 oral argument at 176-77. Defendant took advantage of that ambiguity in 1988 to persuade the Federal Circuit into believing that its acceptance of responsibility and liability under Section 177(a) of the Compact was an open-ended commitment and that the $150 million was "an initial sum," thus deflecting (or at least postponing) the

constitutional question of terminating the jurisdiction of all courts to award just compensation. Now the Justice Department, like the State Department in its 2005 Report, takes the exact opposite approach in characterizing that fund, representing now that there is no legal basis under the Article IX changed circumstances provision or any other provision of the Compact to support a request for additional funding.

It is therefore little wonder that the Federal Circuit referred to the $150 million as "an initial sum" and pointed to subsequent congressional actions and the changed circumstances provisions as allaying concerns about the adequacy of the Nuclear Fund to provide just compensation. Nor is it surprising that both Judge Harkins and the Federal Circuit characterized the U.S. obligation as that of providing "just compensation," which is a specific Fifth Amendment obligation of the United States. In *Juda II*, 13 Cl.Ct. at 689, Judge Harkins held that "Congress has recognized and protected plaintiffs' rights to just compensation for takings and breach of contract" through the Section 177 Agreement, but added that "[w]hether the settlement provides 'adequate' compensation cannot be determined at this time."

Similarly, the Federal Circuit in *People of Enewetak*, 864 F.2d at 135, referred to the "initial sum" of $150 million in its discussion of the fact that "[u]nder Section 177 of the Compact, the United States accepted responsibility for the just compensation owing for loss or damage resulting from its nuclear testing program." *See also id.* at 136, in which it described Judge Harkins' ruling: "The Claims Court agreed with the government that pursuant to Article XII of the section 177 Agreement, the consent of the United States to be sued in the Claims Court . . . had been withdrawn in conjunction with the establishment of an alternative tribunal to provide just compensation." Moreover, the court clearly accepted the argument the United

States made in its brief that the changed circumstances provision could be invoked to seek additional funding, because the opinion adds a footnote immediately after the above-quoted sentence stating that: "In addition, Article IX of the referenced section 177 Agreement provides . . . .," and it went on to quote the changed circumstances provision in its entirety. *Id.* at 136 n. 3.

These statements are consistent with the inevitable conclusion that if the initial sum provided by the defendant has failed to provide just compensation, this Court must be the forum to determine the amount of the shortfall.[6] This is the point that Justice Powell emphasized in his concurring opinion in *Dames & Moore*:

> The opinion makes clear that some claims may not be adjudicated by the Claims Tribunal, and that others may not be paid in full. The Court holds that *parties whose valid claims are* not adjudicated or *not fully paid may bring a 'taking' claim against the United States in the Court of Claims*, the jurisdiction of which this Court acknowledges.

452 U.S. at 691 (emphasis added).

The procedure has now run its course, and Lucy has pulled away the football from Charlie Brown. "We were just kidding," says the United States today. "You can't invoke the changed circumstances provision, and there is no forum or remedy for your inadequately compensated taking claims."

---

[6] Defendant's 1988 brief (p. 37) also argued that the $150 million fund was actually "well within the range of other international settlements to which courts have granted deference," citing one case in which the President settled private claims of $144 million for $20 million and another that resulted in payment of less than 10 percent of the claim. In this regard, cases involving the acceptance by the United States of less than 100% of its citizens' otherwise uncollectible claims against a foreign government are irrelevant to the issue here, where the United States has effected an uncompensated taking by limiting its own liability to a fraction (less than .5%) of its true value. The plaintiffs are entitled under the Fifth Amendment to be paid in full, and the United States cannot avoid that obligation by laying it off on the RMI Government which lacks the resources to provide compensation.

**CONCLUSION**

The Court has jurisdiction and should proceed to address the Plaintiffs' claims on the merits. The motion to dismiss should be denied.

Respectfully submitted,

/s/ Jonathan M. Weisgall
Jonathan M. Weisgall

Jonathan M. Weisgall, Chartered
1200 New Hampshire Avenue, N.W., Suite 300
Washington, D.C. 20036-6812
Telephone: (202) 828-1378
Facsimile: (202) 828-1380
E-mail: jmweisgall@midamerican.com

Attorney for plaintiffs in *People of Bikini Atoll*

Of Counsel:

Robert K. Huffman
Miller & Chevalier Chartered
655 15th St., N.W.
Washington, DC 20005
Telephone: (202) 626-5824
Facsimile: (202) 626-0858
E-mail: RHuffman@milchev.com

Elizabeth Langer
Law Offices of Elizabeth Langer
3712 Ingomar Street, N.W.
Washington, D.C. 20015
Telephone: (202) 244-0456
Facsimile: (202) 244-0456
E-mail: el@elizabethlanger.com

/s/Davor Pevec
Davor Pevec
Law Offices of Davor Pevec
American Savings Bank Tower
1001 Bishop Street, Suite 1360
Honolulu, Hawaii 96813
Telephone: (808) 599-5655
Facsimile: (310) 402-5983
E-mail: dzpevec@aol.com
Attorney for plaintiffs in *Ismael John*

Of Counsel:

Jon Van Dyke
2515 Dole Street
Honolulu, Hawaii 96822
Telephone: (808) 956-5569
Facsimile: (808) 956-8509
E-mail: jvandyke@hawaii.edu

May 23, 2007

Certificate of Filing

I hereby certify that on May 23, 2007, a copy of the foregoing "Plaintiffs' Joint Response to the Court's Order of April 24, 2007" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Jonathan M. Weisgall