**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **PEOPLE OF BIKINI, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 06-288C** |
| **v.** | ) | **(Judge Christine O.C. Miller)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

| | | |
|---|---|---|
| **ISMAEL JOHN, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 06-289L** |
| **v.** | ) | **(Judge Christine O.C. Miller)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO THE COURT'S APRIL 24, 2007 ORDER**

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

PETER D. KEISLER
Assistant Attorney General
Civil Division

JEANNE E. DAVIDSON
Director

BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0238

KATHRYN A. BLEECKER
Assistant Director
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 307-6288

Attorneys for Defendant

May 23, 2007

# TABLE OF CONTENTS


**I. Introduction** . . . . . . . . . . 1

**II. Argument** . . . . . . . . . . 3

A. This Court Does Not Possess Jurisdiction to Review the Constitutional Adequacy of the Remedy Available Under the Compact Agreements . . . . . . . . . . 3

B. The Federal Circuit Recognized, When Referring to the "Initial Sum" and the "Initial Amount," that the Compact Provides an Overarching Scheme that Includes the Section 177 Agreement, as Well as Other Payments Made Over a 15-Year Period . . . . . . . . . . 13

**III. Conclusion** . . . . . . . . . . 16

## TABLE OF AUTHORITIES

### CASES

Abrahim-Youri v. United States,
139 F.3d 1462 (Fed. Cir. 1997) . . . . . . . . . . 6-8

Abrahim-Youri v. United States,
36 Fed. Cl. 482 (1996) . . . . . . . . . . 7

Baker v. Carr,
369 U.S. 186 (1962) . . . . . . . . . . 10

Belk v. United States,
858 F.2d 706 (Fed. Cir. 1988) . . . . . . . . . . 7

Blanchette v. Conn. Gen. Ins. Co.,
419 U.S. 102 (1974) . . . . . . . . . . 4

Dames & Moore v. Regan,
453 U.S. 654 (1981) . . . . . . . . . . 6

Japan Whaling Ass'n v. Am. Cetacean Soc'y,
478 U.S. 221(1986) . . . . . . . . . . 10

Juda v. United States ,
13 Cl. Ct. 667 (1987) . . . . . . . . . . 1, 4, 5, 14

Langford v. United States,
101 U.S. 341 (1880) . . . . . . . . . . 11

Lion Raisins, Inc. v. United States,
57 Fed. Cl. 435 (2003) . . . . . . . . . . 12

Lion Raisins, Inc. v. United States,
58 Fed. Cl. 391 (2003) . . . . . . . . . . 11, 12

Lynch v. United States,
292 U.S. 571 (1934) . . . . . . . . . . 5

Marks v. United States,
15 Cl. Ct. 609 (1988) . . . . . . . . . . 8

Meade v. United States ,
2 Ct. Cl. 224 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 10

Nitol v. United States,
13 Cl. Ct. 690 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Oetjen v. Central Lumber Co.,
246 U.S. 297(1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Orff v. United States ,
545 U.S. 596 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

People of Enewetak v. United States,
864 F.2d 134 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Penn Central Transp. Co. v. New York ,
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Peter v. United States,
13 Cl. Ct. 691 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Shanghai Power Co. v. United States ,
4 Cl. Ct. 237 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

United States v. Hopkins,
427 U.S. 123 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. King,
395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Sperry Corp.,
493 U.S. 52 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**

28 U.S.C. § 2517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

48 U.S.C. § 1901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1- 3

**MISCELLANEOUS**

Shimomura, Floyd D., The History of Claims Against the United States: The Evolution from a Legislative Toward a Judicial Model of Payment, 45 La. L. Rev. 625 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**DEFENDANT'S RESPONSE TO THE**
**COURT'S APRIL 24, 2007 ORDER**

Defendant, the United States, respectfully files the following combined response to the Court's Order dated April 24, 2007.

## I. INTRODUCTION

In its April 24, 2007 Order, issued after oral argument upon the Government's motions to dismiss both above-captioned actions, the Court identified two issues for further briefing:

> i) Caselaw and other guidance on the scope of judicial review of the adequacy of relief provided by an international tribunal, particularly in light of the statement made by the Federal Circuit in People of Enewetak v. United States, "Congress intended the alternative procedure to be utilized, and we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate," 864 F.2d 134, 136 (Fed. Cir. 1988), similar statements made in Juda v. United States, 13 Cl. Ct. 667, 689 (1987), and the facts of this case.
>
> [and]
>
> ii) Their understanding of the characterization of the appropriation of $150 million by Congress for the Claims Settlement Fund as an "initial sum" and "initial amount" by the Federal Circuit in People of Enewetak v. United States, 864 F.2d 134, 135-136 (Fed. Cir. 1988).

In response to the Court's first issue, legal precedent demonstrates that this Court does not possess jurisdiction to review the adequacy of the relief provided by the Republic of the Marshall Island's ("RMI") Nuclear Claims Tribunal ("NCT").[1] Congress' unconditional

---

[1] The RMI's Nuclear Claims Tribunal is the tribunal to which claims against the United States arising from its nuclear testing program were referred pursuant to the Compact of Free Association (the "Compact") and the Section 177 Agreement. The Compact was enacted into United States law by the Compact of Free Association Act of 1985, Pub. L. No. 99-239, 99 Stat. 1770, 1800-36 (1986) (codified at 48 U.S.C. § 1901 et seq.) ("Compact Act"). The "Section 177 Agreement" is the Agreement Between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact, which is attached

withdrawal of jurisdiction from courts in the United States to entertain claims that "arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States," could not be clearer. See Section 177 Agreement, arts. X and XII (emphasis added). The Federal Circuit in People of Enewetak did not, and could not, modify the Compact Agreements to convert an unconditional withdrawal of jurisdiction into a withdrawal of jurisdiction conditioned upon the undefined notion of the adequacy of the remedy obtained from the NCT.

This case is not the first instance where plaintiffs have challenged the allegedly "inadequate" remedy available from an alternative tribunal established pursuant to an international agreement. See, e.g., Meade v. United States, 2 Ct. Cl. 224 (1866) (alleging that the United States had taken plaintiff's claims against Spain by an espousal in the Treaty of 1819). Since the United States espoused claims against Spain, apparently no court has found it appropriate, or within its jurisdiction, to entertain such claims, and neither should this Court.

In People of Enewetak, the Court of Appeals for the Federal Circuit characterized the plaintiffs' argument to be "in essence, that no alternative remedy can be constitutionally 'adequate' unless it preserves ultimate resort to the Tucker Act." 864 F.2d at 136 (citations omitted). That the Federal Circuit found plaintiffs' argument to be premature at that time does not mean that it held – or even considered – that this Court retained jurisdiction to entertain the issue later. Moreover, Congress' express withdrawal of jurisdiction cannot be re-written to include an implied waiver of sovereign immunity, and any waiver of sovereign immunity must be

---

as Ex. 2 to the United States' Motion to Dismiss and Memorandum in Support Thereof in Ismael John, No. 06-289L ("John Opening Br."). The Compact Act, Compact, and Section 177 Agreement, collectively, are referred to herein as the "Compact Agreements."

strictly construed in favor of the Government. See, e.g., Orff v. United States, 545 U.S. 596, 601-02 (2005) ("a waiver of sovereign immunity must be strictly construed in favor of the sovereign").

Congress made clear in Section 101(d) of the Compact Act that the Compact only may be modified with its approval. Because Congress has not reinstated or extended the jurisdiction of any court in the United States to entertain claims arising from or related to the Nuclear Testing Program, or to review any aspect of the NCT's award, this Court does not possess jurisdiction over these actions and they must be dismissed.

In response to issue (ii) in the Court's April 24, 2007 Order, the Federal Circuit's characterization of the $150 million payment as the "initial sum" and "initial amount" is in recognition of the comprehensive programs established pursuant to the Compact Agreements to resolve all claims arising from the Nuclear Testing Program and assist the people of the Marshall Islands. Subsequent to the initial $150 million payment made upon the effective date of the Compact Agreements, the United States paid well over $335 million more over the ensuing fifteen years. The Federal Circuit thus recognized that these additional payments were part of an overarching scheme which included settlement of all claims against the United States arising from the Nuclear Testing Program.

## II. ARGUMENT

### A. This Court Does Not Possess Jurisdiction To Review The Constitutional Adequacy Of The Remedy Available Under The Compact Agreements

As the United States demonstrated in its papers in support of its motions to dismiss, and at oral argument held on April 23, 2007, Congress properly withdrew jurisdiction from courts in

the United States, including from this Court's jurisdiction under the Tucker Act, to hear claims arising from or related to the United States' Nuclear Testing Program. Plaintiffs' claims validly were settled and released as consideration for the various programs and funds established under the Compact Agreements.[2] As part of that settlement, the RMI established the NCT with funds provided by the United States to resolve all claims arising from or related to the Nuclear Testing Program. Under the terms of the Compact Agreements, Congress expressly withdrew jurisdiction from all United States courts over claims that "arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States." See Section 177 Agreement, arts. X and XII. The Claims Court properly dismissed plaintiffs' earlier complaints specifically as a result of Congress' withdrawal of jurisdiction. People of Enewetak v. United States, 864 F.2d 134, 136 (Fed. Cir. 1988); Juda v. United States, 13 Cl. Ct. 667, 690 (1987); see also Peter v. United States, 13 Cl. Ct. 691 (1987); Nitol v. United States, 13 Cl. Ct. 690 (1987).

In People of Enewetak, the Federal Circuit found no error in the Claims Court's refusal to address plaintiffs' argument that the alternative remedy established by the Compact could not be "constitutionally 'adequate,' unless it preserves ultimate resort to the Tucker Act." 864 F.2d at 136. The Federal Circuit's determination that jurisdiction had been properly withdrawn is consistent with well-established precedent that there is no requirement that Congress specifically preserve a takings claim under the Tucker Act to validly withdraw jurisdiction. People of Enewetak, 846 F.2d at 137 (distinguishing Blanchette v. Conn. Gen. Ins. Co., 419 U.S. 102 (1974), which did not need to decide whether a fallback Tucker Act claim must be available);

[2] The United States also continues to assert its other arguments, including that plaintiffs' claims are barred by the statute of limitations and the political question doctrine.

Juda, 13 Cl. Ct. at 688-69 (citing, among other cases, Lynch v. United States, 292 U.S. 571 (1934)). Because Congress has not restored jurisdiction over these claims, this Court does not possess jurisdiction to consider either the new claims asserted in plaintiffs' amended complaints or their reasserted claims from the earlier litigation.

As the Court noted in its April 24, 2007 Order, however, the Federal Circuit in Enewetak also stated that "judicial intervention is [not] appropriate at this time," 864 F.2d at 136, and similarly, the Claims Court indicated that plaintiffs' claims were "premature" and that the "alternative procedure for compensation cannot be challenged judicially until it has run its course," Juda, 13 Cl. Ct. at 689. These statements indicate the Courts' view that it was premature to consider plaintiffs' facial challenge to the constitutional adequacy of the alternative remedy; but they did not consider nor decide whether they had jurisdiction to later address that issue.

As discussed below, in cases where plaintiffs have challenged the adequacy of awards from alternative tribunals, courts have consistently declined to entertain the plaintiffs' attempts to obtain additional funds. As plaintiffs allege here, the plaintiffs in these prior cases alleged that the settlement and espousal of their claims constituted a taking without just compensation. See Bikini, Amd. Compl., Counts I and V; John, Amd. Compl., Counts III, IV and V. These decisions also show that it would be inappropriate for this Court to review the awards made by the NCT as well as the adequacy of the funds established to compensate plaintiffs for their claims arising from the Nuclear Testing Program – the claims that were expressly espoused and settled in conjunction with the United States' recognition of the nascent government of the Marshall Islands.

The seminal case of Meade v. United States, 2 Ct. Cl. 224 (1866), involved an alleged taking of the plaintiff's claim against the government of Spain pursuant to an 1819 treaty between the United States and Spain. In the 1819 treaty, the United States espoused the claims of United States nationals and established a special tribunal to hear any such claims. While the Court of Claims found that the special tribunal had committed errors when deciding the plaintiff's claim, it dismissed the complaint because the tribunal provided the exclusive means of redress. Id. at 272, 279. The court based its decision upon the fact that the claimant was pursuing

> the same claim, for the same identical money, [that] was presented to that special tribunal. Their decision was made . . . It is not for us, nor for any other court, to overturn or disregard that decision. No appeal was given, no power of revision lodged anywhere, in any person or tribunal, and their decision was therefore necessarily the conclusion of the whole matter.

Id. at 276. The Court of Claims thus understood that to determine whether there had been a taking of the plaintiff's claim, it would exceed its limited jurisdiction to review the tribunal's decision.

In the recent case of Abrahim-Youri v. United States, 139 F.3d 1462 (Fed. Cir. 1997), the Federal Circuit addressed claims of United States nationals against Iran that were heard by the Foreign Claims Settlement Commission ("FCSC"), which had jurisdiction to decide certain claims resulting from the dispute resolution procedures discussed by the Supreme Court in Dames & Moore. Abrahim-Youri, 139 F.3d at 1463-64 (citing Dames & Moore v. Regan, 453 U.S. 654 (1981)). The settlement between the United States and Iran secured the release of the hostages taken in 1979 at the United States Embassy in Tehran. Id. at 1463. Pursuant to the

agreement, Iran agreed to pay $105 million and the United States espoused certain small claims.[3] Id. at 1464. The United States allocated $55 million of the settlement amount for its own claim, leaving $50 million to cover the small claims referred to the Commission. Id. The FCSC awarded total compensation and interest in excess of $86 million and, as a result, each claimant received only a portion of the total due on his claim. Id. at 1464-65. Some of the small claims holders brought suit in this Court against the United States, arguing that the Government's espousal and settlement of their claims against Iran constituted a taking of their claims without just compensation, because they were not fully compensated by the Commission. Id. at 1465. The Court of Federal Claims dismissed the plaintiffs' takings claims based upon its analysis of the three-factor test set out in Penn Central Transp. Co. v. New York, 438 U.S. 104 (1978), and the Federal Circuit affirmed. Abrahim-Youri, 139 F.3d at 1465; see also Abrahim-Youri v. United States, 36 Fed. Cl. 482, 486-87 (1996).

The Federal Circuit agreed with the plaintiffs that their claims, their "choses in action," had been "extinguished when the Government espoused and settled their claims." Abrahim-Youri, 139 F.3d at 1465. But, the Federal Circuit concluded:

> Here, though the choses in action were extinguished, the Government provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could

[3] In Belk v. United States, 858 F.2d 706 (Fed. Cir. 1988), the former hostages alleged that the United States had taken their claims against Iran without just compensation. The court assumed, without deciding, that plaintiffs' claims constituted property under the Fifth Amendment. Id. at 708. The Federal Circuit, agreeing with the Claims Court, found that the plaintiffs failed to state a claim upon which relief could be granted, i.e., that the Fifth Amendment did not require payment to the hostages because the hostages were the intended beneficiaries of the Government's actions even though it also incidentally benefitted the public. Id. at 709. The Federal Circuit also found, in the alternative, that the claims were barred by the political question doctrine. Id. at 710.

> reasonably be expected. Plaintiffs have not shown that they sustained losses that were avoidable under the circumstances. Nor have they shown that those engaged in international transactions with Iran could not have anticipated the need for government intervention . . . A compensable taking has not been established; the fact that plaintiffs are not satisfied with the settlement negotiated by the Government on their behalf does not entitle them to compensation by the United States.

Id. at 1468. See also United States v. Sperry Corp., 493 U.S. 52 (1989) (upholding as constitutional statute requiring Federal Reserve Bank to deduct "user fee" from any award of the Iran-United States claims tribunal and to pay it to the United States Treasury as reimbursement for expenses incurred through the arbitration and tribunal process); Marks v. United States, 15 Cl. Ct. 609, 612 (1988) (dismissing claims of plaintiffs based upon assignment of judgment against Iran, finding, among other things, that prohibition in Executive Order and regulations "against trying plaintiffs' claim in any forum other than Tribunal does not amount to a taking"). Accordingly, plaintiffs here may be dissatisfied with the settlement negotiated by their government, but it "does not entitle them to compensation by the United States." Abrahim-Youri, 139 F.3d at 1468.

In Shanghai Power Co. v. United States, 4 Cl. Ct. 237 (1983), a United States corporation's property had been confiscated by the Chinese government. The plaintiff subsequently presented its claim to the FCSC, which had been authorized by Congress to evaluate claims such as the plaintiff's against the People's Republic of China ("PRC"). Id. at 239. The Commission determined that the plaintiff would receive $54 million for its property, plus six percent interest, for a total of over $144 million. Id. As part of the normalization of relations between the United States and the PRC, the United States subsequently settled claims of

its nationals against the PRC for a total of $89.5 million, to be paid to the United States by China over a six-year period. The United States then paid each of the claimants a pro rata share of the amounts received from the PRC. Pursuant to the settlement, the plaintiff in Shanghai Power was due to receive approximately $20 million – a fraction of the total award from the Commission. Plaintiff brought a takings action in the Claims Court, seeking to recover the $124 million difference between the FCSC's original award and the settlement amount. Id.

Assuming that the plaintiff possessed a property interest in its claims and that the property was worth more than it would receive through the settlement, the Court rejected the plaintiff's takings claim, noting that the Commission's award may have reflected the value of the power plant, but the Commission did not consider the risk of litigating plaintiff's claim against the PRC. Id. at 241-42. Moreover, after analyzing the long-accepted practice of espousing and settling claims as part of foreign relations, the Court concluded that, "[t]he President, in the exercise of his constitutional prerogative, struck the bargain he determined would best accommodate all relevant interests. This is a classical adjustment of 'the benefits and burdens of economic life to promote the common good.'" Id. at 246 (citing Penn Central, 438 U.S. at 124).

The Claims Court also noted that the case raised issues not normally addressed in a takings action, because it implicated the President's power to conduct foreign relations. Shanghai Power, 4 Cl. Ct. at 247. "A judicial inquiry into whether the President could have extracted a more generous settlement from another country would seriously interfere with his ability to carry on diplomatic relations." Id. at 248. The Court found that such examination would be inappropriate and intrusive and, accordingly, dismissed the case for failure to state a claim upon which relief could be granted. Id. at 249.

The courts' deferential review of the international agreements and refusal to consider takings claims based upon alleged inadequate settlements by the Government is based upon well-established principles of the separation of powers – the Constitution commits to the President and the legislature the authority to conduct foreign relations, "and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Central Lumber Co., 246 U.S. 297, 302 (1918) (citations omitted); see also Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986); Baker v. Carr, 369 U.S. 186 (1962) (discussing the political question doctrine). As we demonstrate in our briefs, those same considerations apply here.

Thus, these cases further support the United States' motions to dismiss the plaintiffs' takings claims. Moreover, they also demonstrate why plaintiffs' claims must be dismissed. Just as with the treaty considered in Meade, the Compact Agreements established the NCT with exclusive jurisdiction to hear plaintiffs' claims. See Section 177 Agreement, art. IV. Similarly, pursuant to the Compact, '[n]o appeal was given, no power of revision lodged anywhere, in any person or tribunal, and their decision was therefore necessarily the conclusion of the whole matter." Meade, 2 Ct. Cl. at 276. Indeed, here, Congress explicitly withdrew jurisdiction of all courts to hear these claims. Section 177 Agreement, art. XII.

Moreover, a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." United States v. Testan, 424 U.S. 392, 399 (1976) (quoting United States v. King, 395 U.S. 1, 4 (1969)) (internal quotation marks omitted). "In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity. . . ." Id. at 400. Plaintiffs, therefore, cannot assert their claims without an unequivocal waiver of sovereign

immunity. But no such waiver exists here. Indeed, the situation here is just the opposite as Congress unequivocally withdrew the United States' waiver of sovereign immunity with respect to plaintiffs' claims through the Compact Agreements. Where, as here, Congress has unequivocally withdrawn the United States' waiver of sovereign immunity, imposing a new, unexpressed, condition on that withdrawal of sovereign immunity would improperly create an implied waiver of sovereign immunity. Accordingly, the Federal Circuit in Enewetak could not properly condition the United States' withdrawal of its waiver of sovereign immunity upon the adequacy of the remedy available through the NCT.

Indeed, Congress retained sole responsibility for paying takings claims against the Federal Government until the passage of the Tucker Act, when it gave the Court of Claims jurisdiction over such cases. See Langford v. United States, 101 U.S. 341, 343 (1880) ("It is to be regretted that Congress has made no provision by any general law for ascertaining and paying this just compensation."); Floyd D. Shimomura, The History of Claims Against the United States: The Evolution from a Legislative toward a Judicial Model of Payment, 45 La. L. Rev. 625, 627- 64 (1985) (tracing evolution of jurisdiction over takings claims).

As this Court has recognized, it is Congress, not the courts, that determines what types of cases the Federal courts may hear. Lion Raisins, Inc. v. United States, 58 Fed. Cl. 391, 397 (2003) (citing United States v. Hopkins, 427 U.S. 123, 125 (1976)).

> As it stands, the United States has waived its immunity for some, but not all, of its acts. It is true that the Fifth Amendment is self-executing. However, this only means that there does not have to be separate statutory authority allowing for compensation, if the court can otherwise hear the suit. The Fifth Amendment itself does not provide a tribunal for every suit. This is evidenced by the fact that, prior to the Tucker Act, even with the Fifth Amendment in effect,

> the United States was not generally subject to suit; individuals claiming violations of the Fifth Amendment were relegated to seeking redress from Congress. [footnote omitted] Lion Raisins [v. United States, 57 Fed. Cl. 435, 438 (2003)]. Therefore, in order for this court to hear a Fifth Amendment claim, it must fit both within the Tucker Act and within the limitation placed on the court by 28 U.S.C. § 2517, which authorizes the payment of judgments only from appropriated funds. 28 U.S.C. § 2517.

Id. The Court further noted that before the Tucker Act was passed, the United States could not be sued for money damages based upon a Fifth Amendment takings claim, and that "[p]roperty owners who claimed that their property was taken without just compensation had only one remedy: they could submit a private bill to Congress in the hopes that Congress would grant them relief. However, Congress had total discretion as to whether or not to pay for its action." Id. at 125 n.4 (citing Lion Raisins, 57 Fed. Cl. at 438). Similarly, here, even though this Court now generally possesses jurisdiction under the Tucker Act to hear takings claims, the Court cannot hear plaintiffs' claims because jurisdiction was withdrawn through the Compact Agreements.

In summary, the Executive negotiated and Congress approved and enacted as law, a comprehensive scheme designed to accomplish the following primary objectives: (1) to promote the self-governance and independence of the Marshall Islands; and (2) to acknowledge the United States' responsibility for the loss or damage to property or person resulting from the nuclear testing program and provide for "the just and adequate settlement of all claims" arising from the testing program. Joint Resolution to Approve Compact of Free Association, Pub. L. 99-239, 99 Stat. 1800; Section 177 Agreement, art. I, § 1, art. X. For the reasons discussed above and in support of our motions to dismiss, the Court can not, and should not, undertake to second-guess the agreements negotiated between the governments of the United States and the Marshall

Islands. The Federal Circuit did not, and could not, hold that the Congress impliedly granted this Court jurisdiction to consider the adequacy of the remedy available from the Nuclear Claims Tribunal.

**B. The Federal Circuit Recognized, When Referring To The "Initial Sum" And The "Initial Amount," That The Compact Provides An Overarching Scheme That Includes The Section 177 Agreement, As Well As Other Payments Made Over A 15-Year Period**

However, if the Court decides to consider plaintiffs claims, it must assess the adequacy of the compensation as provided through the Compact Agreements in their entirety. As discussed in more detail below, the constitutional adequacy of the settlement must be assessed by considering the entire compensatory scheme, including both monetary payments as well as the non-monetary benefits and programs established through the Compact Agreements. In addition, the Court's assessment should also include other payments made by the United States to the citizens or government of the Marshall Islands resulting from the damage caused by the nuclear testing program, such as the $90 million appropriation to the people of Bikini.[4]

Furthermore, as the Court recognized during the hearing on April 23, 2007, it is not appropriate for the Court simply to "enforce" the award of the NCT, as contemplated in plaintiffs' amended complaints. This is particularly true because the NCT considered claims and provided damages for matters not within the jurisdiction of this Court. See, e.g., People of Bikini, No. 06-288C, Amd. Compl., Ex. C at 35-43 (NCT's March 5, 2001 Memorandum of Decision and Order awarding to the people of Bikini consequential damages from hardship);

---

[4] Indeed, consideration of these other payments is consistent with the Compact Agreement which provides that awards made by the claims tribunal "shall take into account . . . any prior compensation made as a result of such claim. . .." Section 177 Agreement, art. IV, § 2.

Ismael John, No. 06-289L, Amd. Compl., Ex. E at 28-33 (NCT's Memorandum of Decision and Order awarding consequential damages from hardship to the people of Enewetak).

In Juda, the Claims Court stated that, whether the compensation "is adequate is dependent upon the amount and type of compensation that is ultimately provided through those [alternative] procedures." 13 Cl. Ct. at 689. Even if this Court were to consider the amount allocated only to the claims adjudication fund, the $45.75 million specifically was intended "for whole or partial payment of monetary awards made by the Claims Tribunal," to be distributed in annual amounts up to $2.25M for a three-year period and up to $3.25M for the following 12 years. Section 177 Agreement, art. II, § 6 (emphasis added). Therefore, the parties never contemplated that that fund necessarily would fully pay all awards made by the tribunal or fully pay each claimant upon issuance of an award by the tribunal.

When referring to the $150 million payment as an "initial sum" and "initial amount" in People of Enewetak, the Federal Circuit recognized that the Compact of Free Association provided an overarching scheme which included the Section 177 Agreement settling the claims related to the Nuclear Testing Program and payment of the $150 million, as well as over $335 million more to be paid during the ensuing 15 years. This is clear from the Federal Circuit's statement in People of Enewetak, the plain language of the Compact, and the Section 177 Agreement.

In People of Enewetak, the Federal Circuit observed:

> The United States Government committed an initial sum of $150,000,000, with additional financial obligations over fifteen years for the settlement of all claims. The initial amount was to establish a Claims Settlement Fund (Fund), and that amount has been appropriated.

People of Enewetak, 864 F.2d at 135-36 (emphasis added). Under the terms of the Section 177 Agreement, the United States paid $150 million "on the effective date of [the Section 177] Agreement. . . ." See Section 177 Agreement, art. I, § 1 (attached as Ex. 2 to Def.'s Opening Br. in John, No. 06-289L); see also Compact § 177(c), 99 Stat. at 1812 (granting $150 million to the Government of the Marshall Islands pursuant to the terms of the Section 177 Agreement, and incorporating by reference the language of the Section 177 Agreement). Subsequent, annual payments would follow for the next fifteen years pursuant to the Compact.

Pursuant to the terms of the Compact, the United States granted additional monies to the Marshall Islands to be paid annually for fifteen years, totaling over $335 million over that span of time. For example, under Compact § 211 (a)(1) the United States agreed to grant to the Marshall Islands $26.1 million annually for the five year period commencing on the effective date of the Compact ($130.5 million total during the five year period), $22.1 million annually for the next five year period ($110.5 million), and $19.1 million annually for a third five year period ($95.5 million). See Compact § 211(a)(1), 99 Stat. at 1813. The United States thus was committed under § 211(a)(1), alone, to grant $336.5 million to the government of the Marshall Islands for 15 years after the effective date of the Compact.

While these funds generally were to promote the economic self-sufficiency of the people of the Marshall Islands (see Compact § 211(a)), under the express terms of the Section 177 Agreement, some of these funds "may also be expended by the Government of the Marshall Islands to provide its citizens with health-care programs and services [r]elated to [the] consequences of the Nuclear Testing Program," in addition to the $150 million initial grant. See

Section 177 Agreement, art. II, § 1(b).[5] Accordingly, when referring to the $150 million payment as the "initial sum," the Federal Circuit recognized that the United States subsequently would pay to the Marshall Islands substantial additional amounts on an annual basis over a span of fifteen years that also may be used for necessary health care arising from the nuclear testing program under the Section 177 Agreement.

## III. CONCLUSION

For the reasons stated above and in our motions to dismiss and reply briefs, we respectfully request that the Court dismiss plaintiffs' amended complaints for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim.

///

[5] Article II § 1(b) of the Section 177 Agreement contains several typographical errors including an incorrect citation to "Section 211(a)(3)" of the Compact, which does not exist. Rather, only subparagraph (a)(1) of Section 211 grants funds to the Marshall Islands and must be the paragraph that art. II § 1(b) of the Section 177 Agreement intended to cite.

Respectfully submitted,

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

PETER D. KEISLER
Assistant Attorney General
Civil Division

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0238
Fax: (202) 305-0267
E-mail: bruce.trauben@usdoj.gov

s/ Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tel: (202) 307-6288
Fax: (202) 514-8640
E-mail: kathryn.bleecker@usdoj.gov

Attorneys for Defendant

May 23, 2007

**Certificate of Filing**

I hereby certify that on May 23, 2007, a copy of foregoing "DEFENDANT'S NOTICE OF FILING" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kathryn A. Bleecker